# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC.,<br><br>     *Plaintiffs*,<br><br>v.<br><br>CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT,<br><br>     *Defendants*. | Civil Action No. 4:23-cv-03516<br><br><br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 1

STANDARD OF REVIEW .......................................................................... 6

ARGUMENT ............................................................................................ 6

   I.  Defendants' Programs Violate the Equal Protection Clause ............................ 6

      A.  Defendants lack a compelling interest to racially discriminate .................. 7

         1.  Defendant City of Houston ......................................................... 8

         2.  Defendant Midtown Management District ............................................ 13

      B.  Defendants' discriminatory programs are not narrowly tailored .............. 16

         1.  Defendant City of Houston ....................................................... 16

         2.  Defendant Midtown Management District ............................................ 17

      C.  The programs violate the "twin commands" of equal protection ............. 18

   II.  Defendants' Programs Discriminate on the Basis of Race in Violation of 42 U.S.C. § 1981 .............................................................................. 19

CONCLUSION ........................................................................................ 20

CERTIFICATE OF SERVICE .................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)....................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................6

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) ........................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................6

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989).............................................................................*passim*

*Crowe v. Henry*,
115 F.3d 294 (5th Cir. 1997) ..........................................................................6

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006)................................................................................19–20

*DynaLantic Corp. v. U.S. Dep't of Def.*,
885 F. Supp. 2d 237 (D.D.C. 2012)...............................................................12

*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991).......................................................................................6

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013)..................................................................................7, 16

*Gratz v. Bollinger*,
539 U.S. 244 (2003).....................................................................................16

*Grutter v. Bollinger*,
539 U.S. 306 (2003)..................................................................................7, 16

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 ................................................................................................20

*L. Tarango Trucking v. Cnty. of Contra Costa*,
181 F. Supp. 2d 1017 (N.D. Cal. 2001) ................................................................12

*McDonald v. Santa Fe Trail Co.*,
427 U.S. 273 (1976) ................................................................................................19

*Miller v. Vilsack*,
No. 4:21-CV-0595-O, 2021 WL 11115194
(N.D. Tex. July 1, 2021) ...............................................................................7, 10–12

*Nuziard v. Minority Business Development Agency*,
676 F. Supp. 3d 473 (N.D. Tex. June 5, 2023) ..............................................10, 17

*O'Donnell Const. Co. v. D.C.*,
963 F.2d 420 (D.C. Cir. 1992) ................................................................................12

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ................................................................................................19

*Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ..................................................................................................9

*Shaw v. Hunt*,
517 U.S. 899 (1996) ................................................................................9–10, 13, 15

*Strickland v. United States Department of Agriculture*,
No. 2:24-CV-60-Z, 2024 WL 2886574 (N.D. Tex. June 7, 2024) ....................10

*Students for Fair Admissions, Inc. v.*
*President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .........................................................................................*passim*

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) ...................................................7–8, 10–11, 17

*Walker v. City of Mesquite*,
169 F.3d 973 (5th Cir. 1999) ................................................................................16

*Wilson v. Tregre*,
787 F.3d 322 (5th Cir. 2015) ..................................................................................6

**Statutes**

42 U.S.C. § 1981 ................................................................................19–20

42 U.S.C. § 1981(a) .................................................................................19

42 U.S.C. § 1981(b) .................................................................................20

Houston Code § 15-81 .........................................................................1, 20

Houston Code § 15-81(a)............................................................................1

Houston Code § 15-81(b)............................................................................1

Houston Code § 15-83(b)............................................................................1

Houston Code § 15-83(c)(1)........................................................................1

Houston Code § 15-83(c)(2)........................................................................1

Houston Code § 15-86(a)............................................................................1

Tex. Local Gov't Code § 375.222 .................................................13–14

**Rules**

Fed. R. Civ. P. 56 ......................................................................................1

Fed. R. Civ. P. 56(a)...................................................................................6

**Other Authorities**

Houston Television, Houston City Council Consolidated Session
    Meeting (Jan. 17, 2024),
    https://houstontx.new.swagit.com/videos/295029............................................12

Sledge, Matt, "Houston paid $821,000 for a contracting study it later
    scrapped, officials won't say why," Houston Landing
    (Aug. 25, 2023), https://houstonlanding.org/houston-paid-821000-
    for-a-contracting-study-it-later-scrapped-officials-wont-say-why/.....................2

For the reasons set forth below, Plaintiffs are entitled to summary judgment pursuant to Fed. R. Civ. P. 56.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*Defendant City of Houston*

Houston's Minority, Women, and Small Business Enterprise (MWSBE) Program exists to "stimulate the growth of local minority, women, and small business enterprises by encouraging the full participation of these business enterprises in various phases of city contracting." Houston Code § 15-81(a). The Program is not intended to "remedy any single specific, past violation of the U.S. Constitution," Ex. 1, no. 7, but "to mitigate and remedy the effects of past discrimination and its lingering effects against minority and women-owned businesses, and to make public contracting opportunities equally available to such businesses." *Id*. at no. 4. Houston sets annual citywide minority and women-owned business enterprise (MWBE) goals, then City departments impose contract-specific percentage goals for individual contracts, with limited exceptions. Houston Code §§ 15-81, 15-83(b), (c)(1)–(2). The penalty for failing to comply with a contract-specific goal or prove good faith efforts to do so is debarment from all Houston contracts for five years. Houston Code § 15-86(a).

Houston's most recent comprehensive disparity study is from 2006, despite a requirement that the city "make its best efforts" to review the Program every five years to determine if the racial preferences are necessary. Houston Code § 15-81(b).

1

A disparity study was completed in 2020, but—despite a nearly $1 million price tag—the City Council never adopted it.[1] ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

---

[1] Matt Sledge, "Houston paid $821,000 for a contracting study it later scrapped, officials won't say why," Houston Landing (Aug. 25, 2023), https://houstonlanding.org/houston-paid-821000-for-a-contracting-study-it-later-scrapped-officials-wont-say-why/; *see also* Dkt. 53 at 2. The implication here is obvious. Houston buried the 2020 Study because its results undercut the rationale for its racially discriminatory Program. To that end, Houston has fought Plaintiffs' attempt to get discovery that would definitively prove this. Dkt. 48, 58.

Rather than accept the results of this nearly $ 1 million disparity study, Houston contracted for a new disparity study on March 28, 2023. Dkt. 41-1, Hoyrd Aff. ¶5. The study was "expected" to be provided to City administrators in May 2024, *id*; Plaintiffs are unaware if that has occurred.

Houston has not identified any prime contract awards based on intentional discrimination against MWBE bidders in the last five years, nor has it disciplined any employee or City official for discriminating in the award of public contracts during that period. Ex. 3, nos. 1–2. Houston has not identified any specific constitutional or statutory violations related to its public contracting or procurement process or awards during that period. Ex. 1, no. 20. Instead, "[t]he compelling interests advanced by the MWSBE program includes the City of Houston's attempts to remedy past discrimination by rectifying its own actions." *Id*. at no. 4.

*Defendant Midtown Management District*

Defendant Midtown Management District (Midtown)'s policy is "to stimulate the growth of minority, women, and disadvantaged business enterprises by encouraging the full participation of MWDBE businesses in all phases of its procurement activities and affording those firms a full and fair opportunity to

compete for contracts." Ex. 4, Marshall Dep. Tr., Ex. 3 at 4. Midtown awards ten out of one hundred points to bids from minority and women-owned business enterprises. *Id*. Midtown's program is not based on a disparity study of its market area; it has not adopted any study, report, or research that identifies specific instances of discrimination in public contracting in the last five years, nor has it adopted Harris County's 2020 disparity study. Ex. 7, nos. 6, 23.

MWBEs certified by Houston are eligible for Midtown's 10-point preference. Ex. 7, no. 9. Midtown admits that its Program may disadvantage non-MWBE companies—even if those companies have never themselves been guilty of discrimination. *Id*. at no. 16. Most significantly, Midtown has zero evidence of racial discrimination in its public contracting program: in the last five years it has identified no prime contract awards based on intentional discrimination against MWBE bidders in the last five years; it has not disciplined, sanctioned, or terminated any employee or official for discrimination in awarding public contracts; it has not identified instances of a prime contractor discriminating against a subcontractor; it has not debarred or sanctioned a prime contractor for such discrimination; and it can identify no specific constitutional or statutory violations related to its public contracting or procurement process awards. *Id*. at nos. 1–2, 4–5, 21.

*The Plaintiffs*

Plaintiffs Landscape Consultants and Metropolitan are small, family-owned landscaping businesses that share approximately fifty employees. Ex. 8, Thompson Decl., ¶ 3. The companies have operated in the Houston area since 2006, and approximately 80–90 percent of each company's annual revenue comes from winning local government landscaping contracts. *Id*. at ¶¶ 2, 4. Neither Landscape Consultants nor Metropolitan qualify as an MWBE. *Id*. at ¶ 5; Ex. 5, Thompson Dep. Tr. 117:16–22.

Landscape Consultants is currently performing on a five-year, $1.3 million contract with Houston that has an 11 percent MWBE goal. Ex. 5, 20:21–25. In 2022, Metropolitan bid for Midtown's Field Maintenance Service Project, a contract it held off-and-on over the last fifteen years. *Id*. at Ex. 8. The successful bidder and highest point-scorer earned 87.68 points total, including 10 points awarded for being certified as an MWBE. *Id*. at Ex. 9. Metropolitan scored second highest, with 84.98 total points but zero points awarded in the MWBE category. *Id*. But for the 10 points awarded based on the race of the bidding company's owner, Metropolitan would have scored the highest and secured the $350,000 contract. *Id*. About 95 percent of Plaintiffs' employees are racial minorities. *Id.* at 4:20–21.

*Procedural History*

Plaintiffs filed their Complaint on September 19, 2023. Dkt. 1. On January 12, 2024, this Court denied separate motions to dismiss filed by Houston and

Midtown. Dkt. 36. On July 3, 2024, this Court denied without prejudice Plaintiffs' Motion for Summary Judgment against Houston. Dkt. 47. This motion follows.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where the nonmoving party bears the burden of proof on an issue at trial, the movant need only point to the absence of evidence, shifting the burden to the nonmoving party to show why summary judgment should not be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## ARGUMENT

### I. Defendants' Programs Violate the Equal Protection Clause

The Supreme Court is unequivocal: "Racial discrimination is invidious in all contexts." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll. (SFFA)*, 600 U.S. 181, 214 (2023) (cleaned up) (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991)). Race-based classifications are presumptively unconstitutional and can only be overcome if the government satisfies

6

the "daunting two-step examination" of strict scrutiny. *SFFA*, 600 U.S. at 206. Both Houston and Midtown must first demonstrate that their programs' racial classifications are used to "further compelling governmental interests." *SFFA*, 600 U.S. at 206–07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). Second, they must show that the "use of race is 'narrowly tailored'—meaning 'necessary'— to achieve that interest." *SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)). Defendants can do neither; their programs should be declared unconstitutional and permanently enjoined.

### A. Defendants lack a compelling interest to racially discriminate

There are only two compelling interests that permit the government to treat individuals differently based on race: (1) "remediating specific, identified instances of past discrimination that violated the constitution or a statute," and (2) "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207. A Defendant may establish a compelling interest in remedying racial discrimination if it meets three criteria: (1) it identifies a specific instance of past discrimination and does not rely on general allegations of bias in the industry; (2) it provides direct evidence of intentional discrimination as opposed to mere disparities; and (3) it shows past governmental participation in the discrimination it seeks to remedy. *Miller v. Vilsack*, No. 4:21-CV-0595-O, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing

U.S. Supreme Court precedents)). Courts must undertake a "searching judicial inquiry into the justification" of a race-based program to ensure that government entities are "pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

### 1. Defendant City of Houston

This Court need not search far—Houston admits that it cannot identify any "specific Constitutional or statutory violations related to its public contracting or procurement process" in the past five years. Ex. 3, no. 20. In fact, Houston cannot identify *any* racial discrimination within its contracting program in the past five years and admits that its Program is not based on any contemporary evidence of disparities or discrimination within the greater Houston area. Ex. 3, nos. 2, 4–6, 22. Nor has it sanctioned—or even investigated—any city employee for racial discrimination in the last five years. Ex. 1, no. 6; Ex. 3, no. 1. Houston could not even identify a single prime contractor that has discriminated against an MWBE in the past five years. Ex. 3, no. 4. Houston has zero evidence of contemporary discrimination.

Instead, Houston claims that its Program can be upheld because it is "designed to mitigate and remedy the effects of past discrimination and its lingering effects against minority and women-owned businesses, and to make public contracting opportunities equally available to such businesses." Ex. 1, no. 4. This word salad

does not provide a compelling interest for operating a race-based public contracting program. And most troubling, Houston rejected evidence ██████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Houston buried the study.

*Houston's Program does not target a specific episode of past discrimination.* It can't possibly do so, because Houston is not aware of any racial discrimination within its Program. Ex. 3, nos. 2, 4–5, 22. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

Houston claims its Program seeks to "mitigate and remedy the effects of past discrimination and its lingering effects against minority and women-owned businesses." Ex. 1, no. 4. However, programs that rest on a "generalized assertion that there has been past discrimination in an entire industry" cannot justify race-based preferences. *Croson*, 488 U.S. at 498*; see also Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not

a compelling interest."); *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007) (plurality opinion) ("remedying past societal discrimination does not justify race-conscious government action"); *Vitolo*, 999 F.3d at 361 (general societal discrimination against business owners insufficient to justify race-based policy).

In *Nuziard v. Minority Business Development Agency*, the court rejected that volumes of congressional testimony demonstrated intentional discrimination, because the federal government failed to identify a specific episode of discrimination for most of the racial groups preferred by the program. 676 F. Supp. 3d 473, 482 (N.D. Tex. June 5, 2023). Without pointing to specific episodes of racial discrimination, the program lacked a compelling governmental interest. *Id.*

Similarly, in *Strickland v. United States Department of Agriculture*, the court found that "minimizing and remediating the effects of [past] discrimination" was not a compelling interest in operating a race-based farm loan-forgiveness program where the government failed to identify discriminatory actions it previously took or link those actions to its statistical findings of racial disparities. No. 2:24-CV-60-Z, 2024 WL 2886574, at *7 (N.D. Tex. June 7, 2024). And in *Miller*, the court found the government's lack of evidence of intentional discrimination for the past decade against minority farmers "falls short of demonstrating a compelling interest, as any past discrimination is too attenuated from any present-day lingering effects to justify

10

race-based remedial action by Congress." 2021 WL 11115194, at *9. The consensus is clear: race-based policies must target specific episodes of past discrimination and preference only actual victims. Houston's program, by its own admission, does not.

*Houston has no evidence of past intentional discrimination*. Instead, it relies on broad, decades-old statistical disparities from a 2006 study. But "statistical disparities don't cut it." *Vitolo*, 999 F.3d at 361. This is because equating disparities with discrimination gives government "license to create a patchwork of racial preferences based on statistical generalizations." *Croson*, 488 U.S. at 499. In *Vitolo*, a challenge to race and sex-based preferences for COVID relief funds, the Sixth Circuit found that the government's patchwork of racial preferences—granting priority to Pakistanis but not Afghans; Japanese but not Iraqis; Hispanics but not Middle Easterners—were supported only by broad statistical disparities that did not show intentional discrimination. 999 F.3d at 361–62.

Houston's 2006 disparity study is worse. It is woefully inadequate to prove past intentional discrimination towards any racial or ethnic group granted a preference under its Program. Despite including individuals who originate from five continents and dozens of countries, Houston admits that its Program's definition of a "minority person" is not based on specific data from the Houston metropolitan area and that it has not identified individuals from any of those countries who have suffered discrimination in Houston public contracting. Ex. 3, nos. 2, 10, 12.

That was all true in 2006; it is certainly true twenty years later. Houston's 2006 study is too old and stale to constitute evidence of past intentional discrimination today. Houston's City Attorney recognized as much at a January City Council Meeting, telling the council that disparity studies "get stale over time. Ours is now stale."[2] Disparities must, at an absolute bare minimum, reflect contemporary reality. *See, e.g.*, *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 427 (D.C. Cir. 1992) (reliance on eight-year-old statistics for current MBE goal was "arbitrary"); *L. Tarango Trucking v. Cnty. of Contra Costa*, 181 F. Supp. 2d 1017, 1032 (N.D. Cal. 2001) (ten-year-old statistics were too stale); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 258 (D.D.C. 2012) (dismissing stale disparity study evidence as not probative of compelling interest).

In *Miller*, the district court found that the government's lack of evidence of intentional discrimination in at least the past decade "requires a logical leap, as well as a leap back in time" that "falls short of demonstrating a compelling interest, as any past discrimination is too attenuated from any present-day lingering effects to justify race-based remedial action by [government]." 2021 WL 11115194, at *9. Without any recent evidence of disparities—much less actual intentional racial

---

[2] Houston Television, Houston City Council Consolidated Session Meeting (Jan. 17, 2024), https://houstontx.new.swagit.com/videos/295029_at_39:29 (City Attorney Arturo Michel: "You have to have a disparity study to show what the issue is. They get stale over time. Ours is now stale.").

discrimination—Houston cannot show a compelling interest in operating a race-based contracting program.

*Houston did not participate in the discrimination it seeks to remedy.* To the contrary, Houston admits it has not disciplined, terminated, or otherwise sanctioned any employee or official for discrimination in the award of public contracts, identified no prime contract awards based on intentional discrimination against MWBE bidders, identified no instances of a prime contractor discriminating against MWBE subcontractors, and has not debarred or sanctioned a public contractor for discrimination against MWBE subcontractors in the last five years. Ex. 3, nos. 1–2, 4–5. Houston admits it has not adopted any study, report, or research identifying specific instances of discrimination in procurement or public contracting in the last five years and in fact has specific procurement policies that forbid discrimination in awarding public contracts. Ex. 3, nos. 6–7. Though government participation can be either active or passive, *Croson*, 488 U.S. at 492, Houston admits it has done neither.

### 2.    Defendant Midtown Management District

Midtown lacks any evidence—let alone a "strong basis in evidence"—for its race-conscious contracting program that awards ten points to certain bidders based on skin color. *See Shaw*, 517 U.S. at 910 (citation omitted). It asserts that following Tex. Local Gov't Code § 375.222 relieves it of the burden of demonstrating a compelling interest for its discriminatory program. Ex. 6, no. 4. To that end,

Midtown relies on the Texas Legislature's generic finding of "a history of discrimination in the award of public contracts that necessitated the enactment of this statute." *Id*.

Of course, a state law allowing localities to adopt a tailored race-conscious program where evidence of discrimination is present is not a mandate to adopt such a program in the absence of such evidence. Tex. Local Gov't Code § 375.222 even says so explicitly. It requires that programs established under that section "must attempt to remedy any statistically significant disparities that are found to exist," and may continue "only until its purposes and objectives are met as determined by the regular periodic review." *Id*. at (d). Midtown has never conducted a study to determine whether statistically significant disparities exist and admits it has no statistical basis for its Program. Ex. 7, no. 6. Instead, "discussions by staff and/or committees" determined that the race-based 10-point award "would be the most effective way to address the history of discrimination[.]" Ex. 6, no. 8

*Midtown's Program does not target a specific episode of past discrimination.* Midtown admits it has identified no specific constitutional or statutory violations related to its public contracting or procurements process or awards in the last five years. Ex. 7, no 21. Additionally, Midtown cannot identify any specific, past constitutional or statutory violation that its Program is intended to remedy. Ex. 6, no. 7. Midtown's race-conscious program seeks only to remedy the effects of general

societal discrimination, which is not a compelling interest. *Shaw*, 517 U.S. at 909–10.

*Midtown has no evidence of past intentional discrimination*. In addition to admitting that it cannot identify specific, past constitutional or statutory violations, Midtown also admits that it has identified no prime contract awards based on intentional discrimination against MWBE bidders in the last five years. Ex. 7, no. 2. In the last five years, Midtown has not disciplined, terminated, or otherwise sanctioned any employee or official for discrimination in public contracting, nor has it debarred or sanctioned a contractor for discriminating against a MWBE subcontractor. *Id*. at nos. 1, 4–5. In other words, Midtown operates a race-based public contracting program despite no evidence of past intentional discrimination against contractors of any race or sex whatsoever.

*Midtown did not participate in the discrimination it seeks to remedy*. Midtown's Program does not even seek to remedy specific instances of past intentional discrimination. *Id*. at nos. 1–2, 4–6, 21. Nor can it; none exists. Without a specific constitutional or statutory violation to remedy, Midtown has no compelling interest in operating a race-based contracting program.

The prohibition against enacting race-conscious set-aside programs that do not attempt to remedy underlying statutory or constitutional violations is nothing new; in *Croson*, the Court struck down Richmond's 30% contracting set-aside

because there was "nothing approaching a prima facie case of a constitutional or statutory violation by anyone in the Richmond construction industry." *Croson*, 488 U.S. at 500. *SFFA* clarified last year what Croson said over 35 years ago: government may not enact race-conscious set-aside programs unless there is an underlying statutory or constitutional violation that it is attempting to remedy. *SFFA*, 600 U.S. at 207; *Croson*, 488 U.S. at 500. Defendants' programs do exactly what *Croson* prohibited, and they are unconstitutional.

### B. Defendants' discriminatory programs are not narrowly tailored

A race-conscious program should be the remedy of last resort. *Walker v. City of Mesquite*, 169 F.3d 973, 982–83 (5th Cir. 1999). For a race-based program to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *Croson*, 488 U.S. at 507. Courts must strike down race-based programs unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher*, 570 U.S. at 312. Further, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications, *Croson*, 488 U.S. at 507–08; *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003), and it must have an end point. *SFFA*, 600 U.S. at 225.

### 1.    Defendant City of Houston

Houston's Program fails on all fronts. First, Houston has used racial preferences in awarding public contracts for four decades, yet there is no evidence

that it ever attempted a workable race-neutral alternative to its race-conscious program. To the contrary, ███████████████████████████████

███████████████████. Second, the Program is both underinclusive and overinclusive. It is underinclusive in that it excludes many minority-owned businesses, like those with owners from the Middle East or North Africa, as well as any minority business owner who owns less than 51% of their business. *Nuziard*, 676 F. Supp. 3d at 483–84. The Program is overinclusive because it includes businesses who may never have been discriminated against. Houston admits that it does not require evidence that an applicant has experienced previous discrimination when determining whether to grant MWBE status. Ex. 3, no. 14. Nor does Houston distinguish between recent immigrants and those whose families have been established in the United States for generations. *Id*. at no. 13. This "scattershot approach" is not sufficient narrow tailoring. *Vitolo*, 999 F.3d at 364. Finally, the Program never ends, as its forty-year history and infrequent review attest. Race-based programs must end. *SFFA*, 600 U.S at 225.

### 2.   Defendant Midtown Management District

Midtown's Program is not tailored in any way, let alone narrowly. To start, Midtown admits its policy is to use Houston's definition of "minority persons" when evaluating bidders for its 10-point bonus. Ex. 7, no. 10. Therefore, Midtown's Program suffers the same underinclusive and overinclusive defects as Houston's

Program. *See* p. 17, *supra*. Indeed, Midtown admits that this policy grants a racial preference to individuals originating from five continents and dozens of countries, yet it cannot identify any individuals from those countries who have suffered discrimination by Midtown, "particularly because there are so many countries listed in this code section." Ex. 7, nos. 11, 13.

There is no evidence that Midtown attempted any race-neutral alternatives to its race-based contracting program. Instead, Midtown "staff/committees" simply decided to award 10 points to MWBE bidders that are not available to non-MWBE bidders. Ex. 6, no. 8; Ex. 7, no. 8. And since Midtown does not evaluate its Program to determine whether a race-based policy is necessary, the Program has no end point. Ex. 4, 26:24–27:9.

### C. The programs violate the "twin commands" of equal protection

The Equal Protection Clause's "twin commands" require that race never be used as a negative and that it may never operate as a stereotype. *SFFA*, 600 U.S. at 218. Defendants' programs do both. Like college admissions, contracting awards are zero-sum; Midtown's 10-point policy and Houston's MWBE goals are a benefit provided to some companies but not others based on race, and "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id*. at 218–19.

Defendants' programs also use race as a stereotype. All black, Hispanic, Native American, Asian American, or Subcontinent Asian American business owners are treated according to group membership. No individualized showing of discrimination is necessary, because Houston and Midtown assume all individuals from racial groups are the same. Ex. 7, no. 13; Ex. 3, no. 12. Defendants' racial stereotyping is "contrary … to the core purpose of the Equal Protection Clause." 600 U.S. at 221 (citing *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

## II.    Defendants' Programs Discriminate on the Basis of Race in Violation of 42 U.S.C. § 1981

42 U.S.C. § 1981(a) states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." To establish a prima facie case under § 1981, Plaintiffs must show that: (1) they are members of a racial minority; (2) Defendants had an intent to discrimination on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288–89 (5th Cir. 2004). Despite the racial minority requirement, the statute "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Co.*, 427 U.S. 273, 295 (1976).

Both Houston and Midtown's programs violate § 1981 by expressly excluding Plaintiffs due to the race of their owners. This racial discrimination is intentional. Houston Code § 15-81, et seq. creates a program that advantages some businesses over others based on the race or ethnicity of the business' majority owner, and Midtown admits that its policy is to use Houston's definition of "minority person" when evaluating bidders to determine which ones receive a race-based preference. Ex. 7, no. 10. A law or policy that expressly classifies people on the basis of a protected characteristic is direct evidence of discriminatory intent. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227–29 (1995); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610.

Defendants' programs also implicate an activity enumerated under § 1981: Plaintiffs' "making … of contracts" with Houston or Midtown for landscaping services. 42 U.S.C. § 1981(b). A contract "need not already exist" to trigger § 1981's protections; the statute "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza*, 546 U.S. at 475. Defendants' programs discriminate against Plaintiffs on the basis of race and should be struck down.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted.

Dated:  November 29, 2024

Respectfully submitted,

Anastasia Boden                          s/ Erin E. Wilcox
*Of Counsel*                             Erin E. Wilcox
Cal. Bar No. 281911                      *Attorney-in-Charge*
S.D. Tex. Bar No. 3495077                Cal. Bar No. 337427
Joshua P. Thompson*                      S.D. Tex. Bar No. 3369027
*Of Counsel*                             Pacific Legal Foundation
Cal. Bar No. 250955                      555 Capitol Mall
Pacific Legal Foundation                 Suite 1290
555 Capitol Mall                         Sacramento, CA 95814
Suite 1290                               Telephone: (916) 419-7111
Sacramento, CA 95814                     Fax: (916) 419-7747
Telephone: (916) 419-7111                ewilcox@pacificlegal.org
Fax: (916) 419-7747
aboden@pacificlegal.org
jthompson@pacificlegal.org

*Pro Hac Vice

*Counsel for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2024, I served this document via the

Court's electronic filing system to Defendants' counsel of record as follows:

Lori Yount
Senior Assistant City Attorney
Darah Eckert
Senior Asst. City Attorney, General Litigation Section
City of Houston Legal Department
P.O. Box 368
Houston, Texas 77001-368
900 Bagby, 4th Floor
Houston, TX 77002
lori.yount@houstontx.gov
darah.eckert@houstontx.gov

Ben Stephens
Sandy Hellums-Gomez
Jarett Dillard
HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
ben.stephens@huschblackwell.com
sandy.gomez@huschblackwell.com
jarett.dillard@huschblackwell.com
*Counsel for City of Houston*

Brett J. Sileo
Britton B. Harris
Harris Hilburn P.L.L.C.
1111 Rosalie
Houston, Texas 77004
bsileo@hhstxlaw.com
bharris@hhstxlaw.com
*Counsel for Midtown Management District*

*s/ Erin E. Wilcox*
Erin E. Wilcox
Pacific Legal Foundation

22