# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT,<br><br>    Defendants. | Civil Action No. 4:23-cv-03516 |

## DEFENDANT CITY OF HOUSTON'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................6

STATEMENT OF FACTS ...........................................................................8

   I.    Factual Background...........................................................................8

       A.    The City's Minority, Women, and Small Business Enterprise Program ........................................................................8

       B.    The City's Consistent and Ongoing Efforts to Gather Empirical Evidence of Racial Disparities in City Contracting.................11

   II.    Procedural Background ....................................................................12

LEGAL STANDARD FOR SUMMARY JUDGMENT .......................................13

ARGUMENT ........................................................................................13

   I.    Plaintiffs lack standing to challenge the City's MWSBE Program. ...13

       A.    Plaintiff Landscape Consultants of Texas, Inc. lacks Article III standing. ...................................................................15

           1.    Statement of undisputed facts regarding Plaintiff Landscape .....................................................15

           2.    Landscape cannot establish an injury-in-fact for Article III purposes because it cannot show that it must compete on uneven ground for City contracts. .............................16

           3.    Assuming *arguendo* that Landscape demonstrates an inability to compete on equal footing, it only has standing to challenge contracts for "other services." ....................18

       B.    Plaintiff Metropolitan Landscape Management, Inc. lacks Article III standing. ................................................................20

           1.    Statement of undisputed facts regarding Plaintiff Metropolitan. .................................................20

           2.    Metropolitan cannot establish an injury-in-fact for Article III purposes because it is not willing, able, or ready to bid on City contracts.........................................21

   II.    The City's MBE Program is constitutional under the Equal Protection Clause. ................................................................22

A.    The City's MBE Program is supported by a compelling interest. ...................................................................23

    1.    The City has commissioned a rigorous study by MGT Consulting that provides statistical and anecdotal evidence that racial discrimination continues to impact City contracting. ...........................................................25

    2.    The MGT disparity study shows that the City has been a passive participant in racial discrimination in public contracting in Houston....................................................29

    3.    Plaintiffs cannot provide credible and particularized evidence to rebut the City's showing of a compelling interest..................................................................31

B.    The City's program is narrowly tailored....................................32

    1.    The City uses race-neutral remedies to combat discrimination. ..................................................................34

    2.    The City's program is flexible.......................................35

    3.    The program's goals are tailored to remedying identified discrimination and are set for each contract based on the availability of MBEs for each NAICS code involved for each portion of the work..................................................35

    4.    Other parties—including Plaintiffs—are not negatively affected and the program does not stereotype minority groups. ..................................................................36

    5.    The City's program is limited in duration and has a logical endpoint. ..........................................................36

    6.    The City's program is neither over-inclusive nor under-inclusive. ......................................................................37

CONCLUSION ........................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995)...................................................................... 21, 22

*Associated Gen. Contractors of Ohio, Inc. v. Drabik*,
  214 F.3d 730 (6th Cir. 2000) .........................................................30

*Carney v. Adams*,
  592 U.S. 53 (2020)..................................................................... 14, 15, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................13

*Concrete Works of Colo., Inc. v. City & Cnty. of Denver*,
  321 F.3d 950 (10th Cir. 2003) ............................................ 25, 27, 30, 31, 38

*Concrete Works of Colo., Inc. v. City & Cnty. Of Denver*,
  36 F.3d 1513 (10th Cir. 1994) ......................................................17

*Contractors Ass'n of E. Pa. v. City of Phila.*,
  6 F.3d 990 (3d Cir. 1993) ..............................................................19

*Coral Constr. v. King Co.*,
  941 F. 2d 910 (9th Cir. 1989) ........................................................27

*Dean v. City of Shreveport*,
  438 F.3d 448 (5th Cir. 2006) .........................................................24

*Edwards v. Oliver*,
  31 F.4th 925 (5th Cir. 2022) .........................................................13

*Geyer Signal, Inc. v. Minn. Dep't of Transp.*,
  No. 11-321 (JRT/LIB), 2014 WL 1309092..................................32

*H.B. Rowe Co. v. Tippett*,
  615 F.3d 233 (4th Cir. 2010) ..................................................... 24, 25, 27, 30

*J.A. Croson Co.*,
  488 U.S. ....................................................................... 23, 24, 30, 33, 35, 37

Kossman,
  No. H-14-1203, 2016 WL 11473826 ............................................. 22, 30, 32

*Lujan v. Defs. Of Wildlife*,
  504 U.S. 555 (1992)..................................................................... 14, 15

*Midwest Fence Corp. v. U.S. Dep't of Transp.*,
    840 F.3d 932 (7th Cir. 2016) .........................................................................24

*Midwest Fence v. U.S. Dep't of Transp.*,
    84 F. Supp. 3d 705 (N.D. Ill. 2015)...................................................... 27, 32

*Ne. Fla. Ch. of the Associated Gen. Contractors of Am., et al. v. City of Jacksonville*,
    508 U.S. 656 (1993).................................................................... 14, 16, 21

*Nuziard* v. *Minority Bus. Dev. Agency*,
    721 F. Supp. 3d 431 (N.D. Tex. 2024)...................................... 24, 29, 30, 38

*Ray Ballie Trash Hauling, Inc. v. Kleppe*,
    477 F.2d 696 (5th Cir. 1973) .......................................................................21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)...................................................................... 33, 34

*TIG Ins. Co. v. Sedgwick James of Wash.*,
    276 F.3d 754 (5th Cir. 2009)........................................................................13

*United States v. Paradise*,
    480 U.S. 149 (1987)......................................................................................33

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) .......................................................... 23, 30, 38

*W. Tenn. Ch. of Associated Builders & Contractors, Inc. v. City of Memphis*,
    302 F. Supp. 2d 860 (W.D. Tenn. 2004) .......................................................32

*W.H. Scott Const. Co., Inc. v. City of Jackson, Miss.*,
    199 F.3d 206 (5th Cir. 1999) .......................................... 14, 18, 19, 23, 24, 30

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986)......................................................................................23

**Statutes**

Article III of the U.S. Constitution ...................................................... 13, 15, 16, 18

**Rules**

Fed. R. Civ. P. 56(a)................................................................................13

Fed. R. Civ. P. 56(c)(1)–(3) ....................................................................13

Federal Rule of Civil Procedure 56 .............................................................6

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant City of Houston ("the City") files this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have filed a challenge under the Equal Protection Clause of the U.S. Constitution to the City's program for promoting participation of minority-owned firms in City contracting. The City is entitled to summary judgment because Plaintiffs lack Article III standing to sue and because the City's program satisfies strict judicial scrutiny.

Plaintiffs lack Article III standing because neither Landscape Consultants of Texas, Inc. ("Landscape") nor Metropolitan Landscape Management, Inc. ("Metropolitan") has carried its burden of proving an injury-in-fact. Landscape has never been penalized by the City for failing to meet minority contracting goals. Landscape asserts that it must compete on uneven ground with minority-owned firms that can satisfy contract goals with their own work, but the record shows that, when Landscape performed work that it had tried to outsource to a minority firm, Landscape was not penalized. In any event, Landscape is only ready, willing, and able to bid on "other services" contracts and thus lacks standing to challenge the City's program with respect to other procurement categories. Metropolitan has never bid on a City contract and has no plans to do so, such that it is not ready, willing, and able to bid on *any* City contracts and thus lacks standing to sue the City.

Moreover, the City's program is constitutional under the Equal Protection

Clause because it satisfies both components of strict scrutiny. First, the City has shown that it has a compelling governmental interest in remedying racial discrimination. The City has met its burden of showing that remedial race-based measures are necessary through commissioned studies that reveal a substantial and statistically significant underutilization of minority-owned firms in City contracting.

Second, the City's program is narrowly tailored to advance its compelling interest in remedying racial discrimination. The City's program (1) utilizes race-neutral measures, including efforts to promote participation in contracting by small businesses and veteran-owned businesses, which are expected to be expanded and initiated, respectively, early next year; (2) operates flexibly by setting goals on a case-by-case basis and by granting waivers where minority firms are unlikely to be available; (3) sets goals based on evidence regarding availability and underutilization of minority firms; and (4) has a logical endpoint, with studies commissioned periodically to evaluate if remedial goals have been met.

The City has devoted substantial resources over many years to meet the demanding standard of strict scrutiny because the City takes seriously its responsibility to address racial discrimination in its operations and to do so in a way that respects the Constitution. Plaintiffs, by contrast, have failed to provide any credible or particularized evidence to rebut the City's case. Plaintiffs have advanced only general criticism, falling short of their burden of showing that the City's

program is unconstitutional. Accordingly, the Court must grant summary judgment in favor of the City.

## STATEMENT OF FACTS

### I.    Factual Background

#### A.    *The City's Minority, Women, and Small Business Enterprise Program*

The City administers a program to remedy active and passive discrimination by encouraging minorities, women, and small businesses to participate in all phases of City contracting. Hoyrd Decl., ¶ 3. The current version of the City's program was adopted in 2013 and is codified in Chapter 15, Article V of the City's Code of Ordinances. Hoyrd Decl., Ex. A, §§ 15-81 *et seq*. The program calls for percentage goals to be set for participation by minority business enterprises, or "MBEs," a term defined by statute.[1] Hoyrd Decl., Ex. A, § 15-82.

Each City department handles its own procurement needs. Hoyrd Decl., ¶ 10. Department staff must determine whether an MBE participation goal is appropriate on a case-by-case basis. Hoyrd Decl., ¶ 10. If required, the department sets the goal with reference to the Office of Business Opportunity's ("OBO") Policies and Procedures or requests a waiver. Hoyrd Decl., ¶ 10. MBE participation goals are

---

[1] Plaintiffs do not challenge the City's efforts to promote participation by woman-owned firms or small businesses. Accordingly, this motion discusses only the program's efforts to promote MBE participation.

based on the availability of MBEs for each North American Industry Classification System ("NAICS") code involved in the contract and the divisibility of work elements. Goals therefore are flexible from contract to contract. Hoyrd Decl., ¶ 10.

A department can apply for a waiver of MBE participation goals for any contract. Hoyrd Decl., ¶ 11; Hoyrd Decl., Ex. A, §§ 15-88. A waiver is granted when a contract requires specialized, technical, or unique goods or services, or requires a product, good, or service that is non-divisible or sole source; when application of MBE participation provisions would impose an unwarranted economic burden on the City or would unduly delay acquisition of the goods or services or would otherwise not be in the best interest of the City; and when MBE availability is so limited that any goal would still result in minimal MBE participation.[2] Hoyrd Decl., ¶ 11; Hoyrd Decl., Ex. A, §§ 15-83(c)(1)(a)-(d)

Even where an MBE participation goal is set, OBO's Policies and Procedures provide contractors with flexibility in meeting such goals. Hoyrd Decl., ¶ 13. A contractor who is awarded a City contract with an MBE participation goal is required only to make "Good Faith Efforts" towards meeting that goal. Hoyrd Decl., ¶ 13. Good Faith Efforts are defined as any steps taken to achieve a Contract Goal which,

---

[2] Some contracts are not eligible for MBE participation goals in the first place. For example, only construction contracts in excess of $1,000,000.00, or goods or non-professional services contracts in excess of $100,000.00 are eligible for MBE participation goals. Hoyrd Decl., ¶ 12.

by their scope, intensity and usefulness, demonstrate the bidder's responsiveness in fulfilling the business opportunity objective prior to the award of a contract, as well as the contractor's responsibility to put forth measures to meet or exceed the Contract Goal(s) throughout the duration of the contract. Hoyrd Decl., ¶ 13 *see also* Hoyrd Decl., Ex. A, § 15-82.

A contractor can demonstrate Good Faith Efforts by, among other steps, showing efforts to obtain bids from MBEs, or showing that there were no MBEs available to work on a particular project or area. Hoyrd Decl., ¶ 14; *see also* Hoyrd Decl., Ex. A, § 15-85. The City's policy promotes MBE participation in contracting but also ensures that prime contractors are not subjected to rigid quotas. Hoyrd Decl., ¶ 14.

Moreover, the City allows for an MBE bidding as a prime contractor to self-perform up to 50% of a contract's MBE participation goal. Hoyrd Decl., ¶ 15; *see also* Hoyrd Decl., Ex. A, § 15-84. Nevertheless, an MBE prime contractor must still exercise Good Faith Efforts to hire out work to other MBEs with respect to the remaining 50% of the contract's MBE participation goal—just as a non-minority-owned contractor would be required to do. Hoyrd Decl., ¶ 15; *see also* Hoyrd Decl., Ex. A, § 15-84.

**B.      The City's Consistent and Ongoing Efforts to Gather Empirical Evidence of Racial Disparities in City Contracting**

The City commissioned studies in 2006 and 2012 to tailor its program to empirical evidence regarding the discriminatory barriers faced by minority firms in City contracting. Hoyrd Decl., ¶ 8. In 2022, the City issued a Request for Proposals for an updated study. Hoyrd Decl., ¶ 9. In March 2023, the City contracted with MGT Consulting to prepare an updated disparity study focusing on all categories of City procurement, including goods, professional services, other services, and construction. Hoyrd Decl., ¶ 9. The MGT disparity study is now complete and was released to the public on Wednesday, November 20, 2024. Hoyrd Decl., ¶ 18.

The City's new disparity study is currently undergoing a public comment period, which will last until December 31, 2024. Hoyrd Decl., ¶ 18.  In the coming weeks, City Council will consider formal adoption of the new disparity study, as well as changes to the City's ordinance to reflect the study's recommendations. Hoyrd Decl., ¶ 19. In coordination with such legislative action, OBO will independently revise its Policies and Procedure through the administrative process. Hoyrd Decl., ¶ 19.

The contemplated changes to the City's program will likely be finalized early next year and will include significant policy modifications, such as expanding efforts to promote small business participation to all procurement categories and initiating a new effort to promote veteran-owned business participation in City contracting.

Hoyrd Decl., ¶ 20–21.  Under the City's new program, prime contractors will be able to satisfy participation goals for any contract in any procurement category by hiring small businesses and veteran-owned businesses, in addition to minority-owned and women-owned firms. Hoyrd Decl., ¶ 20–21.

## II.    Procedural Background

Plaintiffs filed suit on September 19, 2023. Doc. No. 1. On May 6, 2024, the City moved to stay the case pending receipt and review of MGT's disparity study and the anticipated enactment of policy changes recommended by the study. Doc. No. 41. While the motion to stay was pending, Plaintiffs moved for summary judgment arguing that the City lacked current evidence of disparities in the marketplace. Doc. No. 44. The City argued that prior studies remained strong empirical evidence for the City's efforts to remedy racial discrimination in City contracting and highlighted the City's ongoing efforts to gather more current evidence by obtaining a new disparity study. Doc. No. 45. The City reminded Plaintiffs and the Court that the new disparity study was in process and that it was set to be finalized in the autumn. Doc. No. 45. The Court denied the City's motion to stay and denied Plaintiffs' motion for summary judgment without prejudice on July 2, 2024. Doc. No. 47.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" summary judgment is appropriate. *See Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party then bears the burden of proving every essential element of his case to avoid an entry of summary judgment. *Celotex*, 477 U.S. at 323. The non-movant cannot avoid summary judgment simply by presenting "conclusional allegations and denials, speculations, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2009). While the Court may consider any evidence in the record, it need only consider materials cited by the parties. *See* FED. R. CIV. P. 56(c)(1)–(3).

## ARGUMENT

### I.    Plaintiffs lack standing to challenge the City's MWSBE Program.

This Court should grant summary judgment in favor of the City because the record establishes that Plaintiffs cannot carry their burden of showing that they have standing under Article III of the U.S. Constitution. To demonstrate Article III standing, Plaintiffs must show: (1) an "injury in fact" that is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 556 (1992). "The prospect of obtaining relief from the injury as a result of a favorable ruling [must not be] too speculative." *W.H. Scott Const. Co., Inc. v. City of Jackson, Miss.*, 199 F.3d 206, 213 (5th Cir. 1999) (quoting *Ne. Fla. Ch. of the Associated Gen. Contractors of Am., et al. v. City of Jacksonville*, 508 U.S. 656, 663–64 (1993)).

In the context of an Equal Protection challenge to racial classifications employed in a minority contracting program, a plaintiff may show injury-in-fact by adequately pleading that he is unable "to compete on an equal footing in the bidding process," regardless of whether he has ever lost an actual contract. *Ne. Fla.*, 508 U.S. at 666. Plaintiffs must demonstrate that they are "able and ready to bid on contracts and that a discriminatory policy prevents them from doing so on an equal basis." *Id.* (noting that the injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit"). Plaintiffs must provide more than a "bare statement of intent" to bid on a future contract. *Carney v. Adams*, 592 U.S. 53, 65 (2020). Rather, they must clearly demonstrate that they are "likely to [bid on a contract] . . . in the reasonably foreseeable future," but that the

allegedly discriminatory policy prohibits them from doing so on equal footing with other firms. *Id.* at 95.

### A. Plaintiff Landscape Consultants of Texas, Inc. lacks Article III standing.

Plaintiff Landscape fails to establish standing because it cannot show that the City's MBE program places it on unequal footing with minority-owned businesses. The elements of standing, as outlined above, are "indispensable" to Landscape's case, and Landscape bears the burden of establishing them. *Lujan*, 504 U.S. at 561. Landscape has failed to do so.

### 1. Statement of undisputed facts regarding Plaintiff Landscape

Landscape is a small Houston-based landscaping company that has been owned and operated by Gerald and Theresa Thompson since 2006. Compl., Dkt. No. 1, ¶¶ 7, 11; Gerald Thompson Deposition ("Thompson Dep."), 11:20-21. The Thompsons each retain a 50% ownership interest in this company. Thompson Dep. 10:13-21. Landscape bids on projects in the greater Harris County area. *Id.* 16:8–17:10. Its government contracts account for approximately 80%-90% of its annual revenue. *Id.* 19:12–17. Landscape is a successful business, demonstrating excellent financial performance and cultivating a positive reputation in the industry. *Id.* 21:22–22:5.

Landscape has successfully bid on—and been awarded—various government

contracts that set MBE participation goals. *Id.* at 74:11–19. Indeed, in May 2021, Landscape was awarded a five-year, $1.3 million contract by the City. *Id.* 33:12–17. To date, Landscape has received over $600,000 from this contract alone. Hoyrd Aff., Dkt. No. 45-1, ¶ 10. Over the last five years, approximately 10% of Landscape's annual revenue has been attributable to this contract. Thompson Dep. 19:18–25. Landscape has also been awarded other public contracts throughout the region, including contracts with Harris County. *Id.* 33:6–11.

### 2. Landscape cannot establish an injury-in-fact for Article III purposes because it cannot show that it must compete on uneven ground for City contracts.

Landscape cannot establish that it has suffered an injury-in-fact as a result of the City's MBE program. First, the City's MBE program does not exclude Landscape or anyone else from the opportunity to compete for City contracts. *Cf. e.g.*, *Ne. Fla.*, 508 U.S. at 661 (holding that reserving contracts "for the exclusive competition" of black- and female-owned businesses is unconstitutional).

Second, Landscape suffers no injury from the City's MBE program because it is not subject to a mandatory penalty for failing to meet MBE participation goals. Its contract has not been, and will not be, cancelled or suspended for this reason, nor will it incur any fines or fees on such ground. At most, a contractor who fails to meet minority participation goals *and* shows no attempt to make Good Faith Efforts to do so is given an "unsatisfactory" rating. Hoyrd Decl. ¶ 17. This unsatisfactory rating

must be issued multiple times before the OBO director would even consider recommending a sanction such as debarment from City contracting—it is not automatic. Hoyrd Decl. ¶ 17. Put differently, even a contractor who has received an unsatisfactory rating in the past for failing to meet MBE participation goals is not foreclosed from pursuing—and being awarded—City contracts in the future. Hoyrd Decl. ¶ 17. Thus, Landscape cannot show that it has suffered any injury at the hands of the City's program.

Third, Landscape cannot identify evidence or specific facts supporting its contention that it competes on unequal footing with MBEs because such firms can satisfy all MBE participation goals with their own work. The City's MBE program only permits MBE prime contractors to self-perform up to 50% of the contract goal. *See* Hoyrd Decl., Ex. A, § 15-84. Upon reaching that 50% cap, MBE prime contractors must then engage MBE subcontractors or make Good Faith Efforts to do so, like their non-minority counterparts do. *See id.*; *cf. Concrete Works of Colo., Inc. v. City & Cnty. Of Denver*, 36 F.3d 1513, 1518–19 (10th Cir. 1994) (holding that non-minority contractors were forced to compete on unequal basis because ordinance expressly allowed minority-owned contractors to satisfy *all* MBE goals with own work).

Moreover, when Landscape completed and invoiced work that was intended to be delegated to an MBE, Landscape was still compensated by the City and was

17

not penalized. Thompson Dep. 52:6–10. Landscape received a commitment from a minority-owned subcontractor, X-Scape, in connection with its City contract. *Id.* 51:3–8. During performance of the contract, X-Scape went silent and failed to perform the work it was subcontracted to do. *Id.* 51:9–15. In the end, Landscape had to perform the work itself. *Id.* 52:6–8. Still, the City compensated Landscape for performing that work and imposed no penalty. *Id.* 52:9–10. There is no injury to Landscape as it was not forced to lose out on additional revenue that would have otherwise been paid to X-Scape.

In sum, it can hardly be said that Landscape has been concretely injured by the City's MBE program when it is currently performing without penalty a $1.3 million, five-year contract with the City. Accordingly, Landscape lacks Article III standing to challenge the City's program.

### 3.    Assuming *arguendo* that Landscape demonstrates an inability to compete on equal footing, it only has standing to challenge contracts for "other services."

Landscape, a company engaged in performing "other services," does not have standing to "challenge programs relating to *every* contract let by the City." *See Scott*, 199 F.3d at 212 (emphasis added). Indeed, for Landscape to have standing at all, it must be "able and ready to bid" on those contracts of which it complains. *Id.* Here, the City engages in procurement across four different categories: (1) construction; (2) goods; (3) professional services; and (4) other services. Hoyrd Decl. ¶ 4; *see also*

Hoyrd Decl., Ex. A, § 15-83. Landscape's current City contract is considered an "other services" contract. Hoyrd Decl. ¶ 5. Because Landscape is a company that only provides traditional landscaping services, any City contract Landscape would be "able and ready" to bid on in the future would only be those contracts for "other services." *Id.* Landscape does not engage in construction or provide goods or professional services. *Id.* As such, if Landscape has standing at all, it only has standing as applied to challenges relating to City contracts for "other services."

The Fifth Circuit expressly recognized this principle in *W.H. Scott*. There, the plaintiff challenged the constitutionality of a similar MBE program. *Scott*, 199 F.3d at 208–09. That program incorporated a "Special Notice" which applied specifically to construction contracts and required 15% participation by minority-owned businesses. *Id.* In addressing the plaintiff's standing, the court noted that the plaintiff, a construction company, was only eligible to bid on, and therefore challenge, construction contracts. *Id.* at 212–13 ("Indeed, the only evidence presented in this case . . . involved the participation of minority subcontractors in construction contracts and the impact of the 15% goal on [plaintiff's] ability to compete in the construction industry; no evidence has been presented on other areas of City contracting."). As such, the plaintiff could not challenge a program "relating to every contract let by the City." *Id.* at 212; *see also Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 999 (3d Cir. 1993) (allowing plaintiff to challenge MBE program

only with respect to the specific contracts on which its members bid).

Consequently, even if Landscape has standing, it does not have carte blanche to challenge the constitutionality of the entirety of the City's MBE program. It may only challenge the program with reference to the contracts on which it is "able and ready to bid"—i.e., contracts for "other services."

## B. Plaintiff Metropolitan Landscape Management, Inc. lacks Article III standing.

Plaintiff Metropolitan is likewise unable to show an injury-in-fact sufficient to support Article III standing. Metropolitan has never bid on a City contract and has no plans to do so, such that any purported injury to Metropolitan from the City's MBE program is entirely speculative.

### 1. Statement of undisputed facts regarding Plaintiff Metropolitan.

Like Landscape, Metropolitan is also a small Houston-based landscaping company owned and operated by Gerald and Theresa Thompson. Thompson Dep. 10:24–11:5. Both Plaintiff entities are owned and operated by the Thompsons and they are largely run together as a single enterprise, though legally distinct. *Id.* 25:2–14 (explaining that the Plaintiffs are "pretty much one" and that separating the two entities "would be tricky"). Notably, Metropolitan has never had a contract with—or even submitted a bid to—the City. *Id.* at 36:24–37:1–12; Hoyrd Decl. ¶ 6.

### 2. Metropolitan cannot establish an injury-in-fact for Article III purposes because it is not willing, able, or ready to bid on City contracts.

Metropolitan has no standing to assert its equal protection claims against the City. To do so, it must be "able and ready" to obtain a benefit but-for a challenged policy. *See Ne. Fla.*, 508 U.S. at 656–66.

Indeed, a plaintiff typically cannot establish standing for a discrimination claim challenging a program for which they failed to even apply. *See Ray Ballie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 710 (5th Cir. 1973); *cf. also Ne. Fla.*, 508 U.S. at 657, 668 (contractors "able and ready to bid on [future] contracts" because they had "regularly bid on construction contracts" previously and "they would have bid on contracts set aside pursuant to the city's ordinance were they so able."); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 212 (1995) (subcontractor "able and ready" by showing that it "bid[] on every guardrail project in Colorado" and was "very likely to bid on [] such [a] contract" in the future).

Here, Metropolitan cannot establish that it is "ready and able" to bid on any contracts with the City. For one, Metropolitan has never bid on a City contract. Thompson Dep. 37:10–12. Secondly, Metropolitan has never expressed an intention that it is ready, willing, or able to bid on City contracts in the reasonably foreseeable future. Hoyrd Decl. ¶ 6.

Mr. Thompson explained in his deposition that in determining which Plaintiff-

entity—Landscape or Metropolitan—bids on a contract largely depends on that entity's history with the contracting governmental unit. *See* Thompson Dep. 38:4–39:1. If Metropolitan was previously engaged in a successful contract with a municipality, and the opportunity for another contract arose in the future with that same municipality, the Thompsons would likely submit a bid under the Metropolitan entity again because the municipality "know[s] [Metropolitan's] quality of service." *Id.* 38:16–20. Thompson's testimony indicates that if the opportunity to engage in a City contract arises in the future, any bids would be submitted by Landscape—not Metropolitan. *See id.* at 38:4–39:1. Accordingly, Metropolitan cannot show that it is "ready, willing, and able" to bid on City contracts and thus fails to carry its burden of showing that it has suffered an injury-in-fact to support Article III standing.

## II.    The City's MBE Program is constitutional under the Equal Protection Clause.

Because the City's MBE program employs racial classifications that are otherwise prohibited by the Fourteenth Amendment, the program is subject to strict judicial scrutiny. Strict scrutiny is a demanding standard, but it is not fatal. *See Adarand Constructors, Inc.*, 515 U.S. at 237. The City's MBE program can withstand strict scrutiny if it is justified by a compelling governmental interest and if it is narrowly tailored to meet that interest. *See id.* Upon the City's showing of "acceptable proof of a compelling interest and narrow tailoring," the burden "shifts back to the Plaintiff[s] to prove unconstitutionality." *See Kossman*, No. H-14-1203,

2016 WL 11473826, at *17.

### A.    *The City's MBE Program is supported by a compelling interest.*

The City's MBE program is supported by the City's compelling interest in remedying the effects of past and present racial discrimination in City contracting. Courts have long recognized that "combating racial discrimination is a compelling government interest." *Scott*, 199 F.3d at 217; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986) ("[In] order to remedy the effects of prior discrimination, it may be necessary to take race into account.").

To invoke a compelling interest in remedying racial discrimination, the City must provide a "strong basis in evidence" that such remedial action is necessary. *Scott*, 199 F.3d at 217. The City must produce empirical evidence showing (1) a legacy of specific and intentional acts of racial discrimination, as distinguished from general social disparities between different groups; and (2) that the City had either an active or passive hand in such discrimination. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (citing *J.A. Croson Co.*, 488 U.S. at 498). If "the [City] show[s] that it ha[s] essentially become a passive participant in a system of racial exclusion . . . then the [City] can act to undo the discrimination." *Id.* (citing *J.A. Croson Co.*, 488 U.S. at 492).

The City can carry its burden of showing empirical evidence to support its interest in administering a race-conscious remedial program by providing "statistical

evidence", including "disparity indices" and "computations of disparity percentages." *Scott*, 199 F.3d at 217. A study that reveals a "significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors [supports] an inference of discriminatory exclusion." *Id.* at 218 (citing *J.A. Croson*, 488 U.S. at 509); *see also Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination'" (quoting *J.A. Croson Co.*, 488 U.S. at 501)).

The City can supplement its statistical evidence of disparities with anecdotal evidence that provides "examples of . . . discrimination in which the government participated." *Nuziard* v. *Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 489 (N.D. Tex. 2024). The combination of "concrete examples with . . . robust empirics" provides the "strong basis in evidence" for the City's compelling interest in remedying racial discrimination in public contracting. *Id.* at 481, 489. The City is not required, however, to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010); *see also Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 945 (7th Cir. 2016). Rather, the City need only point to

evidence that "raise[s] an inference of discriminatory exclusion in the local [contracting] industry and link[s] its spending to that discrimination." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 970 (10th Cir. 2003) (*Concrete Works II*).

Once the City meets its burden, Plaintiffs must introduce credible, particularized evidence to rebut the City's initial showing of a compelling interest. *H.B. Rowe*, 615 F.3d at 241–42. Plaintiffs may "offer a neutral explanation for the [City's] evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable." *Id.* at 242. But "mere speculation that the [City's] evidence is insufficient or methodologically flawed does not suffice to rebut the [City's] showing." *Id.*

> **1.     The City has commissioned a rigorous study by MGT Consulting that provides statistical and anecdotal evidence that racial discrimination continues to impact City contracting.**

The City has commissioned a rigorous study by MGT Consulting that provides statistical and anecdotal evidence of race discrimination in City contracting. Hoyrd Decl. ¶¶ 9, 18; Hoyrd Decl., Ex. D, Executive Summary of MGT Study, 5–6; Bernal Decl. ¶¶ 5–9. The MGT disparity study shows substantial and statistically significant underutilization of minority-owned businesses in City contracting. Hoyrd Decl., Ex. D, Executive Summary of MGT Study, 5–6; Bernal Decl. ¶¶ 5–9 and Ex. B, MGT Study, 82–88.

The study's statistical analysis reveals that, while MBEs represented 25.75% of the overall market availability, their utilization across procurement categories was disproportionately lower at 22.24%. Bernal Decl. Ex. B, MGT Study, 82. For instance, Black American-owned firms constituted 7.7% of available firms but received only 5.55% of contract spending, resulting in a disparity index of 72—well below the threshold of 80, at which point discrimination is understood to be shown. *Id.*

Such disparity indices reflect, in multiple instances, not only underutilization but also substantial and statistically significant underutilization, which confirms the persistence of racial discrimination in City contracting. Bernal Decl. ¶¶ 5–9. In professional services contracts, for example, Black American-owned firms experienced particularly severe underutilization, with a disparity index of 52. Bernal Decl. Ex. B, MGT Study, 84. Native American firms had an even more severe underutilization rate, resulting in a disparity index of 6.71. *Id.* The "other services" category—the very category in which Landscape competes for contracts—revealed similar patterns: Black American firms held a disparity index of 72, and Asian American firms registered 67.64. *Id.* at 85. MBEs in the other services category represented 33.71% of availability but only 23% of utilization, resulting in an overall disparity index of 68, reflecting a substantial and statistically significant underutilization for all minority firms in this procurement category. *Id.* In sum, the

statistical significance of the measured disparities indicates that the likelihood of these patterns occurring by chance is negligible—such analyses support a strong inference that the measured disparities are the result of discrimination. *Id.* at 88; Bernal Decl. ¶¶ 5–9.

The MGT study also discusses anecdotal evidence of specific incidents of discrimination to supplement the statistical analyses. *Id.* at 129–142; Bernal Decl. ¶ 7. Courts consider anecdotal evidence in conjunction with statistical evidence to show discrimination. *See, e.g.*, *H. B. Rowe,*, 615 F.3d at 249; *Concrete Works II*, 321 F.3d at 989; *Coral Constr. v. King Co*. 941 F. 2d 910, 919 (9th Cir. 1989); *Midwest Fence v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705 (N.D. Ill. 2015). "The combination of convincing anecdotes and statistical evidence is potent." *Coral*, 941 F.2d at 919.

The MGT disparity study collected anecdotal evidence that underscored the challenges and discriminatory practices faced by minority-owned businesses in the marketplace. Bernal Decl. ¶ 7 Ex. B, MGT Study, 129–142. Business owners reported encountering barriers that hindered their ability to compete for City contracts, including perceptions of favoritism in contract awards, a lack of transparency in procurement processes, and challenges accessing informal business networks. Bernal Decl., Ex. B, MGT Study, 136–142. Participants in interviews and focus groups highlighted specific examples of discriminatory treatment, such as

being excluded from bidding opportunities due to restrictive requirements or preferences for established, non-minority firms. *Id.* at 135–36. MBEs also described difficulties securing financing and bonding, which disproportionately affected their ability to participate in large-scale projects. *Id.* at 136. These challenges were compounded by a lack of mentorship and support, as well as insufficient outreach from City agencies to minority-owned firms. *Id.*

The MGT disparity study reached similar conclusions as prior studies, including the 2006 and 2012 studies, regarding significant disparities faced by MBEs. Bernal Decl. ¶ 9; Hoyrd Decl., Ex. E, 2006 Study, 7-1–7-31, 8-2–8-8; Hoyrd Decl., Ex. F, 2012 Study, 9. In all studies, MBEs were generally underutilized in City contracting compared to their availability in the marketplace. Bernal Decl. ¶ 9. In the 2006 study, for example, for prime construction contracts under $500,000, African-American, Hispanic-American, and Asian-American businesses were notably underrepresented relative to their availability in the market. Hoyrd. Decl., Ex. E, 2006 Study, 7-4–7-5. African-American businesses constituted 16.06% of available firms but received only 6.95% of contract dollars, and Asian-American businesses, representing 3.96% of firms, received none of the contracts—both of which are statistically significant disparities. *Id.* Similarly, in goods and other services contracts under $500,000, MBEs, including Hispanic Americans and Asian Americans, faced statistically significant underutilization. *Id.* at 7-13–7-14. While

Hispanic American businesses made up 8.65% of available firms, they received only 2.91% of the contracts. *Id.* Asian American businesses experienced an even more pronounced gap, with 4.65% availability but only 0.45% utilization. *Id.* at 7-15.

The 2012 study focused exclusively on construction contracts, but it also revealed comparable disparities. Bernal Decl. ¶ 9; Hoyrd Decl., Ex. F, 2012 Study, 9, 13. Like the MGT study, the 2006 and 2012 studies underscore the substantial barriers to participation in City contracting that remain for MBEs. Bernal Decl. ¶ 9.

> **2.** **The MGT disparity study shows that the City has been a passive participant in racial discrimination in public contracting in Houston.**

By showing the persistence of substantial and statistically significant underutilization of minority firms in City contracting, the MGT disparity study carries the City's burden of demonstrating that there is racial discrimination in City contracting and that the City is at least a passive participant in that discrimination. A rigorous study with statistical and anecdotal evidence, like the one conducted by MGT here, satisfies the City's requirement to show empirical evidence of specific, intentional episodes of government-linked discrimination, as distinguished from general social disparities. *See Nuziard*, 721 F. Supp. 3d at 480–83, 487–89. The 2006 and 2012 studies are similarly rigorous and provide the needed empirical evidence in support of the City's compelling interest. Indeed, in prior cases in which it was held that a state or local government lacked a compelling interest in a remedial

contracting program, the government either did not conduct a study, *see e.g.*, *J.A. Croson Co.*, 488 U.S. at 505; *Scott*, 199 F.3d at 218-19, or the study was compromised by an improper gauge of minority contractor availability, *see Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000) ("[T]he data does not distinguish minority construction contractors from minority businesses generally . . . ."). When a city commissions a rigorous study that reveals the sharp disparities evident in the MGT study, as well as in the 2006 and 2012 studies, a compelling interest is typically found. *See, e.g., Concrete Works II*, 321 F.3d at 979-80; *H.B. Rowe*, 615 F.3d at 254-55; *Kossman*, 2016 WL 11473826, at *22.

Although recent cases have struck down federal benefit programs despite the federal government's presentation of statistical studies, those situations involved federal efforts to remedy general disparities among racial and ethnic groups without evidence linking such disparities to government discrimination. *See, e.g.*, *Vitolo*, 999 F.3d at 361-62; *Nuziard*, 721 F. Supp. 3d at 483-85. In the local public contracting context, such a link necessarily exists because, when the City procures goods and services in the local marketplace, it becomes at least a passive participant in the kind of discrimination cataloged in the MGT study. *See Vitolo*, 999 F.3d at 361–62 (disparity studies show government participation in intentional discrimination where there is one "decisionmaker"). Accordingly, the Court must conclude that the City

has carried its burden of showing a strong basis in evidence for its view that the MBE program is needed to remedy the City's participation in racial discrimination in City contracting.

### 3. Plaintiffs cannot provide credible and particularized evidence to rebut the City's showing of a compelling interest.

Plaintiffs are required to rebut the City's showing of a compelling interest with credible and particularized evidence. Because the City has produced a rigorous disparity study, Plaintiffs must rebut the study by "(1) showing that the statistics are flawed; (2) demonstrating that the disparities shown by the statistics are not significant or actionable; or (3) presenting contrasting statistical data." *Concrete Works II*, 321 F.3d at 959.

But Plaintiffs have not provided an expert report identifying any problems with the City's study. Nor have they disclosed a competing study. Even if the MGT Study is disregarded and the 2006 and 2012 disparity studies are deemed to be the operative studies, Plaintiffs' sole criticism of those studies is that they are too old. As the City explained in its briefing in response to Plaintiffs' first motion for summary judgment, which is incorporated here by reference, that proposition is unsupported by the case law. *See* Resp. to Pl.'s Mot. For Summ. J., Doc. No. 45, 10–15. In any event, that criticism has become irrelevant now that MGT study is available and confirms that many of the same disparities identified in the 2006 and

2012 studies persist.

Given their lack of any credible evidence, Plaintiffs have made less of a showing here than even unsuccessful litigants in other cases challenging local government minority contracting programs. *See, e.g.*, *Kossman*, 2016 WL 11473826, at *18-*19 (explaining why Plaintiffs' evidence did not discredit the City of Houston's 2012 disparity study); *W. Tenn. Ch. of Associated Builders & Contractors, Inc. v. City of Memphis*, 302 F. Supp. 2d 860, 864–65 (W.D. Tenn. 2004) ("Plaintiffs have produced arguments, and a supporting expert report, detailing missing data, incorrect calculations, and improper methodology in the disparity study."). Indeed, given their failure even to designate an expert, Plaintiffs here are unable to offer anything more than "general criticism" of the City's disparity studies, which courts have said is "of little persuasive value" *Midwest Fence Corp.*, 84 F. Supp. 3d at 727; *see also Geyer Signal, Inc. v. Minn. Dep't of Transp.*, No. 11-321 (JRT/LIB), 2014 WL 1309092, at *15 ("[D]espite their apparent disagreement with the evidence presented by the [government] . . . Plaintiffs have failed to present affirmative evidence that no remedial action was necessary."). Given Plaintiffs' failure to provide credible and particularized evidence that could rebut the City's disparity study, the Court must conclude that the City has carried its burden to show a compelling interest in administration of the MBE program.

    **B.**    ***The City's program is narrowly tailored.***

The second part of the strict scrutiny analysis requires that the City show that its efforts to remediate race discrimination are narrowly tailored to address the identified harm. To determine whether a race-based measure is narrowly tailored to achieve its purpose, courts use the factors articulated by the Supreme Court in *United States v. Paradise*: (1) the efficacy of alternative (race-neutral) remedies; (2) the flexibility and duration of the program, including the availability of waiver provisions, (3) the relationship of the numerical goals to the relevant labor market; and, (4) the impact of the program on the rights of third parties. 480 U.S. 149, 171 (1987). Courts may also assess whether a program is overinclusive or underinclusive. *Croson*, 488 U.S. at 506. As shown below, the City's program is narrowly tailored to its compelling interest of remedying its passive participation in racial discrimination in City contracting.

Plaintiffs have implied in their prior briefing that the U.S. Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. Harvard* has somehow modified the factors used to determine whether a race-based measure is narrowly tailored. The Court's opinion in that case made clear, however, that the affirmative action programs invalidated there ran afoul of existing Equal Protection precedents. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 182 (2023) ("*SFFA*"). Moreover, the factors that the Court applied there overlap closely with the *Paradise* factors, suggesting that no change in the legal

framework was intended. *See id.*

Even if *SFFA* could be viewed as modifying or expanding the narrow tailoring component of the strict scrutiny analysis, the City's MBE program would still survive such scrutiny. *SFFA* analyzed whether the program at issue (1) was over- or under- inclusive, (2) utilized stereotypes, or otherwise operated "as a negative," and (3) had a logical endpoint. *See id.* at 212, 216 228. The City's MBE program easily meets the *SFFA* factors as well as the *Paradise* factors.

### 1.    The City uses race-neutral remedies to combat discrimination.

The City employs race-neutral measures to combat discrimination in City contracting. The City has a Hire Houston First program designed to help local small businesses regardless of race. *See* Hoyrd Decl., Ex. B, 17-20. The City also conducts numerous educational and outreach programs in order to help small businesses grow and succeed.

Moreover, per the recommendation of the MGT disparity study, the City is on the cusp of expanding the ability of small business enterprises (SBEs) to substitute for MBEs across all procurement categories, as well as creating a new certification for veteran-owned businesses. Hoyrd Decl. ¶¶ 20-21. The ability of the City and its prime contractors to substitute small businesses or veteran-owned businesses for minority-owned businesses in meeting contract goals is a critical race-neutral measure that will soon be available for virtually all City contracts. *Id.*

34

### 2.   The City's program is flexible.

The City's program is narrowly tailored because it is flexible and responsive to the various circumstances of each contract and to situations that may arise that make it difficult to meet MBE participation goals. The City's program allows for waiver or adjustment of goals when circumstances indicate that such action is appropriate. Hoyrd Decl. ¶¶ 11–13, 16–17. The City also has a good faith efforts policy whereby a prime contractor can explain that it tried to meet contract goals but was unable to do so due to circumstances beyond its control. *Id.* at ¶¶ 11–14, 16–17; Hoyrd Decl., Ex. C, Good Faith Efforts Policy, 1–5; *cf. Croson*, 488 U.S. at 478–79 (challenged program was inflexible where City did not permit waiver of set-aside except in exceptional circumstances).

### 3.   The program's goals are tailored to remedying identified discrimination and are set for each contract based on the availability of MBEs for each NAICS code involved for each portion of the work.

The City narrowly tailors MBE participation goals on a contract-by-contract basis, taking into account the divisibility of the work elements involved in the contract and the availability of MBEs for each portion of the contract by NAICS code. Hoyrd Decl. ¶ 10. There is a direct relationship between public dollars spent and the availability of the firms to do the work. *Id.* Unlike *Croson*, where the goal was inflexible and chosen arbitrarily, MBE participation goals under the City's program are tailored to statistical evidence of underutilization of MBEs by

procurement category. Hoyrd Decl. ¶ 8; Bernal Decl. ¶ 9.

> **4.    Other parties—including Plaintiffs—are not negatively affected and the program does not stereotype minority groups.**

Because the City's MBE program is focused on remedying discrimination in public contracting, it need not utilize stereotypes and merely promotes participation by minority-owned firms belonging to groups where the evidence proves underutilization. Hoyrd Decl. ¶ 8; Bernal Decl. ¶¶ 7, 9. Moreover, third parties are not harmed by the program. As discussed above, Plaintiffs cannot show any harm from the program because they need only show good faith efforts to meet contract goals and, in any event, they have never been penalized for failing to make such a showing. Moreover, the program does not create an uneven playing field for non-minority firms because all firms are required to show good faith efforts for at least half of the stated contract goal. Hoyrd Decl. ¶¶ 13–17. Finally, once the small business and veteran-owned business programs are fully implemented, all contractors will have a race-neutral method of fulfilling contract goals. Hoyrd Decl. ¶¶ 20–21. Accordingly, the City's program does not negatively affect non-minority firms.

> **5.    The City's program is limited in duration and has a logical endpoint.**

The City's program is limited both in duration and scope. The express terms of the City's Ordinance provide for periodic review every five years and state that

the program "is intended to be remedial in nature and to continue only until its purposes and objectives are achieved." Hoyrd Decl., Ex. A., § 15-81(b). Periodic review ensures that the race-conscious elements of the City's program do not last any longer than necessary to rectify the disparities identified. The City's commissioning of the MGT Study and its anticipated adoption of race-neutral programs to promote small businesses and veterans-owned businesses in response to the MGT Study's findings is strong evidence of the City's commitment to end the program once its remedial goals have been met. Hoyrd Decl. ¶¶ 8, 9, 18–21; Hoyrd Decl., Ex. D, MGT Study Executive Summary 9–10.

The program is also limited in scope, both geographically and economically, focusing on data from the local Houston metropolitan market and applying only locally. Unlike the situation in *Croson*, where the Court noted that firms from all over the country would be favored over local firms, Houston's program benefits local businesses because, in order to be certified as an MBE, the firm must be located in the local Houston area. *Cf. Croson*, 488 U.S. at 481; *see* Hoyrd Decl., Ex. A., § 15-82. Unlike the plan which did not pass muster in *Croson*, the City's program is narrow in geographic, temporal, and economic scope.

### 6. The City's program is neither over-inclusive nor under-inclusive.

The City's MBE program is not overinclusive or underinclusive because it only promotes participation by minority-owned firms for which the City has

evidence of underutilization. Bernal Decl. ¶ 7. The MGT study and all prior studies commissioned by the City employ the same Census data-based definitions of minority groups that are used in the City's ordinance and associated policies and procedures. Bernal Decl. ¶ 7, 9. The MGT study, along with past studies, all document substantial and statistically significant underutilization of minority-owned firms with respect to each of the minority groups addressed by the City's program. Bernal Decl. ¶ 7, 9. Unlike the federal benefit programs challenged in *Vitolo* and *Nuziard*, the City has not attempted to include minority groups for which there is no evidence on past or present discrimination or to exclude other similarly situated groups. 999 F.3d at 361; 721 F. Supp. 3d 431 at 489. Rather, like the minority contracting program in Denver upheld in *Concrete Works II*, the City has provided evidence of discrimination for each of the minority groups addressed by the program. 321 F.3d at 970.

## CONCLUSION

For the foregoing reasons, the Court should grant the City's Motion for Summary Judgment, dismiss Plaintiffs' claims with prejudice, and order such other and further relief to which the City may be justly entitled.

By:    */s/ Ben Stephens*
      Ben Stephens
      State Bar No. 24098472
      SDTX Bar No. 2898153
      ben.stephens@huschblackwell.com
      Sandy Hellums-Gomez
      State Bar No. 24036750
      SDTX Bar No. 561314
      sandy.gomez@huschblackwell.com
      Jarrett Dillard
      State Bar No. 24099801
      SDTX Bar No. 2980302
      jarett.dillard@huschblackwell.com

HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
Telephone:    (713)  647-6800
Facsimile:    (713)  647-6884

      */s/ Darah Eckert*
      Darah Eckert
      Senior Assistant City Attorney
      State Bar No. 24007141
      SDTX Bar No. 1890045
      darah.eckert@houstontx.gov
      Lori J. Yount
      Senior Assistant City Attorney
      State Bar No. 2209496
      SDTX Bar No. 24084592
      lori.yount@houstontx.gov

ARTURO G. MICHEL
CITY ATTORNEY
SUZANNE R. CHAUVIN
CHIEF, GENERAL LITIGATION SECTION
CITY OF HOUSTON LEGAL DEPARTMENT
P.O. Box 368

Houston, Texas 77001-368
900 Bagby, 4th Floor
Houston, Texas 77002
Telephone:  (832) 393-6219
Facsimile:   (832) 393-6259

**ATTORNEYS FOR THE CITY OF HOUSTON**

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon the following on

November 30, 2024, via the CM/ECF Filing system.

*/s/ Ben Stephens*
Ben Stephens