# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT, <br><br> *Defendants.* | Civil Action No. 4:23-cv-03516 |

## PLAINTIFFS' PRELIMINARY POST-TRIAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW REGARDING DEFENDANT CITY OF HOUSTON

This is a case challenging Defendant City of Houston's Minority, Women, and Small Business Enterprise program (MBE program).[1] Plaintiffs Landscape Consultants of Texas, Inc. (Landscape Consultants), and Metropolitan Landscape Management, Inc. (Metropolitan), contend that Houston's MBE program violates the Equal Protection Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983, because the program uses racial classifications to award public contracts, furthers no

---

[1] Plaintiffs also challenge the legality of Defendant Midtown Management District's Minority, Woman, and Disadvantaged Business Enterprise (MWDBE) Program. Separate Proposed Findings of Fact and Conclusions of Law have been filed addressing that defendant.

compelling interest, and is not narrowly tailored. Plaintiffs also argue that the MWDBE program's preferential treatment of some contractors on the basis of race denies Plaintiffs the full and equal benefit of the laws within the meaning of 42 U.S.C. § 1981.

From December 1 through December 5, 2025, this Court conducted a non-jury trial in which the parties presented testimony from six witnesses[2] submitted a total of 114 pieces of documentary evidence, and stipulated to 87 Joint Admissions of Fact. In consideration of the evidence, testimony, and oral arguments presented during the trial, Plaintiffs respectfully request that the Court adopt the following post-trial findings of fact and conclusions of law

## PROPOSED FINDINGS OF FACT

*The Plaintiffs*

1.    Plaintiffs Landscape Consultants and Metropolitan are small, family-owned landscaping businesses that share approximately fifty employees. JA[3] 23; Trial Tr. vol. 1, 17:5–8, 20–22; 23:17–19, Dec. 1, 2025.

2.    Approximately 95% of Plaintiffs' employees are racial minorities. JA 33; Trial Tr. vol. 1, 18:8–9.

---

[2] Plaintiffs called their principal Gerald Thompson, and expert witness George La Noue. Midtown called its Senior Director of Engineering & Strategic Development, Marlon Marshall. The City of Houston called its Director of the Office of Business Opportunity, Cylenthia Hoyrd, and expert witness Andres Bernal.

[3] "JA" refers to the parties' Joint Admissions of Fact, Dkt. 118-5.

3.    Approximately 80–90 percent of each company's annual revenue comes from winning local government landscaping contracts. JA 25; Trial Tr. vol. 1, 26:6–18; 24:19–25.

4.    Neither Landscape Consultants nor Metropolitan qualify as or are certified as a Minority-Owned Business Enterprise (MBE) when bidding on contracts with Defendant City of Houston (Houston). JA 26, 27; Trial Tr. vol. 1, 21:2–10.

5.    Though Landscape Consultants and Metropolitan are legally separate entities, they operate as one company and share staff and equipment. Trial Tr. vol. 1, 23:3–24:2.

6.    Some clients are familiar with the Metropolitan brand, while others are familiar with the Landscape Consultants brand. Trial Tr. vol. 1, 24:11–25:11.

7.    Landscape Consultants is completing a five-year, $1.3 million contract with Houston with an 11% MWBE goal. JA 28; Trial Tr. vol. 1, 36:8–14.

8.    Despite being treated differently from other bidders due to the race of their owners, Plaintiffs have continued to bid on contracts offered by Houston since filing this lawsuit and intend to continue working for Houston in the future. Ex. P-013; Ex. P-014; Trial Tr. vol. 1, 50:16–52:2.

*Houston's Minority, Women, and Small Business Enterprise Program*

9.      Defendant City of Houston administers its Minority, Women, and Small Business Enterprise program (MBE program) to "stimulate the growth of local minority, women, and small business enterprises by encouraging the full participation of these business enterprises in various phases of city contracting." Houston Code § 15-81(a).

10.     The MBE program is not intended to remedy any single specific, past violation of the U.S. Constitution, but to mitigate and remedy the effects of past discrimination and its lingering effects against minority and women-owned businesses, and to make public contracting opportunities equally available to such businesses. JA 34.

11.     Houston has not identified any prime contract awards based on intentional discrimination against MWBE bidders in the last six years. JA 5; Trial Tr. vol. 2, 141:8–13.

12.     Houston has not disciplined any employee or City official for discriminating in the award of public contracts in the last six years. JA 6.

13.     Houston has not identified any specific constitutional or statutory violations related to its public contracting or procurement process or awards in the last six years. JA 7.

4

14.     Instead, "[t]he compelling interests advanced by the [MBE] program includes the City of Houston's attempts to remedy past discrimination by rectifying its own actions." JA 8.

15.     Houston does not require evidence that an applicant has experienced previous discrimination when determining whether to grant MWBE status. Ex. P-001 at No. 14.

16.     Houston does not distinguish between recent immigrants and those whose families have been established in the United States for generations when determining whether to grant MWBE status. Ex. P-001 at No. 13.

17.     Houston's MWBE Ordinance defines a "minority business enterprise" as a business in which at least 51 percent of the ownership, stock, or assets is owned, controlled, and managed by "minority persons." Houston Code § 15-82.

18.     In turn, the Ordinance defines "minority person" along strict racial and ethnic lines as a citizen or legal resident alien of the United States who is:

   a. Black American, which includes persons having origins in any of the black racial groups of Africa;
   b. Hispanic American, which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;
   c. Asian-Pacific American, which includes persons having origins from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Marianas Islands, Macao, Fiji, Tonga, Kiribati, Juvalu

[sic], Nauru, the Federated States of Micronesia, or Hong Kong, or the region generally known as the Far East;

d. Native American, which includes persons having origins in any of the original people of North America, American Indian, Eskimo, Aleut, Native Hawaiian; or

e. Subcontinent Asian American, which includes persons whose origins are from India, Pakistan, Bangladesh, Bhutan, the Maldives Islands, Nepal, or Sri Lanka.

Houston Code § 15-82.

19.     Houston sets annual citywide MWBE goals, then City departments impose contract-specific percentage goals for individual contracts, with limited exceptions. Houston Code §§ 15-81, 15-83(b), (c)(1)–(2).

20.     For non-MWBE firms like Plaintiffs, 100 percent of a contract-specific goal must be subcontracted to an MWBE competitor. Trial Tr. vol. 2, 133:9–13.

21.     MWBE firms must subcontract only 50 percent of a contract-specific goal because Houston policy permits them to self-perform the remainder of the goal with their own workers. Ex. P-027 at COH0000098; Trial Tr. vol. 2, 133:6–8.

22.     Firms who cannot fulfill the contract-specific goal must prove they made "good faith efforts" to do so. Ex. P-027 at COH0000090.

23.     Whether a firm made sufficient good faith efforts is up to the discretion of staff in the Office of Business Opportunity. Trial Tr. vol. 2, 133:16–22; 138:17–21.

24.     The penalty for failing to comply with a contract-specific goal or be granted a waiver for good faith efforts is debarment from all Houston contracts for five years. Houston Code § 15-86(a).

25.     Houston is required by statute to "make its best efforts" to review the Program every five years to determine if the racial preferences are necessary. Houston Code § 15-81(b).

26.     When Plaintiffs filed their Complaint in 2023, Houston's MBE program was supported by a comprehensive disparity study from 2006. Trial Tr. vol. 2, 83:20–22.

27.     Houston commissioned a comprehensive disparity study in 2016 that was completed in 2020. The Houston City Council did not adopt this disparity study. Dkt. 118-2 at ¶ 8.

*Houston's MGT Disparity Study*

28.     Houston's most recent comprehensive disparity study (MGT Study), by MGT Consulting, was adopted by the City in May 2024. JA 53; Trial Tr. vol. 3, 53:4–9.

29.     The MGT Study found no disparities for three groups: Hispanic American firms in the construction category, Asian American firms in the professional services category, and women-owned firms in the goods category. Ex. D-23 at COH0006186–87, COH00066189; Trial Tr. vol. 2, 139:1–3.

7

30.    The MGT Study identified no specific instances of racial discrimination that violate the Constitution or a statute. Trial Tr. vol. 3, 56:15–21.

31.    The MGT Study did not identify a single discriminatory act by Houston. Trial Tr. vol. 2, 130:23-25; Trial Tr. vol. 3, 56:3–5.

32.    The MGT Study did not identify a single discriminatory City decisionmaker. Trial Tr. vol. 3, 56:10–15.

33.    The MGT Study did not identify a single instance in which Houston granted or withheld a contract because of discriminatory intent. Trial Tr. vol. 3, 55:24–55:2.

34.    Houston did not instruct MGT to look for specific instances of racial discrimination, discriminatory City employees, or discriminatory contract awards when conducting the MGT Study. Trial Tr. vol. 2, 16–19; Trial Tr. vol 3, 54:25–56:2.

35.    Instead, the MGT Study sought out statistical disparities as evidence of societal discrimination. The MGT Study's core output is a disparity ratio comparing utilization to availability. Trial Tr. vol. 3, 57:8–19.

36.    The meaning and accuracy of the disparity ratios depend entirely on the utilization and availability inputs that MGT selected to use in the study. Trial Tr. vol. 3, 57:20–22.

37.    If those inputs are distorted, incomplete, or mismatched, the resulting disparity ratios will reflect those distortions rather than underlying market conditions. Trial Tr. vol. 3, 57:23–58:7.

38.    The MGT Study does not attempt to determine whether any observed disparity was caused by discrimination. Trial Tr. vol. 3, 64:18–25.

39.    The MGT Study measured utilization by the dollar value of contracts awarded, not by the number of contracts awarded or the number of firms receiving work. Trial Tr. vol. 3, 59:9–60:3.

40.    Because the MGT Study measures utilization in dollars, a small number of very large contracts can dominate utilization figures regardless of how many firms receive contracts. Trial Tr. vol. 3, 60:4–61:7.

41.    As a result, minority firms could receive a majority of contracts yet still appear underutilized if shareholder-owned firms receive the largest contracts. Trial Tr. vol. 4, 10:5–16.

42.    Unclassified firms—into which publicly-traded firms fall when race or ethnicity cannot be identified—account for a majority of utilization, further obscuring any meaningful comparison among small firms. Trial Tr. vol. 3, 84:1–86:1.

43.     Publicly traded and multinational firms are treated as "non-minority" or "non-minority male" firms for purposes of utilization. Trial Tr. vol. 3, 84:25–85:6.

44.     National multi-million-dollar firms are also counted in the "non-minority" or "non-minority male" categories. Trial Tr. vol. 3, 83:12–17; 85:23–86:3.

45.     The MGT Study's utilization data does not distinguish between small, white-owned firms and large, shareholder-owned or multinational corporations. Trial Tr. vol. 3, 84:25–85:6.

46.     In the MGT Study, large, multinational and publicly traded corporations dominate utilization figures and materially affect disparity ratios. Trial Tr. vol. 4, 11:5–22.

47.     The MGT Study's utilization numerator aggregates prime contract dollars awarded by the City with subcontract dollars awarded by private prime contractors. Trial Tr. vol. 3, 61:10–20; Trial Tr. vol. 4, 10:5–19.

48.     The MGT Study does not distinguish between these fundamentally different decisionmakers when calculating disparities. Trial Tr. vol. 4, 10:17–19.

49.     By aggregating prime and subcontracting dollars, the MGT Study attributes private subcontracting outcomes to City decisionmaking without analysis. Trial Tr. vol. 3, 62:12–14.

50.    Availability in the MGT Study is limited to firms located within a defined nine-county market area. Trial Tr. vol. 3, 62:23–25.

51.    However, the MGT Study's utilization numerator includes dollars paid to firms located outside that market area. Approximately twenty-two percent of all Houston contracting dollars—and more than one-third of "Other Services" dollars—went to such firms. Trial Tr. vol. 3, 63:9–12; 68:2–8, 14–19.

52.    These out-of-market firms nonetheless received Houston contracts, demonstrating that they were capable of performing City work even though they were excluded from availability. Trial Tr. vol. 3, 68:20–69:1.

53.    Excluding firms that actually received Houston contracts from the MGT Study's availability analysis mechanically shrinks the denominator and inflates the Study's disparity ratios. Trial Tr. vol. 3, 69:2–12.

54.    Availability is not a count of firms that actually sought or bid on Houston contracts, but a general estimate of firms that could perform the work. Trial Tr. vol. 3, 69:9–12.

55.    The MGT Study's availability estimate relies in part on a marketing database from Dun & Bradstreet, which does not identify which firms bid on government contracts. Trial Tr. vol. 3, 66:8–16.

56.    MGT relied on Dun & Bradstreet data in the MGT Study, despite being aware that Dun & Bradstreet's data contains inaccuracies. Trial Tr. vol. 3, 67:1–5.

11

57.    The MGT Study's disparity analyses and statistical significance testing divide firms into six categories: Black Americans, Asian Americans, Hispanic Americans, Native Americans, Nonminority Women, and Unclassified Firms. Ex. D-23 at COH0006185.

58.    The Hispanic Americans category includes persons with ancestry ranging from Mexico to Argentina, as well as Europeans with ancestry in Spain or Portugal. Trial Tr. vol. 4, 6:23-7:3.

59.    The Asian American category combines individuals from small Pacific islands with those from India, China, and Japan. Trial Tr. vol. 4, 7:4–12.

60.    The Qualitative section of the MGT Study consists of anonymous vendors' perceptions and anecdotes, rather than verified findings of discrimination. Trial Tr. vol. 3, 86:10–14.

61.    The qualitative comments are anonymous, unsworn, and were not investigated, corroborated, or compared to City records by MGT. Trial Tr. vol. 3, 86:13–14, 19–20, 24–25; 87:1–6.

62.    Landscaping services fall within North American Industry Classification System (NAICS) code 5617, "Services to Buildings and Dwellings." The MGT Study found no statistically significant disparity for NAICS code 5617 and described the result as parity. Ex. D-24 at COH0006430; Trial Tr. vol. 3, 80:16–81:6.

63.     Accordingly, the MGT Study found no statistically significant shortfall for landscaping services, like those provided by Plaintiffs. Trial Tr. vol. 3, 81:7–10.

*Houston's MBE Ordinance*

64.     On May 7, 2025, the Houston City Council voted to adopt the MGT Study to "inform future program recommendations and policy decisions" affecting Houston's MBE Program and voted to amend Chapter 15 of the Code of Ordinances. Ex. D-39 at 1; JA 54.

65.     The revised ordinance retained both the MBE Program's racial classifications and its race-based contract goals, despite the MGT Study's findings that some racial and ethnic groups did not experience disparities. Houston Code §§ 15-81, 15-82, 15-83(b), (c)(1)–(2); Trial Tr. vol. 2, 139:1–6; 140:3–6.

66.     For example, while the MGT Study concluded no disparity existed for both white and Hispanic-owned construction firms, Hispanic-owned firms continue to receive a race- and ethnicity-based preference through the MBE Program while firms owned by white individuals do not. Trial Tr. vol. 2, 139:24–140:6.

67.     Moreover, the revised ordinance set new citywide MBE goals for Houston contracts. Most were similar or identical to the previous citywide goals, with one exception. Nonprofessional services—the category in which Plaintiffs compete—nearly doubled its minority and women-owned business enterprise goal, increasing from 11 percent to 19 percent. Ex. D-39 at 3.

68.     On May 8, 2025—one day after the revised ordinance passed—Plaintiff Landscape Consultants received an email from the Houston Office of Business Opportunity's Contract Compliance Division regarding Landscape Consultants' progress in meeting the 11 percent goal for an ongoing city contract. The email threatened Landscape Consultants with enforcement actions, including up to a 5-year suspension under Houston Code § 15-85 if it does not fulfill the 11 percent goal or demonstrate acceptable good faith efforts. Ex. P-015.

## PROPOSED CONCLUSIONS OF LAW

### I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). This Court has jurisdiction to grant both declaratory and injunctive relief pursuant 28 U.S.C. §§ 2201–2202. Venue is proper under 28 U.S.C. § 1391(b).

### II.    MOOTNESS

2.     Houston's May 2025 revision to its MWBE ordinance has no impact on the claims or relief sought in Plaintiffs' Complaint, dkt. 1.

3.     First, Plaintiffs' Complaint is not limited to challenging Houston's MWBE Ordinance. Plaintiffs' Complaint challenges Houston's race-conscious "MBE Program," which is guided by Chapter 15 of the Houston Code of Ordinances, as well as policies and procedures implemented by the Office of Business Opportunity. Dkt. 1 at ¶¶ 47–55; 65–68; Trial Tr. vol. 2, 94:8–11. Houston does not

dispute that it continues to operate a race-conscious MWBE program post-ordinance revision. Trial Tr. vol 1, 206:8–10.

4.     Second, the relief Plaintiffs seek is not limited to the MBE ordinance. In their Prayer for Relief, Plaintiffs ask this Court to "[d]eclare the City of Houston's [MBE] program unconstitutional" and to "[p]ermanently enjoin the City of Houston from operating its [MBE] program or using similar racial preferences in the award of public contracts." Dkt. 1 at 16.

5.     Third, the portions of the MWBE ordinance that Plaintiffs claim violate their right to equal protection and equal treatment remain unchanged in the revised ordinance. The overly broad and stereotyping definition of "minority persons" in Houston Code § 15-82 is untouched. Ex. D-1; Ex. D-2; Trial Tr. vol. 2, 140:3–6. The citywide goals for public contracts also remain in place for all minority-owned businesses—despite evidence that some minority-owned businesses are overutilized. Ex. D-39; Trial Tr. vol. 2, 139:1–6.

6.     Houston also continues to enforce the revised ordinance against Plaintiffs, emailing Plaintiff Landscape Consultants to threaten that failure to comply with a contract's MWBE goal was grounds for up to a 5-year suspension from City contracting. Ex. P-015.

7.     It is "well settled" that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the

legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). A live controversy remains because a city's "repeal of the objectional language would not preclude it from reenacting precisely the same provision[.]" *Id.*

8.    Houston has not even ceased the challenged conduct; it continues to operate a race-conscious public contracting program under the amended MWBE ordinance. Trial Tr. vol 1, 206:8–10. The Supreme Court condemned this practice in *Northeastern Florida*, where Jacksonville replaced one MBE ordinance with a very similar MBE ordinance at a late stage of litigation, then claimed a live controversy no longer existed with respect to the constitutionality of the original ordinance. *N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 660-61 (1993). Referring to its previous decision in *City of Mesquite* as "controlling," the Court found the case against Jacksonville even stronger because it had not just repealed an ordinance (as Mesquite had), but also replaced it with another ordinance that continued the unlawful conduct. *Id.* at 662 ("There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so."). Like Jacksonville, Houston repeated the racial preferences Plaintiffs challenge by retaining every single racial category and race-based goal from the previous ordinance. Trial Tr. vol. 2, 139:1–140:6.

9.    It is irrelevant that Houston's revised ordinance is not identical to the previous ordinance. As the Supreme Court made clear in *Northeastern Florida*:

> *City of Mesquite* does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. *The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment…it disadvantages them in the same fundamental way.*

*Ne. Fla.*, 508 U.S. at 662 (emphasis added).

10.    With no change to the challenged portions of the MWBE ordinance, ongoing harm to Plaintiffs, and clear guidance that alterations to a statute do not deprive this court of jurisdiction, Plaintiffs' claims for relief against Houston's MWBE program are not moot.

## III.    STANDING

### A. Plaintiffs Established Article III Standing

11.    To establish Article III standing, Plaintiffs must demonstrate (1) an "injury in fact" (2) that is "fairly traceable" to each defendant and (3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

12.    In a forward-looking equal protection challenge to a race-based set-aside program like Houston's, a party "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *N.E. Fla.*, 508 U.S. at 666.

13.    Plaintiffs' representative Gerald Thompson testified that Plaintiffs are able and ready to bid on Houston contracts, and in fact recently completed a multi-

year landscaping contract for the City. Trial Tr. vol. 1, 36:8–14. Mr. Thompson further testified that Plaintiffs will continue to bid on Houston contracts if they can do so on an equal footing with other bidders. Ex. P-013; Ex. P-014; Trial Tr. vol. 1, 50:16–52:2. Plaintiffs have established that they are "able and ready" to bid on Houston contracts. *N.E. Fla.*, 508 U.S. at 666.

14.    An "'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 213 (5th Cir. 1999).

15.    Plaintiffs have established an injury in fact through evidence that they are treated unequally due to race when bidding for Houston contracts. Plaintiffs' bid pricing must account for subcontracting 100 percent of the contract-specific MWBE goal. Trial Tr. vol. 2, 133:9–13. The bids of Plaintiffs' MWBE competitors must only account for subcontracting 50 percent of the contract-specific goal and can "self-perform" the other 50 percent of the contract-specific goal with their own employees. Ex. P-027 at COH0000098; Trial Tr. vol. 2, 133:6–8.

16.    Houston's unequal, race-based self-performance requirements put non-MWBE firms at a "competitive disadvantage" and constitute an injury in fact. *W.H. Scott*, 199 F.3d at 215; *see also Concrete Works of Colo., Inc. v. City and Cnty. of*

18

*Denver*, 36 F.3d 1513, 1518-19 (10th Cir. 1994) ("extra requirements impose costs and burdens on nonminority firms that preclude them from competing with [minority businesses] … on an equal basis."); *Contractors Ass'n of Eastern Pa., Inc. v. Cty. of Philadelphia*, 6 F.3d 990, 995–96 (3d Cir. 1993); *Cone Corp. v. Hillsborough Cnty.*, 5 F.3d 1397, 1399 (11th Cir. 1993); *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir. 1997). "Pocketbook harm is a traditional Article III injury." *Bost v. Ill. State Bd. of Elections*, No. 24-568, slip. op. at 2 (U.S. Jan. 14, 2026) (Barrett, J., concurring).

17.    Houston's Good Faith Efforts Policy, Ex. D-04, does not level the playing field. As Houston Office of Business Opportunity (OBO) Director Hoyrd testified, whether a firm made sufficient good faith efforts to waive a contract's MWBE goal is within the complete discretion of OBO staff. Trial Tr. vol. 2, 133:16–22; 137:4–138:2. That the decision to relieve Plaintiffs from race-based differential treatment is discretionary does not turn an unconstitutional program into a constitutional one.

18.    Finally, the threat of harm to Plaintiffs is not theoretical; Houston enforced its MBE ordinance against Landscape Consultants just one day after it was passed, threatening Landscape Consultants with suspension for up to 5 years for

failure to satisfy a contract's MWBE goal. Ex. P-015. Plaintiffs have Article III standing to pursue their section 1983 claims against Houston.[4]

### B. Plaintiffs Established Standing for Their Section 1981 Claims

19.     A plaintiff has statutory standing if it falls within the class of plaintiffs whom Congress has authorized to sue. *White Glove Staffing, Inc. v. Methodist Hospitals of Dallas*, 947 F.3d 301, 307 (5th Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Courts examine "(1) whether the plaintiff falls within the statute's zone of interests and (2) whether the plaintiff's alleged injuries were proximately caused by violation of the statute." *White Glove*, 947 F.3d at 307 (internal quotation marks omitted).

20.     The zone of interest inquiry is "not especially demanding," and looks to the operative statute. *Id*. Section 1981 protects the equal right of "[a]ll persons within the jurisdiction of the United States … to the full and equal benefit of all laws" without respect to race. 42 U.S.C. § 1981. Plaintiffs' section 1981 claims that Defendants' race-based public contracting programs leave Plaintiffs unable to compete equally for contracts because of the race of their owners falls squarely within this zone. *See Lexmark*, 572 U.S. at 130 (zone of interest tests not met "only when a plaintiff's interests are so marginally related to or inconsistent with the

---

[4] The traceability and redressability prongs of Plaintiffs' Article III standing are not in dispute, and this Court finds they have been met.

purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized that plaintiff to sue.") (internal quotation marks and citation omitted).

21.     The proximate cause test is met if the "harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 133. In *White Glove*, a hospital terminated the contract of a temporary staffing agency because the agency assigned a black employee when the hospital had demanded Hispanic employees. 947 F.3d at 304. The staffing agency demonstrated proximate cause under section 1981 because the contract termination had a "sufficiently close connection" to the racial discrimination in making and enforcing contracts prohibited in section 1981. *Id.* at 308. Here, Plaintiffs' alleged harm—the inability to compete for contracts on an equal footing because of the race of its owners—has an equally close connection to section 1981's guarantee of the "full and equal benefit of all laws."

## IV.    EQUAL PROTECTION

22.     The Supreme Court is unequivocal: "Racial discrimination is invidious in all contexts." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) (*SFFA*) (cleaned up) (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991)). Race-based classifications are presumptively unconstitutional and can only be overcome if the government satisfies the "daunting two-step examination" of strict scrutiny. *SFFA*, 600 U.S. at 206. The burden is on Defendants to first demonstrate that their programs' racial

21

classifications are used to "further compelling governmental interests." *Id.* at 206–07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). Second, they must show that the "use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)).

## A. Houston Failed to Prove a Compelling Interest

23.    There are only two compelling interests that permit the government to treat individuals differently based on race: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and (2) "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207. A defendant may establish a compelling interest in remedying racial discrimination if it meets three criteria: (1) it identifies a specific instance of past discrimination and does not rely on general allegations of bias in the industry; (2) it provides direct evidence of intentional discrimination as opposed to mere disparities; and (3) it shows past governmental participation in the discrimination it seeks to remedy. *Miller v. Vilsack*, No. 4:21-CV-0595, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing U.S. Supreme Court precedents)). Courts must undertake a "searching judicial inquiry into the justification" of a race-based program to ensure that

government entities are "pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

24.    Because Houston admits that it cannot identify any specific Constitutional or statutory violations related to its public contracting or procurement process—or indeed *any* racial discrimination within its contracting program—Houston has not carried its burden to demonstrate a compelling interest in the MBE program's racial classifications. Within the last six years, Houston has not sanctioned or investigated any city employee for racial discrimination, identified any prime contractor that has discriminated against an MWBE subcontractor, or gathered any contemporary evidence of disparities or discrimination within the greater Houston area. Houston cannot have an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" if it has no proof of instances of past discrimination.

25.    The MGT Study—despite being written post-*SFFA*—neither searched for nor found any specific, identified instances of past discrimination that violate the Constitution or a statute and is therefore inadequate to prove past intentional discrimination towards any racial or ethnic group granted a preference under Houston's Program. Despite including individuals who originate from five continents and dozens of countries, Houston admits that the Program's definition of a "minority person" is not based on specific data from the Houston metropolitan area

and it has not identified individuals from any of those countries who have suffered discrimination in Houston public contracting. Ex. P-001 at Nos. 10, 12. What's more, the Program continues to include preferences for certain racial or ethnic groups *despite* the MGT Study's conclusion that no disparity exists for those groups. Houston has no compelling interest for its use of racial preferences in the MBE Program.

### B. Houston's Program Is Not Narrowly Tailored

26.     A race-conscious program should be the remedy of last resort. *Walker v. City of Mesquite*, 169 F.3d 973, 982–83 (5th Cir. 1999). For a race-based program to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *Croson*, 488 U.S. at 507. Courts must strike down race-based programs unless they are "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher*, 570 U.S. at 312. Further, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications, *Croson*, 488 U.S. at 507–08; *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003), and it must have an end point. *SFFA*, 600 U.S. at 225.

27.     Houston's Program is both underinclusive and overinclusive. It is underinclusive in that it excludes many minority-owned businesses, like those with owners from the Middle East or North Africa, as well as any minority business owner

24

who owns less than 51% of their business. *Nuziard v. Minority Bus. Dev. Agency*, 676 F. Supp. 3d 473, 483–84 (N.D. Tex. 2023). The Program is overinclusive because it includes businesses who may never have been discriminated against, as well as those which its own disparity study found should be excluded. Houston admits that it does not require evidence that an applicant has experienced previous discrimination when determining whether to grant MWBE status. Ex. P-001 at No. 14. Nor does Houston distinguish between recent immigrants and those whose families have been established in the United States for generations. *Id*. at No. 13. This "scattershot approach" is not sufficient narrow tailoring. *Vitolo*, 999 F.3d at 364. Finally, the Program never ends, as its forty-year history and infrequent review attest. Race-based programs must end. *SFFA*, 600 U.S at 225.

### C. The MGT Study Does Not Establish a Compelling Interest and Cannot Support Race-Based Contracting Preferences

27.    Even assuming that *SFFA* does not resolve this case, Houston's program would still fail constitutional scrutiny. Long before *SFFA*, the Supreme Court made clear that race-based governmental action is permissible only in the rarest of circumstances and only upon a showing of specific, identified discrimination attributable to the government itself. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–95 (1989); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). Generalized assertions, statistical abstractions, and amorphous claims of societal discrimination cannot supply the compelling interest necessary to

justify racial classifications. *Croson*, 488 U.S. at 498–500; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986).

28. That principle remains unchanged after *SFFA*. As the Supreme Court recently reaffirmed, racial classifications are "presumptively unconstitutional," and the burden rests squarely on the government to justify their use through a "daunting two-step examination." *SFFA*, 600 U.S. at 206. Whether analyzed under *SFFA* or under the Court's longstanding remedial-equal-protection cases, Houston must identify concrete, particularized discrimination and demonstrate that its use of race is necessary to remedy that discrimination. Houston has not done so.

29. Instead, Houston relies exclusively on a consultant-produced disparity study that neither searched for nor identified any specific instance of past discrimination by the City and that expressly disclaimed any effort to determine whether observed disparities were caused by discrimination at all. Trial Tr. vol. 3, 54:24-55:2; 56:3-21. As explained below, that study is not evidence of discrimination; it is a collection of methodological assumptions, statistical aggregations, and abstract ratios that collapse distinct actors, industries, and firms into a single numerical output. Such a façade of precision cannot satisfy the Constitution's demand for a compelling interest, even under the most generous

reading of *Croson* and *Adarand*. *See Croson*, 488 U.S. at 501–02; *SFFA*, 600 U.S. at 226–230.

### 1. Houston failed to establish a compelling interest

30.     Even under the pre-*SFFA* remedial-equal-protection framework, Houston bears the burden of identifying specific, actual discrimination attributable to the City itself. *Croson*, 488 U.S. at 493. That burden is "a demanding one," requiring more than statistical imbalance or generalized claims about an industry. *Id.* at 498–500; *Adarand*, 515 U.S. at 226–27 (1995).

31.     Houston did not carry that burden. As Houston's expert witness Andres Bernal testified, the MGT study did not identify a single discriminatory act by the City of Houston, did not identify any discriminatory City decisionmaker, and did not identify any contract award tainted by discriminatory intent. Trial Tr. vol. 3, 54:24-55:2; 56:3-5; 56:10-15. The MGT Study does not claim that Houston violated the Constitution or any statute. Trial Tr. vol. 3, 56:15-21. Houston did not ask MGT to investigate discrimination by City officials or prime contractors; it asked MGT to perform a disparity analysis. Trial Tr. vol. 2, 16–19; Trial Tr. vol 3, 54:25–56:2.

32.     Critically, Bernal testified that the MGT Study does not attempt to determine whether any observed disparity was caused by discrimination. Trial Tr. vol. 3, 64:18–25. That concession alone is fatal under *Croson*. A government cannot justify race-based remedies without evidence that the government itself participated

27

in discrimination. *Croson*, 488 U.S. at 492–93; *Wygant*, 476 U.S. at 274 ("the Court has insisted upon some showing of prior discrimination by the governmental unit involved."). A study that expressly disclaims causation cannot establish a compelling interest as a matter of law.

### a. MGT's disparity ratios are methodologically meaningless

33.    Even if statistical disparities could contribute to a showing of discrimination in some circumstances, the disparity ratios produced here are not probative because they are the product of methodological choices that strip them of meaning. Here, upon even a cursory examination of the MGT Study, Houston's claims "necessarily crumble when the multiple errors of the underlying numbers are exposed." *Lopez v. Laborers Int'l Union Loc. No. 18*, 987 F.2d 1210, 1216 (5th Cir. 1993).

34.    Bernal testified that the meaning and accuracy of the disparity ratios depend entirely on how utilization and availability are defined. Trial Tr. vol. 3, 57:20–22. Where those inputs are distorted or mismatched, the resulting disparities reflect design choices rather than discriminatory exclusion. Trial Tr. vol. 3, 57:23–58:7. So, how are they defined?

35.    Utilization in the MGT study is measured by the dollar value of contracts awarded rather than by the number of contract awards or the number of firms receiving work. Trial Tr. vol. 3, 59:9–60:3. Bernal acknowledged that this

choice allows a small number of very large contracts to dominate utilization figures regardless of how many firms receive contracts. Trial Tr. vol. 3, 60:4–61:7. As a result, a firm group could receive many contracts yet still appear "underutilized" if it does not receive the largest contracts. Trial Tr. vol. 4, 10:5–16.

36.     That distortion is magnified by the study's treatment of multinational and publicly traded corporations. The MGT Study does not distinguish between small, closely held local firms and large shareholder-owned or multinational corporations in its utilization data. Trial Tr. vol. 4, 10:17–19. Bernal testified that publicly traded and multinational firms are treated as "non-minority" or "non-minority male" firms and that national multi-million-dollar companies are counted within that category. Trial Tr. vol. 3, 84:25–85:6. He also acknowledged that "unclassified firms"—into which public companies fall when race or ethnicity cannot be identified—account for a majority of utilization. Trial Tr. vol. 3, 84:1-3.

37.     When utilization is driven by the contract dollars of multinational corporations with no meaningful connection to the local small-business market, the resulting disparity does not measure discrimination. It measures scale. Courts have consistently rejected disparity analyses that compare small local firms to national or multinational entities without accounting for differences in size, scope, and capacity. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737–38 (6th Cir. 2000) (describing such an approach as "ludicrous"); *Engineering Contractors Ass'n*

*of S. Fla., Inc. v. Metro. Dade County*, 122 F.3d 895, 917 (11th Cir. 1997) (recognizing the obvious point that in the absence of discrimination, bigger firms get bigger contracts).

69.    38.    In addition, the disparity ratios are rendered meaningless by the study's decision to combine prime contract dollars awarded by the City with subcontract dollars awarded by private actors. Bernal testified that prime contracts are awarded by the City of Houston, while subcontracts are awarded by private prime contractors, yet the MGT Study aggregates both into a single utilization figure. Trial Tr. vol. 3, 61:10–20. The MGT Study does not distinguish between these fundamentally different decisionmakers, nor does it attempt to analyze whether any alleged disparity arises from City action as opposed to private market behavior. Trial Tr. vol. 4, 10:17–19. By collapsing City-controlled decisions and private subcontracting outcomes into a single metric, the study aggregates unrelated choices by different actors and labels the result a "disparity," further confirming that the ratios do not measure discrimination at all. *See Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 648 (7th Cir. 2001) (recognizing that treating primes and subs similarly is "one of the most dubious propositions" that can justify a disparity).

70.    38.    The availability side of the equation fares no better. Bernal testified that availability is limited to firms located within a defined nine-county

market area, even though the utilization numerator includes dollars paid to firms located outside that area. Trial Tr. vol. 3, 62:23–25; 63:9–12; 68:2–8, 14–19. Approximately 22 percent of all City contracting dollars—and more than one-third of "Other Services" dollars—went to firms located outside the market area. *Id.*

39.    Those out-of-market firms nonetheless received City contracts, demonstrating that they were capable of performing City work, yet they were excluded from availability. Trial Tr. vol. 3, 68:20–69:1. Excluding firms that actually received contracts from availability shrinks the denominator and mechanically inflates disparity ratios. Trial Tr. vol. 3, 69:2–12. Courts have rejected disparity studies that define availability in a manner that excludes firms that demonstrably participate in the relevant market. *Croson*, 488 U.S. at 501–02.

40.    Availability was also constructed using proxy data untethered to City contracting. Bernal testified that the availability estimate relies in part on Dun & Bradstreet, a marketing and credit database that does not identify which firms bid on government contracts. Trial Tr. vol. 3, 66:8–16. MGT did not independently verify that data or confirm whether listed firms were active, operational, or seeking City work. Trial Tr. vol. 3, 67:1–5. A denominator built on unverified estimates rather

than actual bidders cannot support constitutionally meaningful conclusions. *Croson*, 488 U.S. at 501–02.

***

41. In short, the study aggregates unlike entities—large multinational, shareholder-owned corporations and small, locally owned firms (like Landscape)—as though they were comparable; combines private subcontracting decisions with City prime awards; excludes firms that demonstrably participated in City contracting from availability; relies on unverified proxy data untethered to bidding; and then treats the resulting dollar totals as evidence of discrimination—despite having made no effort to isolate discrimination in City procurement. That is not the "particularized showing" *Croson* requires. 488 U.S. at 504. Instead, Bernal has produced for the Houston taxpayer a very expensive "statistical form of self-affirmation." *Ernst v. City of Chicago*, 837 F.3d 788, 802 (7th Cir. 2016).

### b. The "Qualitative Evidence" Does Not Supply Proof of Discrimination

42. The qualitative portion of the MGT Study does not cure the absence of evidence of discrimination; it underscores it. Bernal testified that the qualitative section consists of vendors' perceptions and anecdotes rather than findings of discrimination. Trial Tr. vol. 3, 86:10–14. These comments are anonymous, unsworn, and entirely uninvestigated. Trial Tr. vol. 3, 86:13–14, 19–20, 24–25; 87:1–6. MGT did not test the accuracy of the allegations, did not compare them to

City contracting records, and did not attempt to determine whether the alleged conduct occurred at all. *Id.*

43.    Critically, the qualitative material is untethered to the elements that matter under equal protection doctrine. Bernal testified that the study does not link any qualitative comment to a specific City contract, a specific City decisionmaker, a specific procurement policy, or a specific instance in which race affected an award. Trial Tr. vol. 3, 86:19-87:6: 87:20-23. Nor does the study attempt to distinguish allegations of private market conduct from conduct attributable to the City. Trial Tr. vol. 4, 10:17–19. As a result, even if every anecdote were accepted at face value, the qualitative section would still fail to identify discrimination by the City—the only kind of discrimination that can justify a race-based remedy under *Croson*. 488 U.S. at 492–93.

44.    Allowing such material to do constitutional work would collapse strict scrutiny into deference. Any jurisdiction could justify racial classifications by collecting anonymous complaints, declining to investigate them, and labeling the result "qualitative evidence." That approach would eviscerate *Croson*'s requirement that courts conduct a "searching judicial inquiry" into the justification for race-based action. 488 U.S. at 493. The Constitution demands evidence, not impressions; findings, not feelings. In other words, the qualitative section does not corroborate

evidence of discrimination; it supplies a narrative to justify a conclusion the study never proved.

###### 2. Narrow tailoring fails because the MGT study shows parity in landscaping

45.     Even if the Court were to accept the MGT study's statistical framework wholesale—its use of dollar-weighted utilization, its aggregation of multinational and local firms, its conflation of City decisions with private subcontracting, its truncated availability estimates, and its qualitative gloss drawn from unverified perceptions—the study would still fail to support Houston's program. Taken on its own terms, the MGT Study affirmatively demonstrates that no disparity exists in the very industry in which Landscape operates.

46.     Landscaping services fall within NAICS 5617, "Services to Buildings and Dwellings." Ex. D-24 at COH0006430. Bernal testified that for that NAICS category, the study found no statistically significant disparity and described the result as parity. *Id*.; Trial Tr. vol. 3, 80:16–81:6. Thus, even under the study's chosen metrics, assumptions, and categorizations, the data show no underutilization, no shortfall, and no basis for inferring discrimination in landscaping services.

47.     That finding is dispositive. A race-based remedy cannot be justified where the government's own evidence shows parity in the relevant industry. *Croson* requires that remedial measures be tied to "identified discrimination" in the

particular field where the remedy is imposed. 488 U.S. at 509. A finding of parity forecloses that showing.

48.    Houston attempts to avoid this result by retreating to broader procurement categories—such as "Other Services"—that aggregate dozens of unrelated industries into a single statistical bucket. But Bernal testified that landscaping represents only a small fraction of that category's total dollars. Trial Tr. vol. 3, 77:2-14. A category-wide disparity driven by unrelated industries cannot constitutionally justify race-based preferences imposed on landscaping firms for which the study found none.

49.    This maneuver underscores the core defect in Houston's reliance on the study. Where the analysis is specific, the result is parity; where the analysis is abstract and aggregated, the result is disparity. *Croson* does not permit governments to justify race-based remedies by zooming out until a disparity appears and then applying those remedies everywhere. 488 U.S. at 499–500.

50.    In short, even crediting the study's methodology, assumptions, and qualitative narrative, the evidence defeats Houston's asserted justification. When the

government's own study shows parity in the very industry subject to race-based preferences, narrow tailoring is not merely absent—it is impossible.

### D. Houston's Program Violates the "Twin Commands" of Equal Protection

51.    The Equal Protection Clause's "twin commands" require that race never be used as a negative and that it may never operate as a stereotype. *SFFA*, 600 U.S. at 218. Houston's MWBE program does both. Like college admissions, contracting awards are zero-sum; Houston's MWBE goals are a benefit provided to some companies but not others based on race, and "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19.

52.    Houston's program also uses race as a stereotype. All black, Hispanic, Native American, Asian American, or Subcontinent Asian American business owners are treated according to group membership. No individualized showing of discrimination is necessary, because Houston assumes all individuals from racial groups are the same. Ex. P-001 at No. 12. Houston's racial stereotyping is "contrary … to the 'core purpose' of the Equal Protection Clause." *SFFA*, 600 U.S. at 221 (citing *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

## V.    SECTION 1981

53.    To establish a prima facie case under 42 U.S.C. §1981, Plaintiffs must show that: (1) they are members of a racial minority; (2) Houston had an intent to

36

discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288–89 (5th Cir. 2004). Despite the racial minority requirement, the statute "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Co.*, 427 U.S. 273, 295 (1976).

54.    Houston program violates section 1981 by expressly excluding Plaintiffs due to the race of their owners. This racial discrimination is intentional. Houston Code § 15-81, *et seq.*, creates a program that advantages some businesses over others based on the race or ethnicity of the business's majority owner. A law or policy that expressly classifies people on the basis of a protected characteristic is direct evidence of discriminatory intent. *See, e.g.*, *Adarand Constructors*, 515 U.S. at 213, 227–29; *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

55.    Houston's program also implicates an activity enumerated under section 1981: Plaintiffs' "making … of contracts" with Houston for landscaping services. 42 U.S.C. § 1981(b). A contract "need not already exist" to trigger section 1981's protections; the statute "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza*, 546 U.S. at 476. Houston's MWBE program, which use racial classifications to treat bidders differently,

deprives Plaintiffs of the "full and equal benefits of all laws" in violation of 42 U.S.C. § 1981.

## VI.    ATTORNEYS' FEES

56.    42 U.S.C. ¶ 1988(b) establishes that "[i]n any action or proceeding to enforce a provision of sections 1981 [or] 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." Such an award "may include expert fees as part of the attorney's fee." 42 U.S.C. ¶ 1988(c).

57.    Having found in favor of the Plaintiffs, this Court hereby awards Plaintiffs their attorney's fees, including expert fees, and directs Plaintiffs to submit a proposed attorney's fee award.

## CONCLUSION

Because Houston has not proven that the racial classifications in their public contracting programs satisfy the demanding requirements of strict scrutiny, because Houston's program violates the "twin commands" of Equal Protection, and because Houston's program deprives Plaintiffs of their right to the full and equal benefit of the law under section 1981, this Court will enter judgment for Plaintiffs and grant the following relief:

A.    Defendant City of Houston's Minority, Women, and Small Business Enterprise program is declared unconstitutional under the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981 & 1983;

B.    Defendant City of Houston is permanently enjoined from operating its Minority, Women, and Small Business Enterprise program or using similar racial preferences in the award of public contracts; and

C.    Plaintiffs shall be awarded attorneys' fees and costs pursuant to Federal Rules of Civil Procedure 54(d) and 42 U.S.C. § 1988.

DATED: January 30, 2026.

Respectfully submitted,

Laura D'Agostino*
*Of Counsel*
D.C. Bar. No. 241868
Dean McGee*
*Of Counsel*
N.Y. Bar. No. 5135884
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Fax: (916) 419-7747
ldagostino@pacificlegal.org
dmcgee@pacificlegal.org

*Pro Hac Vice*

s/ Erin E. Wilcox
Erin E. Wilcox
*Attorney-in-Charge*
Cal. Bar No. 337427
S.D. Tex. Bar No. 3369027
Joshua P. Thompson*
*Of Counsel*
Cal. Bar No. 250955
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
ewilcox@pacificlegal.org
jthompson@pacificlegal.org

*Counsel for Plaintiffs*

39

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I served the foregoing document via the Courts electronic filing system as follows to the Defendants' counsel of record:

Lori Yount
Senior Assistant City Attorney
Darah Eckert
Senior Asst. City Attorney, General Litigation Section
City of Houston Legal Department
P.O. Box 368
Houston, Texas 77001-368
900 Bagby, 4th Floor
Houston, TX 77002
lori.yount@houstontx.gov
darah.eckert@houstontx.gov

Ben Stephens
Sandy Hellums-Gomez
Jarett Dillard
Sherri Zack
HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
ben.stephens@huschblackwell.com
sandy.gomez@huschblackwell.com
jarett.dillard@huschblackwell.com
sherri.zack@huschblackwell.com
*Counsel for City of Houston*

Brett J. Sileo
Britton B. Harris
Harris Hilburn P.L.L.C.
1111 Rosalie
Houston, Texas 77004
bsileo@hhstxlaw.com
bharris@hhstxlaw.com
*Counsel for Midtown Management District*

s/ *Erin E. Wilcox*
Erin E. Wilcox
Pacific Legal Foundation

40