# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC.,

        *Plaintiffs,*

v.

CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT,

        *Defendants.*

Civil Action No. 4:23-cv-03516

## PLAINTIFFS' PRELIMINARY POST-TRIAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW REGARDING DEFENDANT MIDTOWN MANAGEMENT DISTRICT

This is a case challenging the Minority, Woman, and Disadvantaged Business Enterprise program (MBE program) of the Midtown Management District (Midtown), located in Houston, Texas.[1] Plaintiffs Landscape Consultants of Texas, Inc. (Landscape Consultants), and Metropolitan Landscape Management, Inc. (Metropolitan), contend that Midtown's MBE program violates the Equal Protection Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983, because the

---

[1] Plaintiffs also challenge the legality of Defendant City of Houston's Minority, Women, and Small Business Enterprise (MWSBE) Program. Separate Proposed Findings of Fact and Conclusions of Law have been filed addressing that defendant.

program uses racial classifications to award public contracts, furthers no compelling interest, and is not narrowly tailored. Plaintiffs also argue that the MBE program's preferential treatment of some contractors on the basis of race denies Plaintiffs the full and equal benefit of the laws within the meaning of 42 U.S.C. § 1981.

From December 1 through December 5, 2025, this Court conducted a non-jury trial in which the parties presented testimony from six witnesses[2] submitted a total of 114 pieces of documentary evidence, and stipulated to 87 Joint Admissions of Fact. In consideration of the evidence, testimony, and oral arguments presented during the trial, Plaintiffs respectfully request that the Court adopt the following post-trial findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

1.    Plaintiffs Landscape Consultants and Metropolitan are small, family-owned landscaping businesses that share approximately fifty employees. JA[3] 23; Trial Tr. vol. 1, 17:5–8, 20–22; 23:17–19, Dec. 1, 2025.

2.    Approximately 95% of Plaintiffs' employees are racial minorities. JA 33; Trial Tr. vol. 1, 18:8–9.

---

[2] Plaintiffs called their principal Gerald Thompson, and expert witness George La Noue. Midtown called its Senior Director of Engineering & Strategic Development, Marlon Marshall. The City of Houston called its Director of the Office of Business Opportunity, Cylenthia Hoyrd, and expert witness Andres Bernal.

[3] "JA" refers to the parties' Joint Admissions of Fact, Dkt. 118-5.

3.      Approximately 80–90 percent of each company's annual revenue comes from winning local government landscaping contracts. JA 25; Trial Tr. vol. 1, 26:6–18; 24:19–25.

4.      Neither Landscape Consultants nor Metropolitan qualify as or are certified as a Minority-Owned Business Enterprise (MBE) when bidding on contracts with Midtown. JA 26, 27; Trial Tr. vol. 1, 21:2–10.

5.      Though Landscape Consultants and Metropolitan are legally separate entities, they operate as one company and share staff and equipment. Trial Tr. vol. 1, 23:3–24:2.

6.      Some clients are familiar with the Metropolitan brand, while others are familiar with the Landscape Consultants brand. Trial Tr. vol. 1, 24:11–25:11.

7.      Plaintiffs have a history of bidding on and winning landscaping contracts with Midtown. JA 67, 68; Trial Tr. vol. 1, 28:2–11.

8.      On December 31, 2025, Metropolitan completed a multi-year landscaping contract to maintain Midtown's Baldwin and Glover Parks. Trial Tr. vol. 1, 28:13–14; Trial Tr. vol. 2, 27:5–10, Dec. 2, 2025.

9.      In addition to the Baldwin and Glover Parks contract, Metropolitan also held Midtown's Field Maintenance Service Project contract off-and-on over the last fifteen years. JA 29; Trial Tr. vol. 1, 31:16–19.

10.     In 2022, Metropolitan's bid for the Field Maintenance Service Project contract was unsuccessful due to Midtown's policy of awarding 10 points to MBE bidders, but not to non-MBE bidders like Metropolitan. Ex. P-006; Trial Tr. vol. 1, 31:12–32:6; 34:6–12.

11.     If Metropolitan had been awarded those 10 points, it would have had the highest score and secured the $350,000 contract. JA 32; Ex. P-006; Trial Tr. vol. 1, 34:6–12.

12.     Because Metropolitan did not qualify for Midtown's 10-point MBE award due to the race of its owners, Metropolitan's bid was unsuccessful. *Id*.

13.     Despite being treated differently from other bidders due to the race of their owners, Plaintiffs would "[a]bsolutely" bid on Midtown contracts in the future if they could bid on a race-neutral footing. Trial Tr. vol. 1, 36:2–5.

14.     Midtown's public contracting program's purpose is to "stimulate the growth of minority, women, and disadvantaged business enterprises inside the boundaries of the District by encouraging the full participation of disadvantaged businesses in all phases of its procurement activities and affording those disadvantaged businesses a full and fair opportunity to compete for District contracts." Ex. P-004 at 8.

15.     Midtown's Program is not based on a disparity study of its market area; it has not adopted any study, report, or research that identifies specific instances of

discrimination in public contracting in the last five years, nor has it adopted Harris County's 2020 disparity study. JA 11, 13–14.

16.    Midtown's policy and procedures manual does not include a policy for scoring bids, and the scoring matrix for landscaping services changed between 2022 and 2025. Ex. P-004; Ex. P-005 at 4; Ex. MMD-38 at 5.

17.    For the 2022 Field Maintenance Services Project contract, Midtown awarded 10 points to MBE bidders. Ex. P-005; Ex. P-006.

18.    For the 2025 Field Maintenance Services Project contract, Midtown removed the MBE 10-point award and instead considered MBE status as part of the "organizational qualifications" section of the scoring matrix, which counted for 25 of a total 100 points. Ex. MMD-38 at 5; Trial Tr. vol. 2, 47:4–48:15; 76:1–5.

19.    Despite removing the 10-point preference for the 2025 contract, Midtown still required bidders to include MBE status as part of their bid paperwork. Ex. MMD-38 at 5; Trial Tr. vol. 2, 77:22–25.

20.    Despite removing the 10-point preference for the 2025 contract, Midtown considered MBE status when scoring bids. Trial Tr. vol. 2, 77:1–5.

21.    Midtown's MBE program may disadvantage non-MBE companies— even if those companies have never themselves been guilty of discrimination. JA 16.

22.    Midtown has zero evidence of racial discrimination in its public contracting program. JA. 17

23.     Midtown has identified no prime contract awards based on intentional discrimination against MBE bidders in the last six years. JA18.

24.     Midtown has not disciplined, sanctioned, or terminated any employee or official for discrimination in awarding public contracts. JA 19.

25.     Midtown has not identified instances of a prime contractor discriminating against a subcontractor. JA 20.

26.     Midtown has not debarred or sanctioned a prime contractor for such discrimination. JA 21.

27.     Midtown can identify no specific constitutional or statutory violations related to its public contracting or procurement process awards.

28.     Midtown's MBE program has no endpoint. Trial Tr. vol. 2, 78:13–16.

## PROPOSED CONCLUSIONS OF LAW

### I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). This Court has jurisdiction to grant both declaratory and injunctive relief pursuant 28 U.S.C. §§ 2201–2202. Venue is proper under 28 U.S.C. § 1391(b).

## II.    STANDING

### A. Plaintiffs Established Article III Standing

2.    To establish Article III standing, Plaintiffs must demonstrate (1) an "injury in fact" (2) that is "fairly traceable" to each defendant and (3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

3.    In a forward-looking equal protection challenge to a race-based set-aside program, a party "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so" in order to establish standing. *N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

4.    Plaintiffs have established that they are "able and ready" to bid on Midtown contracts. *N.E. Fla.*, 508 U.S. at 666. Plaintiffs' representative Gerald Thompson testified that Metropolitan has bid on Midtown's contracts for the past two decades, Metropolitan worked with Midtown as recently as December 31, 2025, and that both or either Plaintiff company may bid on Midtown contracts in the future. Trial Tr. vol. 1, 29:25–30:2, 31:6–19, 36:2–5; Trial Tr. vol. 2, 27:5–10. Mr. Thompson further testified that Plaintiffs will "[a]bsolutely" continue to bid on Midtown contracts if they can do so on an equal footing with other bidders. Trial Tr. vol. 1, 36:2–5.

5.      An "'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 213 (5th Cir. 1999).

6.      Plaintiffs have established an injury in fact through evidence that they are treated unequally due to race when bidding for Midtown contracts. Under Midtown's 10-point MBE preference, non-MBE bidders like Plaintiffs start 10 points behind their minority-owned competitors. Ex. P-005; Ex. P-006; Trial Tr. vol. 1, 34:6–12. Under Midtown's 2025 scoring matrix, MBE status forms part of the 25-point "organizational qualifications and references" category. Trial Tr. vol. 2, 47:13–18; Ex. MMD-38

7.      Moreover, although the loss of a contract is not required to show injury in fact, Metropolitan lost a contract with Midtown in 2022 because it did not receive the 10 points awarded to companies owned by racial and ethnic minorities. Ex. P-006; Trial Tr. vol. 1, 32:4–12.

8.      Midtown's claim that Metropolitan's sister company Landscape Consultants lacks an injury in fact because it has not previously bid on a Midtown contract is unpersuasive. In this forward-looking equal protection claim, Landscape Consultants is not required to prove that it previously held or lost contracts because

of Midtown's race-based public contracting program, only that the Program forces Landscape Consultants to compete for contracts, "on an unequal basis." *W.H. Scott*, 199 F.3d at 213 (citing *N.E. Fla.*, 508 U.S. at 666: "The 'injury in fact' … is the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain the benefit.").

9.    There is no requirement that a plaintiff must first bid for a racially discriminatory contract before it can challenge the discriminatory bidding process. *Northeastern Florida* says the opposite, 508 U.S. at 666, and imposing such a requirement would add an administrative exhaustion requirement for exercising one's constitutional rights, which the Supreme Court has unequivocally rejected. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500-01 (1982) ("this Court has stated categorically that exhaustion is not a prerequisite to an action under § 1983 …"). Both Plaintiffs have Article III standing to pursue their section 1983 claims against Midtown.[4]

10.    Midtown's last-minute change to the scoring matrix for a single 2025 landscaping contract has no impact on Plaintiffs' injury-in-fact.

11.    First, race is still a consideration in evaluating bids under the new scoring matrix—just as it is when Midtown awards a 10-point preference to

---

[4] The traceability and redressability prongs of Plaintiffs' Article III standing are not in dispute and this Court finds they have been met.

minority-owned firms. As Midtown's witness Marlon Marshall testified, a bidder's race is considered as part of the 25 points awarded under the "organizational qualifications" category. Trial Tr. vol. 2, 47:13–18, 77:1–5. Whether considered outright as an award of 10 points for MBE bidders, or rolled into the consideration of "organizational qualifications," considering race as part of a bidder's qualifications forces Plaintiffs to compete for Midtown contracts "on an unequal basis." *W.H. Scott*, 199 F.3d at 213 (citing *N.E. Fla.*, 508 U.S. at 666).

12.     Equally, Midtown officials' discretion in considering a bidder's MBE status does not turn a race-conscious scoring matrix into a race-neutral one. It cannot. Under either Midtown scoring matrix—the matrix that awards 10 points to MBE bidders and the matrix that considers MBE status to be an "organizational qualification"—Midtown unequivocally considers race in awarding public contracts.

**B. Plaintiffs Established Standing for Their Section 1981 Claims**

13.     A plaintiff has statutory standing if it falls within the class of plaintiffs whom Congress has authorized to sue. *White Glove Staffing, Inc. v. Methodist Hospitals of Dallas*, 947 F.3d 301, 307 (5th Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Courts examine "(1) whether the plaintiff falls within the statute's zone of interests and (2) whether the plaintiff's

alleged injuries were proximately caused by violation of the statute." *White Glove*, 947 F.3d at 307 (internal quotation marks omitted).

14.    The zone of interest inquiry is "not especially demanding," and looks to the operative statute. *Id.* Section 1981 protects the equal right of "[a]ll persons within the jurisdiction of the United States … to the full and equal benefit of all laws" without respect to race. 42 U.S.C. § 1981. Plaintiffs' section 1981 claim that Midtown's race-based public contracting program leaves Plaintiffs unable to compete equally for contracts because of the race of their owners falls squarely within this zone. *See Lexmark*, 572 U.S. at 130 (zone of interest tests not met "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized that plaintiff to sue.") (internal quotation marks and citation omitted).

15.    The proximate cause test is met if the "harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 133. In *White Glove*, a hospital terminated the contract of a temporary staffing agency because the agency assigned a black employee when the hospital had demanded Hispanic employees. 947 F.3d at 304. The staffing agency demonstrated proximate cause under section 1981 because the contract termination had a "sufficiently close connection" to the racial discrimination in making and enforcing contracts prohibited in section 1981. *Id.* at 308. Here, Plaintiffs' alleged harm—the inability to compete for contracts on

an equal footing because of the race of its owners—has an equally close connection to section 1981's guarantee of the "full and equal benefit of all laws."

## III.  EQUAL PROTECTION

16.    The Supreme Court is unequivocal: "Racial discrimination is invidious in all contexts." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) (*SFFA*) (cleaned up) (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991)). Race-based classifications are presumptively unconstitutional and can only be overcome if the government satisfies the "daunting two-step examination" of strict scrutiny. *SFFA*, 600 U.S. at 206. The burden is on Defendants to first demonstrate that their programs' racial classifications are used to "further compelling governmental interests." *Id.* at 206–07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). Second, they must show that the "use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)).

### A. Midtown Failed to Prove a Compelling Interest

17.    There are only two compelling interests that permit the government to treat individuals differently based on race: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and (2) "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600

12

U.S. at 207. A defendant may establish a compelling interest in remedying racial discrimination if it meets three criteria: (1) it identifies a specific instance of past discrimination and does not rely on general allegations of bias in the industry; (2) it provides direct evidence of intentional discrimination as opposed to mere disparities; and (3) it shows past governmental participation in the discrimination it seeks to remedy. *Miller v. Vilsack*, No. 4:21-CV-0595, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing U.S. Supreme Court precedents)). Courts must undertake a "searching judicial inquiry into the justification" of a race-based program to ensure that government entities are "pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

18.    Midtown admits it has identified no specific constitutional or statutory violations related to its public contracting or procurements process or awards in the last six years. JA 22. Midtown cannot identify any specific, past constitutional or statutory violation that its Program is intended to remedy. Ex. P-008 at 5, No. 7. In the last six years, Midtown has not disciplined, terminated, or otherwise sanctioned any employee or official for discrimination in public contracting, nor has it debarred or sanctioned a contractor for discriminating against an MBE subcontractor. JA 19, 21.

19.    Without a specific constitutional or statutory violation to remedy, Midtown has no compelling interest in operating a race-based contracting program.

## B. Midtown's Program Is Not Narrowly Tailored

20.    A race-conscious program should be the remedy of last resort. *Walker v. City of Mesquite*, 169 F.3d 973, 982–83 (5th Cir. 1999). For a race-based program to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *Croson*, 488 U.S. at 507. Courts must strike down race-based programs unless they are "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher*, 570 U.S. at 312. Further, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications, *Croson*, 488 U.S. at 507–08; *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003), and it must have an end point. *SFFA*, 600 U.S. at 225.

21.    It is Midtown policy to use the definition of "minority persons" from Houston Code § 15-82 when evaluating MBE bidders. Ex. P-008 at 8, no. 10. However, using this definition makes Midtown's program both overinclusive and underinclusive. It is underinclusive in that it excludes many minority-owned businesses, like those with owners from the Middle East or North Africa, as well as any minority business owner who owns less than 51% of their business. *Nuziard v. Minority Bus. Dev. Agency*, 676 F. Supp. 3d 473, 483–84 (N.D. Tex. 2023). The

Program is overinclusive because it includes businesses who may never have been discriminated against, as well as those which Houston's own disparity study found were overutilized. Midtown's policy grants a racial preference to individuals originating from five continents and dozens of countries, yet it admits it cannot identify any individuals from those countries who have suffered discrimination by Midtown, "particularly because there are so many countries listed in this code section." Ex. P-008 at 8, nos. 11, 13. This "scattershot approach" is not sufficient narrow tailoring. *Vitolo*, 999 F.3d at 364.

22.    Midtown put forward no evidence that it attempted any race-neutral alternatives to its race-based contracting program. Instead, Midtown "staff/committees" first decided to award 10 points to MBE bidders that are not available to non-MBE bidders, and later changed the scoring matrix to roll the consideration of race into another category. Ex. P-008 at 5–6, no. 8; Ex. MMD-38; Trial Tr. vol. 2, 77:1–5, 22–25. And since Midtown never evaluates its Program to determine whether a race-based policy is necessary, the Program has no end point. Trial Tr. vol. 2, 78:13–16.

23.    Because race-based programs must end, *SFFA*, 600 U.S at 225, Midtown's complete lack of tailoring fails strict scrutiny.

15

### C. Defendant's Programs Violate the "Twin Commands" of Equal Protection

24.    The Equal Protection Clause's "twin commands" require that race never be used as a negative and that it may never operate as a stereotype. *SFFA*, 600 U.S. at 218. Midtown's Program does both. Like college admissions, contracting awards are zero-sum; both Midtown's 10-point policy and recent scoring matrix are a benefit provided to some companies but not others based on race, and "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19.

25.    Midtown's Program also uses race as a stereotype. All black, Hispanic, Native American, Asian American, or Subcontinent Asian American business owners are treated according to group membership. No individualized showing of discrimination is necessary, because Midtown assumes all individuals from racial groups are the same. Ex. P-008 at 8, no. 12. Midtown's racial stereotyping is "contrary … to the 'core purpose' of the Equal Protection Clause." *SFFA*, 600 U.S. at 221 (citing *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

## IV.    SECTION 1981

26.    To establish a prima facie case under 42 U.S.C. §1981, Plaintiffs must show that: (1) they are members of a racial minority; (2) Midtown had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Causey v. Sewell Cadillac-Chevrolet, Inc.*,

394 F.3d 285, 288–89 (5th Cir. 2004). Despite the racial minority requirement, the statute "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Co.*, 427 U.S. 273, 295 (1976).

27.    Midtown's Program violates section 1981 by expressly excluding Plaintiffs due to the race of their owners. This racial discrimination is intentional. In adopting the Houston Code's definition of "minority person," Midtown created a program that advantages some businesses over others based on the race or ethnicity of the business's majority owner. A law or policy that expressly classifies people on the basis of a protected characteristic is direct evidence of discriminatory intent. *See, e.g., Adarand*, 515 U.S. at 213, 227–29; *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

28.    Defendants' programs also implicate an activity enumerated under section 1981: Plaintiffs' "making … of contracts" with Midtown for landscaping services. 42 U.S.C. § 1981(b). A contract "need not already exist" to trigger section 1981's protections; the statute "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza*, 546 U.S. at 476. Midtown's program, which uses racial classifications to treat bidders differently, deprives Plaintiffs of the "full and equal benefits of all laws" in violation of 42 U.S.C. § 1981.

29.     Section 1981 supports an independent cause of action against Midtown, where, as here, the claim for relief is entirely forward-looking. Section 1983 "provides the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989) (emphasis added). Interpreting the history of the Civil Rights Acts of 1866 and 1871, the Court determined that "Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Id*. at 731 (emphasis added); *see also Escamilla v. Elliott*, 816 F.App'x 919, 922 (5th Cir. 2020) (applying *Jett* to find that section 1983 claims required "in order to obtain a monetary remedy for violations of civil rights protected by § 1981.").

30.     The parties do not dispute that Plaintiffs seek only declaratory and injunctive relief. In pursuit of prospective equitable remedies, Plaintiffs are entitled to relief on their independent section 1981 claims.

## V.     Texas Local Government Code § 375.222

31.     State law does not require Midtown to operate a race-conscious public contracting program. The plain language of Tex. Local Gov't Code § 375.222(d) makes this clear. Programs established under the statute "must attempt to remedy any statistically significant disparities that are found to exist." *Id*. (emphasis added).

32.    Midtown's program fails this requirement. The Program does not remedy any statistically significant disparities that exist within its boundaries because, as the Parties agree, Midtown's program is not based on a disparity study of the area without Midtown's boundaries. JA 11. In fact, Midtown's program does not remedy any racial disparity, statistically significant or otherwise, because Midtown has "zero evidence of racial discrimination in its public contracting program." JA 17. Even if Tex. Local Gov't Code 375.222 required management districts to utilize race-conscious, as opposed to race-neutral, means to remedy statistically significant disparities (which it does not), the law is clear that they may only do so to remedy actual disparities. Midtown's program does not satisfy the requirements of Tex. Local Gov't Code § 375.222(d), and the statute provides no safe haven for Midtown's racially discriminatory public contracting program.

## VI.    ATTORNEYS' FEES

33.    42 U.S.C. ¶ 1988(b) establishes that "[i]n any action or proceeding to enforce a provision of sections 1981 [or] 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." Such an award "may include expert fees as part of the attorney's fee." 42 U.S.C. ¶ 1988(c).

34.    Having found in favor of the Plaintiffs, this Court hereby awards Plaintiffs their attorney's fees, including expert fees, and directs Plaintiffs to submit a proposed attorney's fee award.

## CONCLUSION

35.    Because Midtown has not proven that the racial classifications in its public contracting program satisfies the demanding requirements of strict scrutiny, because Midtown's program violates the "twin commands" of Equal Protection, and because Midtown's Program deprives Plaintiffs of their right to the full and equal benefit of the law under section 1981, this Court will enter judgment for Plaintiffs and grant the following relief:

A. Defendant Midtown Management District's Minority, Women, and Disadvantaged Business Enterprise program is declared unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981 & 1983;

B. Defendant Midtown Management District is permanently enjoined from operating its Minority, Women, and Disadvantaged Business Enterprise program or using similar racial preferences in the award of public contracts; and

C. Plaintiffs shall be awarded attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 54(d) and 42 U.S.C. § 1988.

DATED: January 30, 2026.

Respectfully submitted,

Laura D'Agostino*                    s/ Erin E. Wilcox
*Of Counsel*                          Erin E. Wilcox
D.C. Bar. No. 241868                 *Attorney-in-Charge*
Dean McGee*                          Cal. Bar No. 337427
*Of Counsel*                          S.D. Tex. Bar No. 3369027
N.Y. Bar No. 5135884                 Joshua P. Thompson*
PACIFIC LEGAL FOUNDATION             *Of Counsel*
3100 Clarendon Blvd., Suite 1000     Cal. Bar No. 250955
Arlington, VA 22201                  PACIFIC LEGAL FOUNDATION
Telephone: (202) 888-6881            555 Capitol Mall, Suite 1290
Fax: (916) 419-7747                  Sacramento, CA 95814
ldagostino@pacificlegal.org          Telephone: (916) 419-7111
dmcgee@pacificlegal.org              Fax: (916) 419-7747
                                     ewilcox@pacificlegal.org
*Pro Hac Vice*                        jthompson@pacificlegal.org


*Counsel for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I served the foregoing document via the Court's electronic filing system as follows to the Defendants' counsel of record:

Lori Yount
Senior Assistant City Attorney
Darah Eckert
Senior Asst. City Attorney, General Litigation Section
City of Houston Legal Department
P.O. Box 368
Houston, Texas 77001-368
900 Bagby, 4th Floor
Houston, TX 77002
lori.yount@houstontx.gov
darah.eckert@houstontx.gov

Ben Stephens
Sandy Hellums-Gomez
Jarett Dillard
Sherri Zack
HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
ben.stephens@huschblackwell.com
sandy.gomez@huschblackwell.com
jarett.dillard@huschblackwell.com
sherri.zack@huschblackwell.com
*Counsel for City of Houston*

Brett J. Sileo
Britton B. Harris
Harris Hilburn P.L.L.C.
1111 Rosalie
Houston, Texas 77004
bsileo@hhstxlaw.com
bharris@hhstxlaw.com
*Counsel for Midtown Management District*

s/ *Erin E. Wilcox*
Erin E. Wilcox
Pacific Legal Foundation

22