## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC., <br><br>            Plaintiffs, <br><br> v. <br><br> CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT, <br><br>            Defendants. | Civil Action No. 4:23-cv-03516 |

## DEFENDANT CITY OF HOUSTON'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant City of Houston files its proposed Findings of Fact and Conclusions of Law as requested after the completion of the non-jury trial in this matter on December 5, 2025.

On December 1, 2025, this Court commenced a non-jury trial in the above-entitled matter. During the four-day proceeding, the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during the trial, along with post-trial submissions and the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)*. Any finding of fact that

1

should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## I.    FINDINGS OF FACT[1]

The following facts have been established by a preponderance of the evidence:

### A.    The City of Houston's Minority, Women, and Small Business Enterprise Program

1.    The City of Houston ("the City") administers a program to remedy active and passive discrimination by encouraging minorities, women, and small businesses to participate in all phases of City contracting. The current version of the City's program was adopted in 2025, when the City Council enacted an ordinance amending Chapter 15 of the City's Code of Ordinances. The newly adopted ordinance is codified in Article V of Chapter 15 of the City Code, which sets forth the program's framework and key structural elements. By ordinance, the establishment and approval of procedures for the program's implementation are principally delegated to the City's Office of Business Opportunity ("OBO"). Trial Tr. 46–47 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000065–66.

2.    Section 15-81(a) of the City Code provides that:

It is the policy of the city to stimulate the growth of local minority, women and small business enterprises by encouraging the full participation of these business enterprises in various phases of city

---

[1] Unless otherwise noted, the findings of fact contained herein are based on the testimony and other evidence presented during the nonjury trial held on December 1, 2, 4, and 5, 2025.

contracting, as set forth in this article. The purposes and objectives of this article are:

(1) To promote equal opportunity for participation amongst local minority, women and small business enterprises in all phases of city contracting;

(2) To increase the utilization of such local firms in providing certain goods and services;

(3) To provide opportunities to broaden and enhance local firms' ranges of capacities; and

(4) To increase opportunities for such local firms to serve as contractors, in addition to acting as subcontractors to others, . . . in an effort to remedy discriminatory practices and eliminate statistical disparities in city contracting.

3.     Section 15-81(b) of the City Code further provides that:

This article is intended to be remedial in nature and to continue only until its purposes and objectives are achieved. At least every five years the city shall make its best efforts to initiate a review of its minority and women business enterprise program, the results of which shall be provided to city council, who shall determine, upon its receipt of recommendations and the consideration of other relevant information from the OBO director, whether there is strong statistical and anecdotal evidence of discrimination against minority and women business enterprises in city contracting warranting the continuation of a race and gender conscious minority and women business enterprise program.

**B.**    **How the City's MBE Program is Administered**

      i.    Setting MBE Participation Goals[2]

4.      Cylenthia Hoyrd, Director of OBO, testified that OBO is responsible for ensuring compliance with, as well as issuing policies and procedures regarding the implementation of, the City's MBE program. Each City department handles its own procurement needs. Department staff must determine whether an MBE participation goal is appropriate on a case-by-case basis. Not every contract has an MBE goal.  Indeed, by ordinance, some contracts are not eligible for MBE participation goals. For example, only construction contracts in excess of $1,000,000.00, or goods or nonprofessional services contracts in excess of $100,000.00, will be considered by the City for MBE participation goals. Trial Tr. 80–81 (Dec. 2, 2025).

5.      When participation goals are set, each contract has its own goal based on the availability of MBEs for each North American Industry Classification System ("NAICS") code and the divisibility of the work elements involved in the contract. Goals are flexible from contract to contract—as Ms. Hoyrd testified, regardless of the City's "aspirational" overall goal of 19% MBE participation under the current ordinance, each contract will be assigned a unique goal tailored to the circumstances

---

[2] *See* CoH Exhibit 3. OBO Policies and Procedures govern the administration of the MBE program, as explained by the City's witness Cylenthia Hoyrd. This includes certification, compliance, graduation process, and outreach.

of that procurement, which may be less, or more, than 19%. Trial Tr. 105–106 (Dec. 2, 2025).

6.    A bidder's racial minority status is not a consideration in the procurement process.  In the bidding process, there is no distinction between what a non-MBE prime and an MBE prime must do to satisfy the City's minority participation requirements.   All prime contractors must submit an MBE subcontractor usage plan or a Good Faith Efforts waiver showing that the prime contractor tried to find MBEs to participate in the bid but was unable to do so.  The City allows for a minority-owned business bidding as a prime contractor to self-perform up to 50% of a contract's MBE goal. Nevertheless, a minority-owned prime contractor must still demonstrate that it made Good Faith Efforts to partner with an MBE subcontractor for the remaining half of the contract's MBE participation goal—exactly as a non-minority-owned contractor must do. Trial Tr. 142–143 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5; Def.'s Ex. 3 at COH0000089.

7.    Even if an MBE participation goal is supposed to be assigned for a given contract, the City department involved may apply to OBO for a waiver of MBE participation goals. A waiver is granted by OBO when (1) a contract requires specialized, technical, or unique goods or services, or requires a product, good, or service that is non-divisible or sole source; (2) application of MBE participation

goals would impose an unwarranted economic burden on the City or would unduly delay acquisition of the goods or services or would otherwise not be in the best interests of the city; and (3) MBE availability is so limited for a particular line of work that any participation goal would still result in minimal MBE participation. Trial Tr. 110–111 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000089.

    ii. <u>Good Faith Efforts</u>

8. When an MBE participation goal is assigned for a given contract, OBO's Policies and Procedures provide vendors with flexibility in meeting such goal. A vendor awarded a City contract with an MBE participation goal needs only to demonstrate "good faith efforts" towards meeting that goal. Good Faith Efforts are defined as any steps taken to achieve a contract goal which, by their scope, intensity and usefulness, demonstrate the bidder's responsiveness in fulfilling the business opportunity objective prior to the award of a contract, as well as the vendor's diligence in pursuing measures to meet or to exceed the MBE participation goals throughout the declaration of the contract.　There are sixteen (16) different ways to demonstrate Good Faith Efforts provided in OBO's Policies and Procedures manual, although the list is not intended to be exhaustive. Trial Tr. 94–95 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5.

9. A vendor can demonstrate Good Faith Efforts by, among other steps, showing that it made efforts to obtain bids from MBEs, or showing that there were

no MBEs available to work on a particular project area. OBO's Policies and Procedures promote MBE participation in contracting but also ensure that prime contractors are not subjected to rigid quotas. Trial Tr. 81–82 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5.

10.     OBO measures Good Faith Efforts based on the totality of the circumstances, prior to award and throughout the performance of the contract. Bidders and awardees can seek a reduction in the MBE participation goal prior to, and during, the bidding process. The fulfillment of the Good Faith Efforts requirement is evaluated both at the procurement proposal and bid award stage to determine the prime contractor's intentions with regard to securing MBE participation, and at the conclusion of a contract's term to assess whether Good Faith Efforts were actually made during contract performance. OBO sends prompts to vendors working on contracts with MBE participation goals throughout the life of the contract to inform the vendor of its progress in reaching such goals, and to assist the contractor with Good Faith Efforts. Trial Tr. 93–94, 112–114, 118–120 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000065–66; Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5.

11.     There are several different ways a vendor can appeal an adverse finding by OBO as to Good Faith Efforts. Ms. Hoyrd testified that she has discretion to set aside such an adverse finding made by OBO staff. Trial Tr. 121–122 (Dec. 2, 2025);

Def.'s Ex. 3 at COH0000065–66; Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5.

12.    Ms. Hoyrd testified Landscape was sent a "Not Meeting Goal" letter on May 8, 2025.   "Not Meeting Goal" letters are sent when vendors are not meeting their contractual obligations and are not specific to MBE participation goals. Vendors are contacted throughout the life of the contract and upon its completion. The B2G platform, accessible to all vendors, shows a vendor's progress on a contract, tracking different statistics related to contract performance to date.  It also provides information on who a vendor can contact at OBO if there are issues meeting contract obligations including MBE participation goals. Trial Tr. 125–126 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000065–66; Def.'s Ex. 35 at COH0003936–37.

13.    A contractor's performance will only be considered unsatisfactory if the contractor failed to meet the MBE goal *and* was unable to document Good Faith Efforts towards meeting such goal. A contractor who has received an unsatisfactory rating on one contract is still eligible to bid on, and be awarded, City contracts in the future. The OBO Director does not even begin the process of considering whether to recommend sanctions for non-compliance with MBE goals until a contractor has exhibited a pattern of non-compliance with the MBE goals. The City has continued to solicit bids from Landscape, which has not been suspended or prohibited in any way from participating in business with the City. Trial Tr. 120–121 (Dec. 2, 2025);

Def.'s Ex. 3 at COH0000065–66; Def.'s Ex. 3 at COH0000090–93; Def.'s Ex. 4 at 1–5.

14.     The City has never sanctioned or disbarred a vendor for failing to meet MBE goals. Trial Tr. 147 (Dec. 2, 2025).

15.     Several vendors have graduated out of the City's MBE program. Trial Tr. 105–106 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000079–80.

### iii.     Race-Neutral Alternatives

16.     As detailed in Article XI of Chapter 15 of the City Code, and Section VI of OBO's Policies and Procedures, the City has a Hire Houston First program designed to help local small businesses regardless of race.  In addition, as detailed in Section V of OBO's Policies and Procedures, in order to be certified as an MBE, a firm must be located in the local Houston area. The City also conducts numerous educational and outreach programs in order to help small businesses grow and succeed. Trial Tr. 51–52 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000065–66, COH0000068, COH0000073.

17.     City Council formally adopted the MGT disparity study, as well as changes to the City's ordinance to reflect the study's recommendations, on May 7, 2025. Trial Tr. 139–140 (Dec. 2, 2025).

18.     The changes to the City's program include significant policy modifications, such as expanding efforts to promote small business participation to

all procurement categories and initiating a new effort to promote veteran-owned business and disabled veteran-owned business participation in City contracting. Under the City's new program, prime contractors will be able to satisfy participation goals for any contract in any procurement category by hiring small businesses, veteran-owned businesses, and disabled veteran-owned businesses, in addition to minority-owned and women-owned firms. Trial Tr. 82–83 (Dec. 2, 2025); Def.'s Ex. 2 at 75–78.

19.    In its new ordinance, the City expanded the existing Small Business Enterprise (SBE) program, which is race- and gender-neutral across all procurement categories, and added a veteran-owned business and disabled veteran-owned business category to the program. In other words, the City phased in the addition of SBE and veteran-owned businesses to other categories of City contracting in addition to construction (i.e., goods, professional services, and other services). A company qualifies for participation in the SBE program if it meets the definition of small business utilized by the federal Small Business Administration, which does not reference any race- or gender-based classifications. Going forward, a City vendor in any procurement category will be able to meet any contract goals for participation by minority-owned firms by contracting with small businesses, veteran-owned business, or disabled veteran-owned businesses. Trial Tr. 103–104 (Dec. 2, 2025); Def.'s Ex. 2 at 68–72, 75–78.

C.    **The City's Consistent and Ongoing Efforts to Gather Empirical Evidence of Racial Disparities in City Contracting**

20.    Pursuant to Section 15-81(b), the City commissioned disparity studies in 2006 and 2012 to gather and evaluate empirical evidence regarding the discriminatory barriers faced by minority firms in City contracting and to narrowly tailor the City's MBE program considering such evidence. Trial Tr. 85–86 (Dec. 2, 2025).

21.    The City awarded the contract for a new disparity study to MGT Consulting, a public sector consulting firm, in March 2023. MGT's scope of work included preparation of a new disparity study focusing on the four primary areas of City procurement: goods, professional services, other services, and construction, with particular focus on collecting data and analyzing disparities among the minority groups identified in Section 15-82 of the City Code. Trial Tr. 148–149 (Dec. 2, 2025).

22.    The MGT study was completed and released to the public on Wednesday, November 20, 2024. The City's expert witness, Andres Bernal, testified that, like the 2006 and 2012 studies, the MGT study showed substantial and statistically significant underutilization of minority-owned businesses in City contracting, confirming the persistence of racial discrimination in City contracting. Trial Tr. 149–150 (Dec. 2, 2025).

23.    The MGT study shows that the City is a passive participant in discrimination. The study documents disparities in the City's own contracts and confirms that the City is a passive participant in existing private sector discrimination. Trial Tr. 150–151 (Dec. 2, 2025).

24.    The qualitative and anecdotal piece of the MGT study confirms that there is evidence of specific identified instances of actual discrimination in public and private contracting. Trial Tr. 151–152 (Dec. 2, 2025).

25.    As the methodological lead and primary author of the MGT study, Mr. Bernal explained how MGT collected data, both quantitative and qualitative, and how that data was processed to come to the study's conclusions.  The processes and methodologies applied to the study meet or exceed industry standards. Trial Tr. 152–153 (Dec. 2, 2025).

26.    The MGT study addressed availability, which is based on qualified, willing, and able vendors.  The study collected data from the 9-county market area and the relevant NAICS codes, as well as publicly available vendor data lists.  That data was cross-referenced with Dun and Bradstreet data.  Audits and calculations were undertaken resulting in an estimation of available firms across all procurement categories. Trial Tr. 153–154 (Dec. 2, 2025).

27.    The MGT study addressed utilization which is the percentage of City dollars that are spent on various procurement categories. The utilization variables

came from data provided by the City, including spend data and subcontractors used. Those categories were broken down into the 4 separate contracting areas. The services provided by Plaintiff, Landscape fell into the "Other Services" category. Trial Tr. 154–155 (Dec. 2, 2025).

28.    The disparity is calculated by dividing the utilization by the availability then multiplying that result by 100. Trial Tr. 155–156 (Dec. 2, 2025).

29.    The study's statistical analysis revealed that, while MBEs represented 25.75% of overall market availability, their utilization across procurement categories was disproportionately lower at 22.24%. For instance, Black American-owned firms constituted 7.7% of available firms, but received only 5.55% of contract spending, resulting in a disparity index of 72—well below the threshold of 80, at which point discrimination is understood to be shown. The "other services" category—the category in which Landscape competes for contracts—revealed similar patterns: Black American firms held a disparity index of 72.71, and Asian American firms registered 67.64.  MBEs in the other services category represented 33.71% of availability but only 23% of utilization, resulting in an overall disparity index of 68, reflecting a substantial and statistically significant underutilization for all minority firms in this procurement category. Trial Tr. 156–157 (Dec. 2, 2025).

30.    Mr. Bernal testified that the disparity study examined quantitative data from the public and private sectors as well as qualitative data, which is used to

corroborate and explain the quantitative data. Qualitative data captures the perceptions of vendors in the marketplace as to discrimination. The qualitative data is collected using surveys, business engagements, in-depth interviews, and focus groups. Part of that process included a questionnaire provided to vendors through a phone or online survey. Minority and non-minority vendors were surveyed for the study. Mr. Bernal identified and documented reported barriers faced by MBEs in the marketplace and specific instances of discrimination and disparate treatment. Trial Tr. 157–158 (Dec. 2, 2025).

31.    The MGT study qualitative analysis found, through various collection methods, that MBEs and, specifically, Black contractors, identified—at higher rates than their non-MBE counterparts—informal networks, limited access to capital, limited communication from the City, delayed payment processes, and similar factors as obstacles hindering their ability to conduct business within the market area. Additionally, the qualitative data showed that MBEs felt discriminated against by the City or its prime contractors due to comments made or lack of contracting opportunities. Mr. Bernal testified that, based on all the data collected and analyzed, the study's conclusion is that there are statistical disparities which reflect that MBEs are being discriminated against in the marketplace, that the City is passively engaging in discrimination, and that there is evidence of specific instances of discrimination. Trial Tr. 4–5 (Dec. 4, 2025).

D.    **Plaintiffs' Testimony**

    i.    Plaintiff Landscape Consultants of Texas, Inc.

32.    Gerald Thompson testified that Landscape is a small Houston-based landscaping company that has been owned and operated by him and his wife Theresa Thompson since 2007.  The Thompsons each retain a 50% ownership interest in this company. Trial Tr. 21, 28, 124 (Dec. 1, 2025).

33.    Landscape bids on projects in the greater Harris County area. Government contracts account for the overwhelming majority of their annual revenue. Trial Tr. 26, 69 (Dec. 1., 2025).

34.    Landscape has successfully bid on—and been awarded—various government contracts that set MBE participation goals. In May 2021, Landscape was awarded a five-year, $1.3 million contract by the City. Landscape has received over $800,000 from this contract alone. Landscape has not lost any contract that they have bid on with the City. Trial Tr. 67 (Dec. 1, 2025); Trial Tr. 123 (Dec. 2, 2025).

35.    Landscape's current contract with the City includes an 11% MBE participation goal. Landscape had 0% MBE participation on the contract at the time of trial.  Landscape has never sought to waive or lower the MBE goal. Trial Tr. 68, 71, 76–77 (Dec. 1, 2025); Trial Tr. 125 (Dec. 2, 2025).

36.    Gerald Thompson was entirely unaware of the new City-wide MBE participation goal of 19% that was adopted in the City ordinance enacted in May

2025. Landscape has not bid on any City contract since being awarded the current

bid in 2021. Trial Tr. 40, 66–67, 82 (Dec. 1, 2025).

37.    Thompson admitted that Landscape has retained 100% of contract

dollars on its contract with the City, including for work where they had originally

intended to subcontract to a minority owned firm. By contracting with the City,

Landscape agreed to comply with the MBE participation goal.   The contract

indicated that Landscape had to make Good Faith Efforts to utilize MBE

subcontractors. Yet the City has never issued an adverse finding stating that

Landscape failed to make Good Faith Efforts to utilize MBE subcontractors. Trial

Tr. 72–74, 76–78 (Dec. 1, 2025); Trial Tr. 119–120, 125 (Dec. 2, 2025).

      ii.    Plaintiffs' Expert George LaNoue

38.    Plaintiff's called George LaNoue to testify as an expert.   LaNoue

unsuccessfully attacked the MGT study admitting the following: he did not conduct

his own disparity study;  he did not perform a statistical analysis of any public sector

data pertaining to the City of Houston;  he did not perform a statistical analysis of

any private sector data pertaining to the City of Houston;  he did not perform an

analysis of any qualitative or anecdotal data collected by him pertaining to the City

of Houston;  he looked only at publicly available census data and Wikipedia;  he

conducted no analysis of which firms in the Houston market are qualified, willing

and able;  he advocated for the use of data reflecting the MWBEs that actually

submitted bids or quotes to better determine firm availability. Trial Tr. 16–18 (Dec. 5, 2025).

39.    LaNoue failed to provide econometric support for the use of bidder data, he admitted to no personal experience with the use of bidder data and provided no proof that it would more accurately reflect availability of MWBEs absent discriminatory influence. He conducted no analysis of what the data would reflect if one separated prime contractors from subcontractors.  He conducted no statistical utilization analysis.  He performed no statistical analysis of any availability data.  He did not perform any statistical significance testing.  He conducted no private sector analysis about passive discrimination.  He conducted no regression analysis and no qualitative analysis.  LaNoue did not gather any anecdotal evidence.  Trial Tr. 18–20 (Dec. 5, 2025).

40.    LaNoue failed to point the Court to any contrary statistically supported findings to contradict the MGT study. LaNoue criticized the study but was unable to provide an alternative explanation for the disparities found in the study. LaNoue could not state that the MGT study was conducted in a manner inconsistent with industry standards. Trial Tr. 19–20 (Dec. 5, 2025).

41.    LaNoue's expert report, Plaintiff's Exhibit 34, was excluded from evidence. Trial Tr. 224–25 (Dec. 1, 2025).

## II.    PROPOSED CONCLUSIONS OF LAW

### ***Standing***

42.    A party seeking to invoke this Court's jurisdiction must demonstrate an "injury in fact," meaning an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). When analyzed in the context of government contracting, a party must show "it is able and ready" to engage in government contracting "and that a discriminatory policy prevents it from doing so on an equal basis." *Ne. Fla. Ch. of Associated Gen. Contractors v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993).

43.    Furthermore, a court must ensure that it restricts its standing analysis to the specific contracts of which a contractor is actually eligible to apply for within the at-issue program. *See W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 212 (5th Cir. 1999). A plaintiff cannot simply challenge a program "relating to every contract let by [a] City" but rather, only those it is eligible to procure in the first place. *Id.*; *see also Contractors Ass'n of E. Pa. v. City of Phila*., 6 F.3d 990, 999 (3d Cir. 1993) (allowing plaintiff to challenge MBE program only with respect to the specific contracts on which its members bid).

44.    Here, Landscape maintains that it has standing because it must compete on unequal footing with MBEs in bidding for City contracts. According to Mr.

Thompson's testimony, the playing field is uneven because MBEs can satisfy up to half of MBE contract participation goals with their own work, but Landscape can only meet MBE participation goals by subcontracting to an MBE. Accordingly, for a contract with an MBE participation goal of 11%, Landscape would have to subcontract 11% of contract dollars, but an MBE would only have to subcontract 5.5% (because it could count its own work on the project for the remaining 5.5%). Mr. Thompson in his testimony maintained that the requirement to divert more contract dollars places Landscape on unequal footing with respect to MBEs. Trial Tr. 64–66 (Dec. 1, 2025).

45.     Landscape's theory of standing is untenable, however, because under the City's program both MBE and non-MBE firms need do no more than demonstrate Good Faith Efforts to meet contract goals. Ms. Hoyrd testified that the City's policies and procedures manual provides multiple pathways for demonstrating good faith efforts. Ms. Hoyrd testified that Landscape and MBE competitors must both demonstrate such good faith efforts and neither is required to divert any contract dollars if such good faith efforts do not result in actual MBE participation. Trial Tr. 112 – 114 (Dec. 2, 2025); Def.'s Ex. 3 at COH0000090; Def.'s Ex. 4 at 1–5.

46.     Landscape has not been punished by the City or in any other way disadvantaged for diverting fewer contract dollars to an MBE subcontractor than a

similarly situated MBE. Ms. Hoyrd testified that all City vendors are held to the same standard of Good Faith Efforts and MBE prime contractors are no different. Regardless of MBE status, all vendors must undertake Good Faith Efforts to comply with the City's program. Trial Tr. 118–120, 125, 147 (Dec. 2, 2025).

47.    Mr. Thompson testified that he received a letter from the City threatening penalties for failure to meet MBE participation goals for the contract. Ms. Hoyrd testified, however, that all vendors receive periodic letters during contract performance until they have affirmatively demonstrated good faith efforts to meet MBE participation goals, that good faith efforts are not assessed until the end of the contract, and that no vendor has ever been suspended for failure to demonstrate good faith efforts. Trial Tr. 76 – 79 (Dec. 1, 2025); Trial Tr. 118–120, 147 (Dec. 2, 2025); Def.'s Ex. 35 at COH0000036-37.

48.    Accordingly, because Landscape competes on an even playing field with MBEs, it cannot show Article III standing to challenge the City's MBE program.

49.    Even if Landscape has standing to challenge the City's current ordinance, it may only challenge the "other services" component, which is the only procurement category in which it is able, ready, and willing to bid on City contracts. Mr. Thompson testified that Landscape only engages in such "other services" work and does not bid on other types of City contracts. Trial Tr. 26, 68 – 69 (Dec. 1, 2025).

### *Mootness*

50.    A claim is rendered moot when a "case or controversy" no longer exists between the parties. *See, e.g.*, *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 345 (5th Cir. 2017). "[A] case will become moot where 'there are no longer adverse parties with sufficient legal interests to maintain the litigation' or 'when the parties lack a legally cognizable interest in the outcome' of the litigation." *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (quoting *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotations omitted).

51.    "Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). Moreover, "[s]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief

and damages)." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 315 (5th Cir. 2024) (Davis, J., concurring).

52.     Here, Landscape's claim is moot because Landscape did not amend its pleading after the City enacted a new ordinance in 2025. Landscape's 2023 pleading seeks prospective relief only as to the City's defunct program, relief which is now impossible for any court to provide. Ms. Hoyrd testified that the City's new ordinance enacted in 2025 makes fundamental changes to the City's MBE program, allowing vendors to meet contract participation goals through race-neutral alternatives, such as subcontracting with small or veteran-owned businesses. Mr. Thompson testified that he was not even aware of key components of the City's new ordinance, including changes to the City-wide aspirational MBE participation rate, and he did not present any testimony supporting the conclusion that the new ordinance puts him on unequal footing in the bidding process with respect to MBEs. Accordingly, Plaintiff's claim is moot and must be dismissed for lack of jurisdiction. Trial Tr. 40, 213–14 (Dec. 1, 2025); Trial Tr. 103 (Dec. 2, 2025).

### ***Constitutionality of the City's MBE Program***

53.     Because the City's MBE program employs racial classifications that are otherwise prohibited by the Fourteenth Amendment, the program is subject to strict judicial scrutiny. Strict scrutiny is a demanding standard, but it is not fatal. *See Adarand Constructors, Inc.*, 515 U.S. at 237. The City's MBE program can

22

withstand strict scrutiny if it is justified by a compelling governmental interest and if it is narrowly tailored to meet that interest. *See id.* Upon the City's showing of "acceptable proof of a compelling interest and narrow tailoring," the burden "shifts back to the Plaintiff[s] to prove unconstitutionality." *See Kossman*, No. H-14-1203, 2016 WL 11473826, at *17.

### *Compelling Interest*

54.     Courts have long recognized that "combating racial discrimination is a compelling government interest." *Scott*, 199 F.3d at 217; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986) ("[In] order to remedy the effects of prior discrimination, it may be necessary to take race into account."). To invoke a compelling interest in remedying racial discrimination, the City must provide a "strong basis in evidence" that such remedial action is necessary. *Scott*, 199 F.3d at 217. The City must produce empirical evidence showing (1) a legacy of specific and intentional acts of racial discrimination, as distinguished from general social disparities between different groups; and (2) that the City had either an active or passive hand in such discrimination. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (citing *J.A. Croson Co.*, 488 U.S. at 498). If "the [City] show[s] that it ha[s] essentially become a passive participant in a system of racial exclusion . . . then the [City] can act to undo the discrimination." *Id.* (citing *J.A. Croson Co.*, 488 U.S. at 492).

23

55.    The City can carry its burden of showing empirical evidence to support its interest in administering a race-conscious remedial program by providing "statistical evidence", including "disparity indices" and "computations of disparity percentages." *Scott*, 199 F.3d at 217. A study that reveals a "significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors [supports] an inference of discriminatory exclusion." *Id.* at 218 (citing *J.A. Croson*, 488 U.S. at 509); *see also Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination'" (quoting *J.A. Croson Co.*, 488 U.S. at 501)).

56.    The City can supplement its statistical evidence of disparities with anecdotal evidence that provides "examples of . . . discrimination in which the government participated." *Nuziard* v. *Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 489 (N.D. Tex. 2024). The combination of "concrete examples with . . . robust empirics" provides the "strong basis in evidence" for the City's compelling interest in remedying racial discrimination in public contracting. *Id.* at 481, 489. The City is not required, however, to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co. v. Tippett*, 615

24

F.3d 233, 241 (4th Cir. 2010); *see also Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 945 (7th Cir. 2016). Rather, the City need only point to evidence that "raise[s] an inference of discriminatory exclusion in the local [contracting] industry and link[s] its spending to that discrimination." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 970 (10th Cir. 2003) (*Concrete Works II*).

57.    Once the City meets its burden, Plaintiffs must introduce credible, particularized evidence to rebut the City's initial showing of a compelling interest. *H.B. Rowe*, 615 F.3d at 241–42. Plaintiffs may "offer a neutral explanation for the [City's] evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable." *Id.* at 242. But "mere speculation that the [City's] evidence is insufficient or methodologically flawed does not suffice to rebut the [City's] showing." *Id.*

58.    Here, the City has met its burden of showing a compelling interest by introducing a disparity study that demonstrates that there is racial discrimination in City contracting and that the City is, at least, a passive participant in that discrimination.

59.    Mr. Bernal, the author of the disparity study, testified at length regarding the rigorous study that he prepared for the City and the statistical and anecdotal evidence of race discrimination in City contracting that the study

discusses. Mr. Bernal testified that the MGT disparity study shows substantial and statistically significant underutilization of minority-owned businesses in City contracting. Mr. Bernal further testified that the disparity indices that he calculated as part of the study confirm the persistence of racial discrimination in City contracting. Trial Tr. 194–196, 205–206 (Dec. 2, 2025).

60.    The City's study satisfies the City's requirement to show empirical evidence of specific, intentional episodes of government-linked discrimination, as distinguished from general social disparities.

61.    Because the City has met its burden of showing a compelling governmental interest, Plaintiffs must introduce credible, particularized evidence to rebut the City's showing. *H.B. Rowe*, 615 F.3d at 241–42.

62.    Plaintiffs fail to "offer a neutral explanation for the [City's] evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable." *Id.* at 242.

63.    Plaintiffs provide only "mere speculation that the [City's] evidence is insufficient or methodologically flawed" and that showing "does not suffice to rebut the [City's] showing." *Id.* Plaintiff's rebuttal expert, Mr. La Noue, testified regarding his objections to the methodology employed by the "disparity study industry" in general and he criticized various choices made by Mr. Bernal in the preparation of the study. Nevertheless, Mr. La Noue testified that he did not prepare a study of his

own, that he did not independently collect or evaluate any data, and that he could not point to any statistically supported findings to contradict Mr. Bernal's study. Trial Tr. 16–20 (Dec. 5, 2025).

### *Narrow Tailoring*

64.    The second part of the strict scrutiny analysis requires that the City show that its efforts to remediate race discrimination are narrowly tailored to address the identified harm. To determine whether a race-based measure is narrowly tailored to achieve its purpose, courts use the factors articulated by the Supreme Court in *United States v. Paradise*: (1) the efficacy of alternative (race-neutral) remedies; (2) the flexibility and duration of the program, including the availability of waiver provisions, (3) the relationship of the numerical goals to the relevant labor market; and, (4) the impact of the program on the rights of third parties. 480 U.S. 149, 171 (1987). Courts may also assess whether a program is overinclusive or underinclusive, *Croson*, 488 U.S. at 506, as well as whether the program utilizes stereotypes or has a logical endpoint. *See Nuziard.*

65.    Here, Ms. Hoyrd testified regarding the multiple race-neutral alternatives that are now incorporated into the City's new ordinance, including the ability of any vendor to meet participation goals by subcontracting with small businesses, veteran-owned businesses, or disabled-veteran-owned businesses. Trial Tr. 103 (Dec. 2, 2025); Def.'s Ex. 2 at 75–78.

66.    Mr. Hoyrd also testified regarding the flexible criteria that are employed by OBO is setting contract participation goals, which include varying the participation goal based on the availability of MBE firms for the type of work required by the contract, allowing department staff to request that participation goals be waived, and allowing vendors to show that goals should be waived or that good faith efforts should be deemed sufficient to meet a participation goal. Trial Tr. 111–114 (Dec. 2, 2025).

67.    Furthermore, Mr. Bernal testified regarding the disparity study's efforts to measure availability and utilization of MBE firms for each highly specific NAICS code to inform the City's tailoring of MBE participation goals to the circumstances of each procurement. And Ms. Hoyrd testified that OBO narrowly tailors participation goals for each contract considering the divisibility of the work elements involved and the availability of MBEs for each portion of the work called for by the contract. Trial Tr. 111, 194–196, 205–206 (Dec. 2, 2025).

68.    Ms. Hoyrd further testified that third party, non-minority firms like Landscape are not harmed by the City's MBE program because they can meet contract participation goals by showing good faith efforts. Ms. Hoyrd testified that no vendor has ever been penalized by the City for failure to demonstrate good faith efforts. Trial Tr. 118–120, 147 (Dec. 2, 2025).

69. Ms. Hoyrd testified that the City's MBE program is required by ordinance to be re-evaluated every five years and therefore has a logical endpoint. Def.'s Ex. 2.

70. Further, both Mr. Bernal and Ms. Hoyrd testified that the categories employed by the City's MBE program are drawn from the U.S. Small Business Administration and are typically used to evaluate racial disparities in contracting within a market area. Trial Tr. 7 (Dec. 5, 2025); Def.'s Ex. 2 at 68–72.

71. Accordingly, the City has shown that its efforts to remediate race discrimination are narrowly tailored to address the identified harm.

Respectfully submitted,

By:   */s/ Ben Stephens*
Ben Stephens
State Bar No. 24098472
SDTX Bar No. 2898153
ben.stephens@huschblackwell.com
Sandy Hellums-Gomez
State Bar No. 24036750
SDTX Bar No. 561314
sandy.gomez@huschblackwell.com

HUSCH BLACKWELL LLP
600 Travis St., Suite 2350
Houston, Texas 77002
Telephone:   (713) 647-6800
Facsimile:   (713) 647-6884

/s/ Darah Eckert
Darah Eckert
Senior Assistant City Attorney
State Bar No. 24007141
SDTX Bar No. 1890045
darah.eckert@houstontx.gov
Lori J. Yount
Senior Assistant City Attorney
State Bar No. 2209496
SDTX Bar No. 24084592
lori.yount@houstontx.gov

ARTURO G. MICHEL
CITY ATTORNEY
SUZANNE R. CHAUVIN
CHIEF, GENERAL LITIGATION SECTION
CITY OF HOUSTON LEGAL DEPARTMENT
P.O. Box 368
Houston, Texas 77001-368
900 Bagby, 4th Floor
Houston, Texas 77002
Telephone:   (832) 393-6219
Facsimile:   (832) 393-6259
**ATTORNEYS FOR THE CITY**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon the following on

January 30, 2026, via the CM/ECF Filing system.

/s/ Ben Stephens
Ben Stephens