## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC., <br> *Plaintiffs*, <br><br><br> CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT, <br><br> *Defendants*. | Civil Action No. 4:23-cv-3516 |

## DEFENDANT MIDTOWN MANAGEMENT DISTRICT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Midtown Management District, defendant in the above-entitled and numbered cause, who files these Preliminary Proposed Findings of Fact and Conclusions of Law following the completion of the non-jury trial of this matter on December 5, 2025, as follows:

### MIDTOWN'S PROPOSED FINDINGS OF FACT

1. Midtown Management District's Minority, Woman, and Disadvantaged Business Enterprise (MWDBE) policy is to stimulate the growth of minority,

1

women, and disadvantaged business enterprises by encouraging the full participation of MWDBE businesses in all phases of its procurement activities and affording those firms a full and fair opportunity to compete for contracts. (Marlon Marshall 2 RR 18:40-12 and Midtown Exhibit 14 at MMD00171)

2. Midtown awarded up to ten out of one hundred points to bids from minority and women-owned business enterprises, although that was not explicitly in its policy. (Marlon Marshall 2 RR 19:10-15)

3. Midtown has a limited territory and solicits bids from contractors throughout the Greater Houston area that are capable of performing services for Midtown. (Marlon Marshall 2 RR 63:14-64:11, 64:3-5).

4. MWBEs certified by Houston are eligible for Midtown' 10-point preference under the policy that existed when Plaintiffs bid on projects.

5. Neither Landscape Consultants nor Metropolitan attempted to obtain certification to qualify as an MWBE for bids to Midtown. (Gerald Thompson 1 RR 106:16-19)

6. Neither Landscape Consultants nor Metropolitan are certified as an MWBE. (Gerald Thompson 1 RR 18-22)

7. In 2022, Metropolitan bid for Midtown's Field Maintenance Service Project, a contract it held off and on over the last 15 years. (Gerald Thompson 1 RR 30:25-31:2 and 27:25-28:14)

8. The successful bidder and highest point scorer earned 87.68 points total, including 10 points awarded for being certified as an MWBE. (Midtown Exhibit 1)

9. Metropolitan scored second highest, with 84.98 total points but zero points awarded in the MWBE category. (Midtown Exhibit 1)

10. Houston commissioned studies in 2006, 2012, and 2016 to tailor its program to empirical evidence regarding the discriminatory barriers faced by minority firms in City contracting. (Cylenthia Hoyrd 2 RR 83:18-85:21 and City of Houston Exhibits 20 and 21

11. In 2022, the City issued a Request for Proposals for an updated study.

12. In March 2023, the City contracted with MGT Consulting to prepare an updated disparity study focusing on all categories of City procurement, including goods, professional services, other services, and construction. (City Exhibit 23, 2023 Disparity Study)

13. The MGT disparity study is now complete and was released to the public on and adopted by the City of Houston in May 2024. (Andres Bernal 3 RR 53:4-10).

14. The MGT disparity study showed substantial and statistically underutilization of minority-owned business in contracting, confirming the persistence of racial discrimination in contracting in Houston. City of Houston Exhibit 23, at 82-

88. The study's statistical analysis revealed that, while MBEs represented 25.75% of overall market availability, their utilization across procurement categories was disproportionately lower at 22.24%. City of Houston Exhibit 23 at 82 For instance, Black American-owned firms constituted 7.7% of available firms, but received only 5.55% of contract spending, resulting in a disparity index of 72—well below the threshold of 80, at which point discrimination is understood to be shown. City of Houston Exhibit 23, at 82. In professional services contracts, Black American owned firms experienced particularly severe underutilization, with a disparity index of 52. City of Houston Exhibit 23 at 82. Native American firms had an even more severe underutilization rate, resulting in a disparity index of 6.71. City of Houston Exhibit 2 at 82. The "other services" category—the very category in which Plaintiff Landscape Consultants of Texas, Inc. competes for contracts— revealed similar patterns: Black American firms held a disparity index of 72, and Asian American firms registered 67.64. City of Houston Exhibit 23 at 85. MBEs in the other services category represented 33.71% of availability but only 23% of utilization, resulting in an overall disparity index of 68, reflecting a substantial and statistically significant underutilization for all minority firms in this procurement category. City of Houston Exhibit 23 at 85.

15. The MGT Study also provided a qualitative analysis that found, through various collection methods, that MBEs and, specifically, Black contractors, identified—at higher rates than their non-MBE counterparts—informal networks, limited access to capital, limited communication from the City, delayed payment processes, and similar factors as obstacles hindering their ability to conduct business within the market area. Additionally, the qualitative data showed that MBEs felt discriminated against by the City or its prime contractors due to comments made or lack of contracting opportunities. (City of Houston Exhibit 23 at 128-141, conclusions at 141).

16. The Midtown Management District was created in 2000 to provide quality of life services such as public safety, marketing services, maintenance and urban planning within the area of the Midtown Tax Increment Reinvestment Zone (TIRZ) in Midtown Houston. (Marlon Marshall 2 RR 6:5-21)

17. The Midtown Redevelopment Authority was created to address blight in Midtown Houston and the Midtown Management District formed as an entity to support the Redevelopment Authority and to maintain capital improvements. (Marlon Marshall 2 RR 11:8-25)

18. Midtown Management District has an agreement with Midtown Redevelopment Authority to handle day-to-day administration of the Management District. (Marlon Marshall 2 RR 5:14 and 8:2-4)).

5

19. The District (operating through the District's Service and Maintenance Committee) is responsible for the maintenance and upkeep of public right of way and public facilities within the Midtown Management District. (Marlon Marshall 1 RR 5:3-6:12)

20. Landscape Consultants has never made any bid to work on projects for Midtown Management District or done any work for Midtown Management District. (Gerald Thompson 1 RR 91:1-22).

21. According to Gerald Thompson, one of the owners of both Landscape and Metropolitan, this is because the companies operate basically as one and the same, so it was never necessary for Landscape to bid on work for Midtown Management District. (Gerald Thompson 1 RR 91:1-22).

22. Landscape sees no need to make any bids to Midtown Management District for projects because Metropolitan takes the lead on Midtown contracts. (Gerald Thompson 1 RR 91:1-22).  Further, Metropolitan and Landscape Consultants consider themselves one and the same.  (Gerald Thompson 1 RR 94:25-95:8).

23. Metropolitan, however, has a long history of working for Midtown Management District over the past 15-20 years. (Gerald Thompson 1 RR 30:25-31:2 and 27:25-28:14)

24. Metropolitan is even performing work for the District today in performing landscape maintenance for Baldwin Park and Glover Park. (Gerald Thompson 1 RR 91 1-5).

25. Metropolitan bid on the contract for maintaining Baldwin Park and Glover Park along with the contract for the District's Field Maintenance Services at the same time, and won the contracts to maintain Baldwin Park and Glover Park, but was not awarded the Field Maintenance Services contract. (Gerald Thompson 1 RR 92:7-96:18)

26. Metropolitan has held the contract for Field Maintenance Services and well as the contracts for maintaining the District's park landscaping on and off over the years, holding the contract for about 12-14 of the past 18 years. (Gerald Thompson 1 RR 94:5-12)

27. This shows that Metropolitan has been capable, and in fact has been awarded contracts for the District under the District's Minority, Women and Disadvantaged Program, as Metropolitan and Landscape owner Gerald Thompon admitted. (Gerald Thompson 1 RR 94:5-12)

28. Landscape and Metropolitan are also each owned 50% by Gerald Thompson and 50% by his wife, Theresa, Thompson, although they previously represented that Metropolitan was 51% owned by Theresa Thompson, a woman, to qualify for preferences given to women owned businesses under the

Texas Historically Underutilized Business (HUB) program. (Gerald Thompson 1 RR 124:5-17 and 105:14-107:22)

29. Metropolitan was certified as a Historically Underutilized Businesses for many years but decided not to renew that certification. (Gerald Thompson 1 RR 19:22-20:2 and 106:16-107:20)

30. Midtown Management District operates its MWDBE program because it believes it is commanded to have such a program by the Texas Legislature's enactment of Texas Local Government Code §375.222 in 1991 which orders management districts such as Midtown Management District to have a program for disadvantaged businesses. Marlon Marshall 2 RR 41:22-54:23, 56:15-57:10.

31. Texas Local Government Code §375.222(a) states that "[a] district shall attempt to stimulate the growth of disadvantaged businesses inside its boundaries by encouraging the full participation of disadvantaged businesses in all phases of its procurement activities and affording those disadvantaged businesses a full and fair opportunity to compete for district contracts." (Midtown Exhibit 34).

32. Texas Local Government Code §375.222(b) provides that "[a] district shall establish one or more programs designed to increase participation by disadvantaged businesses in public contract awards. Each program shall be

structured to further remedial goals and shall be established to eradicate the effects of any prior discrimination." (Midtown Exhibit 34).

33. The District's MWDBE program to increase participation by disadvantaged businesses in bidding for the District's public contracts includes both outreach to organizations that target disadvantaged businesses to advertise upcoming procurement and bid scoring criteria that included (at the time that Metropolitan did not win the bid at issue in this lawsuit) 50 points for financial considerations, 25 points for organizational qualifications and references, 15 points for proposed approach, and 10 points for being a Minority, Woman or Disadvantaged Enterprise. (Marlon Marshall 2 RR 22:13-23:6, 1 RR 31:3-42:10 and Midtown Exhibit 1, 1 RR 70:8-23)

34. Metropolitan, despite maintaining that it was a 51% woman-owned company, never pursued certification with the Houston Women's Council that would have qualified it as a MWDBE to gain the up to ten points offered for the bid score by Midtown. (Gerald Thompson 1 RR 124:5-17, 105:14-107:22, 1 RR 19:22-20:2 and 106:16-107:20)

35. Metropolitan's bid was awarded 84.98 total points by Midtown but lost the award of the Field Maintenance Services contract to SMC Landscape Services, which was awarded 87.68 total points. (Midtown Exhibit 1)

36. Metropolitan was not the lowest bidder financially, as Four Eleven LLC was awarded 50 out of 50 points for financial considerations where Metropolitan was only awarded 46.14 points. (Midtown Exhibit 1)

37. Metropolitan scored highest in Organizational Qualifications and References (24.58 out of 25) and Proposed Approach (14.25 out of 15) but was not awarded points for qualifying as a certified MWDBE and therefore scored lower than SMC. (Midtown Exhibit 1)

38. The bid scoring for the Proposed Approach category is somewhat subjective and includes the bid scoring committee's opinion as to whether the bidder provides value added services or recommends performing services more efficiently. (Marlon Marshall 2 RR 36:3-14)

39. The bid scoring committee also evaluated the organizational qualifications and references with the score being the average of the committee members, up to 25 points for that category. (Midtown Exhibit 1, Marlon Marshall 2 RR 34:7-36:3)

40. The MWDBE score awarded by the bid committee under the system used when Metropolitan bid on the field maintenance services contract is also the average assigned by the committee members, up to 10 points, with the number of points at the discretion of the committee members. (Marlon Marshall 2 RR 36:16-37:22)

41. The award of 10 points to a bidder certified as a MWDBE under the bid criteria when Metropolitan bid on the field maintenance contract was discretionary, not mandatory, as zero to ten points could be awarded.  (Marlon Marshall 2 RR 37:2-22)

42. Four Eleven was the lowest bidder, but it was not awarded the contract because it had lower scores in other categories. (Marlon Marshall 2 RR 34:15-17)

43. The District created the category for an award of up to 10 points for a MWDBE business as part of the District's good faith effort to comply with Texas Local Government Code §375.222 and similar requirements from the City of Houston.  The District's MWDBE is in good faith compliance with  Texas Local Government Code §375.222. (Marlon Marshall 2 RR 19:4-19, 41:22-42:10, Midtown Exhibit 20, Midtown DBE Policy Statement).

44. The District felt that this was the most effective way to address the history of discrimination against public contractors while ensuring that highly qualified contractors provided the District with quality goods and services, while not overly disadvantaging anybody.  (Marlon Marshall 2 RR 19:4-19, 41:22-42:10, Midtown Exhibit 20, Midtown DBE Policy Statement).

45. The District's Service and Maintenance Committee, legal counsel and District staff arrived at the award of 10 points out of 100 to meet the Texas

Legislature's MWDBE requirements.  (Marlon Marshall 2 RR 40:2-41:20, 51:1-8)

46. The District entered into an agreement with the Midtown Redevelopment Authority to administer and comply with the laws of the state and to review the administrative policy annually.  (Marlon Marshall 2 RR 5:10-15, 8:2-7, 14: 3-24, Midtown Exhibit 12 at MMD00138)

47. The District has not performed its own disparity study, as the boundaries of the District are small and the District relies on vendor and contractor participation from across the City of Houston and Greater Houston Area. The District relies on  disparity studies from other local Houston area governmental entities that analyze the disparities in the contracting market in Houston, including the City of Houston's most recent MGT study, the City of Houston's disparity study from Colette and Holt in 2016, the Metropolitan Transit Authority of Harris County's 2013 study, and the Port of Houston Authority's 2020 disparity study. Midtown Management District has considered and will consider such studies in setting its DBE goals.  (Marlon Marshall 1RCR 59:11-21, 63:14:64-11, 69:10-70:5, Midtown Exhibit 40 at MMD 00420 "Disparity Studies", Midtown Exhibit 35 at PLTF00114-00115 "Market Studies")

48.  A history of discrimination in the award of public contracts exists within the Greater Houston market as shown by the City of Houston's disparity studies,

including the most recent MGT study, and the studies by the Metropolitan
Transit Authority and Port of Houston Authority, which cover the market area
from which Midtown draws contractors to bid on Midtown's public projects,
including the most recent MGT study. (Marlon Marshall 2 RR 73:19-21)

49. The contractors that have historically bid on Midtown's public contracts are
not located within Midtown's small geographic boundaries but come from
across the Greater Houston area. (Marlon Marshall 2 RR  63:14-64:11, 64:3-
5).

50. There is a compelling interest in Midtown's MWDBE policy to remedy prior
discrimination in the award of public contracts. Texas Local Government Code
§375.222(a) states that "[a] district shall attempt to stimulate the growth of
disadvantaged businesses inside its boundaries by encouraging the full
participation of disadvantaged businesses in all phases of its procurement
activities and affording those disadvantaged businesses a full and fair
opportunity to compete for district contracts." (Midtown Exhibit 34).   The
Texas Legislature thus has already identified that there is a compelling interest
for the District to stimulate the growth of disadvantaged businesses and
directed the District to do so.  The City of Houston 2023 disparity study
showed substantial and statistically underutilization of minority-owned
business in contracting, confirming the persistence of racial discrimination in

contracting in Houston as explained further in point 14 above. City of Houston Exhibit 23, at 82-88.

51. Midtown's MWDBE policy before 2025 was narrowly tailored to meet that compelling interest. As noted above, Midtown's MWDBE program before 2025 included includes a discretionary award of up to 10 points for a certified MWDBE business, not a mandatory award of points, and therefore there is no automatic award of points simply because a business is certified as women or minority owned. The District created the category for an award of up to 10 points for a MWDBE business as part of the District's good faith effort to comply with Texas Local Government Code §375.222 and similar requirements from the City of Houston. The District felt that this was the most effective way to address the history of discrimination of public contractors while ensuring that highly qualified contractors provided the District with quality goods and services, while not overly disadvantaging anybody. The District's Service and Maintenance Committee, legal counsel and District staff arrived at the award of 10 points out of 100 to meet the Texas Legislature's MWDBE requirements. The District entered into an agreement with the Midtown Redevelopment Authority to administer and comply with the laws of the state and to review the administrative policy annually. The City of Houston 2023 MGT disparity study also demonstrated that disparity still exists in the

Houston area public procurement market across most demographic categories. Metropolitan also demonstrated that it can win contracts with the District under the current policy, including approximately 12 out of the last 18 years for the Field Maintenance Services project and the current contracts for Baldwin and Glover Parks. The District's program therefore does not unfairly disadvantage Plaintiffs and is narrowly tailored enough to redress the past history of discrimination in public contracting in the Houston metropolitan area while still affording Plaintiffs the opportunity to win the award of contracts from the District.

52. Midtown's program is not a racial set aside program such as the one disapproved in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989). There is no set quota or percentage for hiring MWDBE contractors, and race or gender certified businesses receive points that are part of a complete holistic review of factors including financial considerations, qualifications and references, proposed approach to the project. The bid is not awarded to a company just because it is a MWDBE, but because the balance of all factors being considered shows that the company is best suited to perform the work while the District also complies with the requirement by the Texas Legislature to have a program to remedy past discrimination. The District admittedly does not have a history of discriminating against minority or women owned

businesses because it has only existed for a short time, but the reality is that the history of public contracting in Houston and Texas is rife with discrimination such that the Texas Legislature commanded management districts to have an MWDBE programs.

53. Midtown changed its MWDBE policy for procurement in 2025 and no longer awards points to contract bidders based on MWDBE status. (Marlon Marshall 2 RR 45:18-50:2; Midtown Exhibit 28 at MMD 00355).

54. The Midtown board changed the policy based on the board's review of the disadvantaged business program in accordance with Texas Local Government Code §375.222, including considerations of market disparity studies by the City of Houston, the Port of Houston and the Houston Metropolitan Transit Authority (Marlon Marshall 2 RR 71:2-72:16, Midtown Exhibit 40 at MMD 00420).

## MIDTOWN'S PROPOSED CONCLUSIONS OF LAW

1. Plaintiffs cannot carry their burden of showing they have standing to sue under Article III of the U. S. Constitution.

In order to satisfy their burden to show that Plaintiffs have standing under Article III, Plaintiffs must bring forward specific facts and evidence that establish that they have suffered an injury-in fact that is fairly traceable to the challenged

conduct of the defendant and that is likely to be redressed by a favorable judicial decision. *Inclusive Communities Project, Inc. v U. S. Dept. of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Plaintiffs cannot show any injury-in-fact from Midtown's policies. See Conclusion of Law 2 below.

2. Plaintiffs cannot establish that it has suffered an injury-in-fact as a result of Midtown's MWDBE program,

Plaintiffs assert that they are injured by Midtown's policy of awarding up to ten points in scoring contract bids to qualified, certified disadvantaged minority or women owned contractors Metropolitan, however, has a long history of working for Midtown Management District over the past 15-20 years while Midtown's MWDBE program has been in force.   (Gerald Thompson 1 RR 30:25-31:2 and 27:25-28:14). Metropolitan was even performing work for the District through the time of trial performing landscape maintenance for Baldwin Park and Glover Park (Gerald Thompson 1 RR 91 1-5). Landscape also has never bid on a contract with Midtown and never will, as Landscape and Metropolitan are both owned by Gerald Thompson and his wife and they simply choose to use Metropolitan as the company that bids on work with Midtown. Landscape Consultants has never made any bid to work on projects for Midtown Management District or done any work for Midtown Management District. (Gerald Thompson 1 RR 91:1-22)  Plaintiffs therefore cannot show that they have been injured by Midtown's policies, as Metropolitan has been

able to win contracts with Midtown under the current policies. Further, Plaintiffs cannot show that they have any injury-in-fact under Midtown's current policy that no longer awards 10 points in the bid score based on status as a disadvantaged business.

Midtown's MWDBE program does not exclude anyone from the opportunity to compete for Midtown contracts, Metropolitan currently is performing a contract for Midtown and historically has been awarded contracts by Midtown.

3. Landscape has never bid and never intends to bid on Midtown projects, so it does not have standing to challenge Midtown's policies.

Mr. Thompson also admitted that Landscape did not have a separate injury from Metropolitan as the two companies are connected, and that there was no need for Landscape to ever submit a bid for Midtown's work, as Metropolitan was the lead on Midtown contracts. (Gerald Thompson 1 RR 91:1-22 and 94:25-95:8). At the very least, Landscape cannot demonstrate any injury-in-fact.

4. Midtown's MWDBE policy is constitutional under the Equal Protection Clause.

Midtown adopted its disadvantaged business program because it was specifically required by the Texas Legislature to establish one or more programs designed to increase participation by disadvantaged businesses in public contract awards. Tex. Local Gov't Code §375.222(b), Marlon Marshall 2 RR 41:22-54:23,

18

56:15-57:10.  The Texas Legislature further directed that Midtown's program shall be structured to further remedial goals and shall be established to eradicate the effects of any prior discrimination.  Tex. Local Gov't Code §375.222(b).  The Texas Legislature therefore already determined that there was prior discrimination that violated the Constitution in enacting these laws requiring Midtown to create and operate its disadvantaged business program.   Midtown's disadvantaged business program is therefore permissible under *Croson* and the standards in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023).

     5.  Midtown's MWDBE policy withstands strict scrutiny because it is justified by a compelling government interest and it is narrowly tailored to advance that interest.

Combating racial discrimination is a compelling government interest.  *W.H. Scott Cost. Co v. City of Jackson, Miss.,* 199 F.3d 206, 217 (5th Cir. 1999). Texas Local Government Code §375.222(a) states that "[a] district shall attempt to stimulate the growth of disadvantaged businesses inside its boundaries by encouraging the full participation of disadvantaged businesses in all phases of its procurement activities and affording those disadvantaged businesses a full and fair opportunity to compete for district contracts." (Midtown Exhibit 34).   The Texas Legislature thus has already identified that there is a compelling interest for the District to stimulate the growth of disadvantaged businesses and directed the District

to do so.  The City of Houston 2023 disparity study showed substantial and statistically underutilization of minority-owned business in contracting, confirming the persistence of racial discrimination in contracting in Houston as explained further in Findings of Fact point 14 above. City of Houston Exhibit 23, at 82-88.

There is a compelling interest in using race or gender in a program to support disadvantaged businesses where there is a "significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality." *W.H. Scott,* 199 F. 3d at 218 (citing *J.A. Croson*, 488 U.S. at 501).  The City of Houston disparity study (City Exhibit 23 at 82-88) showed that such disparity exists. Plaintiffs did not offer evidence to rebut that there is a compelling interest.

Midtown's MWDBE policy before 2025 was narrowly tailored to meet that compelling interest. As noted above, Midtown's MWDBE program before 2025 included includes a discretionary award of up to 10 points for a certified MWDBE business, not a mandatory award of points, and therefore there is no automatic award of points simply because a business is certified as women or minority owned.  The District created the category for an award of up to 10 points for a MWDBE business as part of the District's good faith effort to comply with Texas Local Government Code §375.222 and similar requirements from the City of Houston.  The District felt that this was the most effective way to address the history of discrimination of public

20

contractors while ensuring that highly qualified contractors provided the District with quality goods and services, while not overly disadvantaging anybody. The District's Service and Maintenance Committee, legal counsel and District staff arrived at the award of 10 points out of 100 to meet the Texas Legislature's MWDBE requirements. The District entered into an agreement with the Midtown Redevelopment Authority to administer and comply with the laws of the state and to review the administrative policy annually. The City of Houston 2023 MGT disparity study also demonstrated that disparity still exists in the Houston area public procurement market across most demographic categories. Metropolitan also demonstrated that it can win contracts with the District under the current policy, including approximately 12 out of the last 18 years for the Field Maintenance Services project and the current contracts for Baldwin and Glover Parks. The District's program therefore does not unfairly disadvantage Plaintiffs and is narrowly tailored enough to redress the past history of discrimination in public contracting in the Houston metropolitan area while still affording Plaintiffs the opportunity to win the award of contracts from the District.

6. Texas Local Government Code §375.222 commands Midtown to have a MWDBE policy, which further establishes that there is a compelling interest for Midtown to have its MWDBE policy.

Plaintiffs' position appears to be that the only two compelling interests that permit race-based government policies like Midtown's disadvantaged business program are "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" or avoiding prison race riots, as Plaintiffs' argued in response to the District's Motion to Dismiss, citing *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (SFFA)*, 600 U.S. 181, 207 (2023). Midtown adopted its disadvantaged business program because it was specifically required by the Texas Legislature to establish one or more programs designed to increase participation by disadvantaged businesses in public contract awards. Tex. Local Gov't Code §375.222(b). The Texas Legislature further directed that Midtown's program shall be structured to further remedial goals and shall be established to eradicate the effects of any prior discrimination. Tex. Local Gov't Code §375.222(b). The Texas Legislature therefore already determined that there was prior discrimination that violated the Constitution in enacting these laws requiring Midtown to create and operate its disadvantaged business program.

Midtown's disadvantaged business program is therefore permissible under the *Students for Fair Admissions* standard. The state legislature has already determined that there has been past discrimination and requires Midtown to apply its disadvantaged business policy as a remedy. Plaintiffs do not argue in their Complaint that Midtown's policy is not narrowly tailored to remedy past

discrimination but instead argue that Midtown should not be allowed to have a disadvantaged business program at all. This sharply clashes with the clear directive from the Texas Legislature that Midtown have a disadvantaged business policy to remedy past discrimination as identified by the Texas Legislature. Plaintiffs do not argue that Tex. Local Gov't Code §375.222 is unconstitutional or deprives Plaintiffs of equal protection under the law. Plaintiffs instead argue that this court should enjoin Midtown from applying its disadvantaged business program, which would place Midtown in violation of state law. Plaintiffs have failed to show that they have a valid equal protection claim or valid claims under either Section 1981 or 1983.

7. Midtown has shown "acceptable proof of a compelling interest and narrow tailoring," such that the burden shifts back to the Plaintiffs to prove unconstitutionality. *See Kossman Contracting Co. v. City of Houston,* 2016 WL 11473826 at *17 (S.D. Tex. Feb 17, 2016).

The Plaintiffs were required to introduce credible and particularized evidence to rebut Midtown's initial showing of a compelling interest. *H.B. Rowe*, 615 F. 3d 233, 241-2422 (4th Cir. 2010). Plaintiffs failed to offer any evidence showing that Midtown did not have a compelling interest in enacting its disadvantaged business policies.

8. Midtown's MWDBE policy is supported by Midtown's compelling interest in remedying the effects of past and present racial discrimination in public contracting.

See Proposed Conclusions of Law 4, 5, 6 and 7 above.

9. Midtown has carried its burden of showing a strong basis in evidence for its view that Midtown's MWDBE program is needed to remedy prior racial discrimination in public contracting (including as Midtown has been commanded by Texas Local Gov't Code §375.222).    Accordingly, Midtown may invoke a compelling interest in remedying racial discrimination.  *W.H. Scott Const. Co. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999).

See Proposed Conclusions of Law 4, 5, 6 and 7 above.

10. Midtown Management District is located entirely within the City of Houston and therefore justifiably relies on data from the City of Houston and Houston area entities such as the Metropolitan Transit Authority and Port of Houston Authority to show that there are racial disparities in the award of public contracts.  The City of Houston has shown and carried its burden (and thus so has Midtown of showing empirical evidence of racial or ethnic disparities in the award of public contracts, including statistical evidence, disparity indices and computations of disparity percentages.)

24

The City has also shown multiple studies showing significant disparities between the number of qualified minority contracts willing and able to perform a service and the number of such contractors actually engaged. These studies cover Midtown's territory and therefore support Midtown's showing of a prima facia proof of a pattern or practice of discrimination.

The contractors that have historically bid on Midtown's public contracts are not located within Midtown's small geographic boundaries but come from across the Greater Houston area. (Marlon Marshall 2 RR  63:14-64:11, 64:3-5). Neither Plaintiff is located within the boundaries of Midtown, and there may even not be any potential landscape contractors who would bid on work for Midtown located inside Midtown's boundaries.  Therefore, Midtown justifiably relied on disparity studies conducted across the Houston metropolitan area, which is the trade area from which Midtown draws its contractors.  Midtown Management District therefore properly considered such disparity studies in setting its DBE goals, including the City of Houston's most recent MGT study, the City of Houston's disparity study from Colette and Holt in 2016, the Metropolitan Transit Authority of Harris County's 2013 study, and the Port of Houston Authority's 2020 disparity study..  (Marlon Marshall 1RCR 59:11-21, 63:14:64-11, 69:10-70:5, Midtown Exhibit 40 at MMD 00420 "Disparity Studies", Midtown Exhibit 35 at PLTF00114-00115 "Market Studies")

11. The City of Houston's MGT study also shows that racial and ethnic disparities still exist in the award of public contracts in the Greater Houston area, which is the area from which Midtown Management district draws contractors, and this supports the showing that Midtown has a compelling interest in maintaining its MWDBE policy.

See Proposed Finding of Fact 14 above reciting the findings of the City of Houston MGT study showing that there are still significant racial and ethnic disparities in public procurement in the Houston area. City of Houston Exhibit 23, particularly pages 82-88.

12. Because Midtown has met its burden of showing a compelling governmental interest, Plaintiffs must introduce credible, particularized evidence to rebut Midtown's showing. *H.B. Rowe,* 615 F.3d at 241-42.

Plaintiffs did not offer evidence to rebut that Midtown had a compelling government interest. Plaintiffs also particularly did not offer any evidence to rebut the compelling interest that prompted the Texas Legislature to command Midtown to have a disadvantaged business program. Plaintiffs did not challenge the constitutionality of Texas Local Government Code §375.222 the Texas Legislature enacted because it found there was a compelling interest in remedying discrimination in public procurement for districts such as Midtown.

13. Plaintiffs fail to "offer a neutral explanation for Midtown's evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable." *H.B. Rowe*, 615 F.3d at 242.

The Plaintiffs did not offer any neutral explanation for Midtown's evidence or present any contrasting data to the data presented in the City of Houston MGT study or any other study with Midtown relied upon over the years in enacting and reviewing the disadvantaged business policies. Plaintiff's expert George LaNoue testified that he did not do a study of his own, did not collect any data of his own, did not evaluate any of the data and did not do any statistical analysis of the City of Houston MGT study. (La Noue, 4 RR 16:14-21:8).

14. Plaintiffs provide only "mere speculation that Midtown's evidence is insufficient or methodologically flawed and that showing does not suffice to rebut Midtown's showing. *H.B. Rowe*, 615 F.3d at 242.

Again, Plaintiff's expert George LaNoue testified that he did not do a study of his own, did not collect any data of his own, did not evaluate any of the data and did not do any statistical analysis of the City of Houston MGT study. (La Noue, 4 RR 16:14-21:8).

15. Midtown has shown that its efforts to remediate racial or ethnic discrimination are narrowly tailored to address the identified harm.

Please see Proposed Finding of Fact 51 and Proposed Conclusions of Law 4, 5, 6 and 7 above.

16. In formulating Midtown's MWDBE program, Midtown made a good faith effort to adopt a program compliant with Texas Local Government Code to adopt a program compliant with Texas Local Government Code §375.222, which requires Midtown to have a MWDBE program.

Please see Proposed Findings of Fact 43-46 and 51 and Proposed Conclusions of Law 4. 5 and 6 above.

17. Midtown's program is narrowly tailored because there the bid scorers have discretion to award from zero to ten points to qualified MWDBE contractors and there is no mandatory award of points to a contractor just because of the contractor's racial, ethnic or gender status. The program is also narrowly tailored because it takes many other factors into account for the bid scoring. Metropolitan's history of winning contracts from Midtown, including the current park contract under which Metropolitan is currently performing work for Midtown, shows that Midtown's MWDBE program does not exclude Metropolitan or similarly situated parties from earning contract awards under the MWDBE policy. The flexibility of the bid scoring shows that Midtown's policy is narrowly tailored to the circumstances of each bid.

See Proposed Conclusions of Law 4, 5, 6 and 7 above.

18. Midtown narrowly tailors the application of its MWDBE policy by considering bid scoring and the potential award of zero to ten points for a qualified MWDBE contractor on a bid-by-bid basis.

See Proposed Findings of Fact  33, 40-45.

19. Other parties, including Plaintiffs, are not negatively affected by Midtown's MWDBE program.

As noted above, Metropolitan was even performing work for the District through the time of trial performing landscape maintenance for Baldwin Park and Glover Park (Gerald Thompson 1 RR 91 1-5).  This shows that Plaintiffs were capable of being awarded contracts under Midtown's program before 2025 that awarded up to 10 points to certified disadvantaged businesses for the bid score.  The Plaintiffs also did not present any evidence or argument that they would be hindered in any award of a contract from Midtown under the current system bid scoring system enacted by Midtown in 2025 that no longer awards points for being a certified disadvantaged business.

20. Midtown's program does not stereotype minority groups.

The Plaintiffs simply presented no evidence that Midtown stereotyped any minority group.

21. Midtown's program is neither over-inclusive nor under-inclusive.

Again, the District created the category for an award of up to 10 points for a MWDBE business as part of the District's good faith effort to comply with Texas Local Government Code §375.222 and similar requirements from the City of Houston. (Marlon Marshall 2 RR 19:4-19, 41:22-42:10, Midtown Exhibit 20, Midtown DBE Policy Statement). Midtown felt that this was the most effective way to address the history of discrimination against public contractors while ensuring that highly qualified contractors provided the District with quality goods and services, while not overly disadvantaging anybody. (Marlon Marshall 2 RR 19:4-19, 41:22-42:10, Midtown Exhibit 20, Midtown DBE Policy Statement). The District's Service and Maintenance Committee, legal counsel and District staff arrived at the award of 10 points out of 100 to meet the Texas Legislature's MWDBE requirements. (Marlon Marshall 2 RR 40:2-41:20, 51:1-8). There was no evidence that this policy was over-inclusive or under-inclusive, only that the policy was created as a good faith effort by Midtown to comply with the Texas Local Government Code.

Further, Midtown changed its policy in 2025 and now no longer awards up to 10 points to a certified disadvantaged business in the bid scoring. Plaintiffs did not offer any evidence of how this policy would be allegedly over or under inclusive, or how the current policy would create an injury in fact to Plaintiffs.

22. Plaintiffs are not entitled to judgment on their claims under §42 U.S.C. 1981 because it is duplicative of their §1983 claim, which is the only federal damages remedy that may be invoked against a local government for alleged violations of rights enumerated by §1981.   Accordingly, Plaintiffs' §1981 claim is superfluous.

Section 1981 does not provide an independent cause of action against local government entities. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 731-33 (1989); *see Oden v. Oktibbeha Cnty.*, 246 F.3d 458, 463 (5th Cir. 2001) (section 1981 does not provide "a remedial cause of action against local government entities."). A plaintiff asserting a claim against a governmental entity for an alleged violation of section 1981 must do so through section 1983. *Jett*, 491 U.S. at 735-36.  Plaintiffs improperly present their section 1981 claim for relief as an independent cause of action against a local government entity, and therefore the section 1981 claims should be dismissed as a matter of law.   Permitting a claim under section 1981 to proceed with "implicit references to § 1983 would effectively create an independent cause of action under § 1981 where none exists." *Jenkins v. City of Dallas*, No. 3:22-CV-0960-B, 2022 WL 6225559, at *4 (N.D. Tex. Oct. 6, 2022).

The United States District Court here in the Southern District of Texas held that Section 1981 does "not provide a separate cause of action against local governmental entities."  *Bluitt v. Houston Indep. Sch. Dist.*, 236 F. Supp. 703, 720

(S.D. Tex. 2002). The *Bluitt* court followed the precedent established by the United State Supreme Court in *Jett* that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S. Ct. 2702, 2722 (1989). The court must dismiss both Plaintiffs' claims against Midtown under Section 1981 because Plaintiffs do not have a private right of action against a state governmental unit such as Midtown.

22. Even if a §1981 claim could be pleaded separately from a §1983 claim, Plaintiffs are not entitled to judgment on their §1981 claim for the same reasons that they fail to carry their burden on their §1983 claim. Plaintiffs have failed to show that they have standing or that Midtown's MWDBE program, or how MWDBE treated Plaintiffs in the award of contraction, is unconstitutional. Landscape Consultants' failure to bid on Midtown contract means Landscape does not have a valid claim against Midtown under 1981.

Landscape Consultants' section 1981 claims for relief against the District should be dismissed because Landscape Consultants failed to establish "the loss of an actual, not speculative contract interest." *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001). The Fifth Circuit approvingly cited a Federal District Court's holding that a "§ 1981 claim must allege that the plaintiff was

'actually prevented and not merely deterred'" from contracting. *Morris*, 277 F.3d at 752 (citing *Henderson v. Jewel Food Stores, Inc.,* No. 96 C 3666, 1996 WL 617165 at *3-4 (N.D. Ill. Oct. 23, 1996)). Landscape Consultants has never made any bid to work on projects for Midtown Management District or done any work for Midtown Management District. (Gerald Thompson 1 RR 91:1-22). Landscape therefore does not have a valid claim against Midtown under section 1981.

23. Midtown's 2025 changes to Midtown's disadvantaged business program to no longer award points to disadvantaged businesses in the bid evaluation criteria renders Plaintiffs' claims moot.

Midtown changed its MWDBE policy for procurement in 2025 and no longer awards points to contract bidders based on MWDBE status. (Marlon Marshall 2 RR 45:18-50:2; Midtown Exhibit 28 at MMD 00355). The Midtown board changed the policy based on the board's review of the disadvantaged business program in accordance with Texas Local Government Code §375.222, including considerations of market disparity studies by the City of Houston, the Port of Houston and the Houston Metropolitan Transit Authority (Marlon Marshall 2 RR 71:2-72:16, Midtown Exhibit 40 at MMD 00420). Plaintiffs did not challenge Midtown's current policies for bid scoring in public procurement contracts at trial and only seeks a ruling from the court concerning the policy that existed before 2025.

Plaintiffs are not seeking monetary damages in this case for any alleged loss of business from the application of Midtown's contract policies. The Plaintiffs only claim that Midtown's old policy violated Plaintiffs' civil rights and seek a declaration that Midtown's old policy be declared unconstitutional. However, Midtown's old policy is no longer in effect. Plaintiffs are not challenging Midtown's current public procurement and bid evaluation policies.

Plaintiffs' claims against Midtown now are moot. The claims that Plaintiffs may have had when they filed this litigation no longer exist, and in order to continue to have standing, the "personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness). *Ctr. For Individual Freedom v. Carmouche*, 449 F. 3d 655, 661 (5th Cir. 2006) (quoting *United State Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). Plaintiff only seeks prospective relief from Midtown's policies that were changed in 2025. Plaintiffs do not seek any relief from Midtown's current policies. Plaintiffs' claims against Midtown are therefore moot and must be dismissed for lack of jurisdiction.

Respectfully submitted,


**HARRIS HILBURN, P.L.L.C.**

*/s/ Britton B. Harris*
    Britton B. Harris
    Attorney in Charge
    So. Dist. of Texas No. 00021

34

Texas Bar. No. 09054500
bharris@hhstxlaw.com
1111 Rosalie Street
Houston, Texas 77004
Telephone:  713-223-3936
Facsimile:  713-223-3936
**ATTORNEYS FOR DEFENDANT
MIDTOWN MANAGEMENT**

**DISTRICT**
OF COUNSEL:
Brett J. Sileo
So. Dist. Of Texas No.
22560  Texas Bar No.
00794634
bsileo@hhstxlaw.com Harris
Hilburn, PLLC. 1111 Rosalie
Houston, Texas 77002
Telephone: (713) 223-3936

CERTIFICATE OF SERVICE

This certifies that the above was served on all counsel of record on this 23rd[st] day of
February 2025 by ECF/electronic filing.

/s/ *Brett J. Sileo*
Brett J. Sileo