United States District Court
Southern District of Texas

**ENTERED**

July 28, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC. AND METROPOLITAN LANDSCAPE MANAGEMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF HOUSTON, TEXAS, AND MIDTOWN MANAGEMENT DISTRICT <br><br> Defendants. | § § § § § § § § § § § § § § § § § <br><br> Civil Action No. H-23-3516 |

## FINDINGS OF FACT & CONCLUSIONS OF LAW & ORDER OF PERMANENT INJUNCTION

This case arises out of a challenge to the constitutionality of the City of Houston and Midtown Management District's requirements for awarding public contracts. On September 19, 2023, Plaintiffs Landscape Consultants of Texas, Inc. ("Landscape") and Metropolitan Landscape Management, Inc. ("Metropolitan") (collectively, "Plaintiffs") brought suit against Defendants City of Houston, Texas ("Houston") and Midtown Management District ("Midtown") (collectively, the "Defendants") seeking to permanently enjoin Houston and Midtown's enforcement of their race-conscious public contracting policies pursuant to the Equal Protection

Clause of the Fourteen Amendment.[1] Plaintiffs have made clear throughout the course of this litigation that they **only** challenge the race-conscious aspects of both Houston's Minority, Women, and Small Business Enterprise Program and Midtown's Minority, Woman, and Disadvantaged Business Enterprise Policy. Thus, any injunctive relief provided must be limited to the "minority-owned business" portion of Houston and Midtown's race-conscious public contracting programs. *See National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 522 (2010) ("[w]hen a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislation.").

Currently pending before the Court is Plaintiffs' request for injunctive relief declaring Houston and Midtown's race-conscious public contracting programs unconstitutional. Commencing on December 1, 2025, the Court conducted a four-day bench-trial, with witness testimony, as to the request for a permanent injunction

---

[1] *See Plaintiffs' Complaint*, Document No. 1 at 1–17. Specifically, Plaintiffs challenge Houston's revised ordinance, Houston Code, Art. V § 15-82, which set new citywide minority-owned business goals for Houston contracts. The Court notes that the category in which Plaintiffs compete—nearly doubled its minority-owned business enterprise subcontracting goal, increasing from eleven percent to nineteen percent.

(the "Hearing").[2] Plaintiffs now move this Court to declare the City of Houston's Minority, Women, and Small Business Enterprise Program unconstitutional and to permanently enjoin the City of Houston from operating its program or using similar racial preferences in the award of public contracts.[3] Plaintiffs also move this Court to declare Midtown Management District's Minority, Woman, and Disadvantaged Business Enterprise Policy unconstitutional and to permanently enjoin Midtown Management District from operating its policy or using similar racial preferences in the award of public contracts.[4] Plaintiffs specifically bring this pending action to challenge the racial aspect of Houston and Midtown's Programs.

The Court notes that this case presents an issue of first impression within the federal caselaw. Plaintiffs ask this Court to determine whether the constitutional framework announced by the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,* 600 U.S. 181 (2023), governs race-conscious municipal public contracting programs. In resolving that question, this

---

[2] The parties presented testimony from six witnesses, submitted a total of 114 documents in evidence, and stipulated to eighty-seven Joint Admissions of Fact. Plaintiffs called the principal owner of both Landscape and Metropolitan, Gerald Thompson, and expert witness George La Noue. Midtown called its Senior Director of Engineering & Strategic Development, Marlon Marshall. The City of Houston called its Director of the Office of Business Opportunity, Cylenthia Hoyrd, and expert witness Andres Bernal.

[3] *See Plaintiffs' Complaint*, Document No. 1 at 16.

[4] *Id.* at 17.

Court addresses an unresolved issue of constitutional law. Thus, having considered the record in this case, oral argument presented at the Hearing, and applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any conclusion of law that should be construed as a finding of fact is hereby adopted as such. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.

## I. FINDINGS OF FACT

The following facts have been established by a preponderance of the evidence:

### A. THE CITY OF HOUSTON'S MINORITY, WOMEN, AND SMALL BUSINESS ENTERPRISE PROGRAM

1. Houston administers its program to "stimulate the growth of local minority, women, and small business enterprises by encouraging the full participation of these business enterprises in various phases of city contracting."[5]

2. Section 15-81(a) of the Houston City Code provides that the program is not intended to remedy any single specific, past violation of the U.S. Constitution, but to mitigate and remedy the effects of past discrimination and its lingering

---

[5] Houston Code, Art. V § 15-81(a).

effects against minority and women-owned businesses, and to make public contracting opportunities equally available to such businesses.[6]

3.      Houston has not identified any prime contract awards based on intentional discrimination against minority bidders in the last five years.[7] Houston has also not disciplined any employee or Houston official for discriminating in the award of public contracts for the last five years.[8] Houston has also not identified any specific constitutional or statutory violations related to its public contracting or procurement process or awards in the last five years.[9]

4.      Instead, "[t]he compelling interests advanced by the program includes the City of Houston's attempts to remedy past discrimination by rectifying its own actions."[10]

---

[6] *Joint Proposed Pretrial Order*, Document No. 118, Exhibit 5 at ¶ 34 (*Joint Admissions of Fact*) [hereinafter *Joint Admissions of Fact*]; *see also* Houston Code, Art. V § 15-81(a) ("[i]t is the policy of the city to stimulate the growth of local minority, women and small business enterprises by encouraging the full participation of these business enterprises in various phases of city contracting.").

[7] *Joint Admissions of Fact, supra* note 6 at ¶ 6.

[8] *Joint Admissions of Fact, supra* note 6 at ¶ 7.

[9] *Joint Admissions of Fact, supra* note 6 at ¶ 8.

[10] *Joint Admissions of Fact, supra* note 6 at ¶ 9.

5.    Houston is required by statute to "make its best efforts" to review its program every five years to determine if the racial preferences are necessary.[11]

6.    When Plaintiffs filed their complaint in 2023, Houston's program was supported by a comprehensive disparity study from 2006.[12]

7.    After a ten-year delay, Houston commissioned a comprehensive disparity study in 2016 that was completed in 2020. The Houston City Council chose not to adopt this disparity study with no justification provided.[13]

8.    In March 2023, seventeen years after the last disparity study was adopted, Houston awarded the contract for yet another new disparity study to MGT Consulting, a public sector consulting firm. MGT's scope of work included preparation of a new disparity study focusing on the four primary areas of City procurement: goods, professional services, other services, and construction, with particular focus on collecting data and analyzing disparities among the minority groups identified in Section 15-82 of the Houston City Code.[14]

---

[11] Houston Code, Art. V § 15-81(b).

[12] *Hearing Transcript Day* 2, Document No. 150 at 83:20–22.

[13] *Joint Proposed Pretrial Order*, Document No. 118, Exhibit A-3 at ¶ 8 [*Defendant City of Houston's Preliminary Proposed Findings of Fact and Conclusions of Law*].

[14] *Hearing Transcript Day* 2, Document No. 150 at 85:19–20, 192:17–18.

6

9.     The MGT study was completed and released to the public on Wednesday, November 20, 2024, (hereinafter, the "2024 MGT Study").[15]

10.    Houston's expert witness, Andres Bernal, testified that, like the 2006 study, the 2024 MGT Study showed a statistical underutilization of minority-owned businesses in Houston's contracting, thereby, in Mr. Bernal's view, confirming the persistence of racial discrimination in Houston's contracting.[16]

11.    Mr. Bernal further testified that the 2024 MGT Study's statistical analysis revealed that minority-owned businesses are significantly underutilized compared to their non-minority-owned counterparts.[17]

12.    Mr. Bernal further testified that, based on all the data collected and analyzed, the study's conclusion is that there are statistical disparities which reflect that minority-owned businesses are being discriminated against in the marketplace and that Houston is passively engaging in discrimination.[18]

---

[15] *Defendant City of Houston's Response to Motion to Strike and for Sanctions*, Document No. 84 at 5.

[16] *Hearing Transcript Day 2*, Document No. 150 at 209:22–210:5.

[17] *Hearing Transcript Day 2*, Document No. 150 at 192:6–7; *Defendant City of Houston's Proposed Findings of Fact and Conclusions of Law*, Document No. 146, Exhibit 23 at COH0006167, COH006175, COH0006185, COH0006187, COH0006188 (*the 2024 MGT Study*) [hereinafter *the 2024 MGT Study*].

[18] *Hearing Transcript Day 3*, Document No. 151 at 23:11–24:1, 44:23–45:9.

7

13. However, Mr. Bernal conceded during his testimony that the 2024 MGT Study identified no specific instances of racial discrimination, past or present, that violate the Constitution or a statute.[19] Mr. Bernal also specifically stated at the Hearing that the 2024 MGT Study he conducted failed to identify a single, specific, discriminate act by Houston, past or present, in its public contracting by any person or office associated with the City of Houston.[20]

## HOUSTON'S ORDINANCE

14. On May 7, 2025, the Houston City Council voted to adopt the 2024 MGT Study to "inform future program recommendations and policy decisions" affecting Houston's program.[21] On the same date, the Houston City Council voted to amend Chapter 15 of the Code of Ordinances.[22]

15. Houston's Ordinance defines a "minority business enterprise" as a business in which at least fifty-one percent of the ownership, stock, or assets are owned, controlled, and managed by "minority persons."[23]

---

[19] *Hearing Transcript Day 3*, Document No. 151 at 56:10–21.

[20] *Hearing Transcript Day 3*, Document No. 151 at 56:10–21.

[21] *Joint Admissions of Fact, supra* note 6 at ¶54.

[22] *See Defendant City of Houston's Motion to Dismiss for Lack of Jurisdiction*, Document No. 105, Exhibit 1 at 2 (City of Houston, Texas Ordinance No. 2025-378) [hereinafter *City of Houston's Revised MWSBE Ordinance*].

[23] Houston Code, Art. V § 15-82.

16.  The revised ordinance sets new citywide minority-owned business goals for Houston contracts. In doing so, Houston set annual minority and women-owned business enterprise goals and gave city departments the authority to impose contract-specific percentage goals for individual contracts, with limited exceptions.[24]

17.  Most citywide goals in the revised ordinance were similar or identical to the previous citywide goals, with one exception. Nonprofessional services—the category in which Plaintiffs compete—nearly doubled its minority-owned business enterprise subcontracting goal, increasing from eleven percent to nineteen percent.[25]

18.  Additionally, the record in this matter is clear that Houston's ordinance creates an imbalance between minority-owned and non-minority-owned businesses. For non-minority-owned businesses like Plaintiffs, Houston's ordinance requires that Plaintiffs' contract-goal **must be subcontracted** to a minority-owned business.[26]

---

[24] *Joint Admissions of Fact, supra* note 6 at ¶ 3.

[25] *City of Houston's Revised MWSBE Ordinance, supra* note 22 at 4.

[26] *Hearing Transcript Day 2*, Document No. 150 at 133:9–13 (emphasis added).

19.   Conversely, Houston allows minority-owned businesses to self-perform subcontracting requirement **with their own workers.**[27]

20.   Firms who cannot fulfill the contract-specific goal must prove they made "good faith efforts" to do so.[28]

21.   Whether a firm made sufficient good faith efforts is up to the discretion of staff in the City of Houston's Office of Business Opportunity, who wield the authority to reject good-faith efforts of bidding contractors.[29]

22.   According to Houston, a contractor's performance will only be considered unsatisfactory if the contractor failed to meet the minority-owned business goal and was unable to document good faith efforts towards meeting such goal. A contractor who has received an unsatisfactory rating on one contract is still eligible to bid on, and be awarded, Houston contracts in the future.[30]

---

[27] *Hearing Transcript Day 2*, Document No. 150 at 133:6–8.

[28] *Hearing Transcript Day 2*, Document No. 150 at 149:19–150:9.

[29] *Hearing Transcript Day 2*, Document No. 150 at 133:16–22, 138:10–21.

[30] *Hearing Transcript Day 2*, Document No. 150 at 119:10–22, 142:20–24; Defendant City of Houston's Trial Exhibit 3 at COH0000090–93 (*City of Houston Office of Business Opportunity Policies and Procedures*); Defendant City of Houston's Trial Exhibit 4 at 78–84 (*City of Houston's Office of Business Opportunity Good Faith Efforts Policy*).

23. The penalty for failing to comply with a contract-specific goal or being granted a waiver for good faith efforts is debarment from all Houston contracts for five years.[31]

24. On May 8, 2025—one day after the revised ordinance passed—Landscape received an email from the Houston Office of Business Opportunity's Contract Compliance Division regarding Landscape's progress in meeting the subcontracting goal for their ongoing city contract. The email threatened Landscape with enforcement actions, including up to a five-year suspension under Houston Code, Art. V § 15-85 if it does not fulfill the City's subcontracting goal or demonstrate acceptable good faith efforts.[32]

### B.   MIDTOWN MANAGEMENT DISTRICT'S MINORITY, WOMAN, AND DISADVANTAGED BUSINESS ENTERPRISE POLICY

25. The Midtown Management District ("Midtown") was created in 2000 to provide quality of life services such as public safety, marketing services,

---

[31] Houston Code, Art. V § 15-86(a).

[32] Plaintiff's Trial Exhibit 15 (May 8, 2025, Houston Office of Business Opportunity's Compliance Email Sent to Landscape) [hereinafter *May 8, 2025, Houston Office of Business Opportunity's Compliance Email Sent to Landscape*]. The Court notes that Landscape's pre-existing contract with Houston requires a subcontracting goal of eleven percent. Under Houston's revised ordinance, all contracts Landscape obtains moving forward require a subcontracting goal of nineteen percent. *See Hearing Transcript Day 2*, Document No. 150 at 133:9–13

11

maintenance, and urban planning within the area of the Midtown Tax Increment Reinvestment Zone ("TIRZ") in Midtown Houston.[33]

26.   Midtown, operating through the District's Service and Maintenance Committee, is responsible for the maintenance and upkeep of public right of way and public facilities within the Midtown Management District.[34]

27.   Midtown operates its program because it believes it is commanded to have such a program by the Texas Legislature's enactment of Texas Local Government Code § 375.222 in 1991 which orders management districts such as Midtown to have a program for disadvantaged businesses.[35] Plaintiffs bring this action to specifically challenge the minority-owned business aspect of Midtown's program.

28.   Texas Local Government Code § 375.222(a) states that "[a] district shall attempt to stimulate the growth of disadvantaged businesses inside its boundaries by encouraging the full participation of disadvantaged businesses in all phases of its procurement activities and affording those disadvantaged businesses a full and fair opportunity to compete for district contracts."

---

[33] *Joint Admission of Fact, supra* note 6 at ¶ 62.

[34] *Joint Admission of Fact, supra* note 6 at ¶ 63.

[35] *Joint Admissions of Fact, supra* note 6 at ¶ 76.

12

29.　Texas Local Government Code § 375.222(b) provides that "[a] district shall establish one or more programs designed to increase participation by disadvantaged businesses in public contract awards. Each program shall be structured to further remedial goals and shall be established to eradicate the effects of any prior discrimination."

## MIDTOWN'S PROGRAM

30.　Midtown's public contracting program's stated purpose is as follows: "[to] stimulate the growth of minority, women, and disadvantaged business enterprises inside the boundaries of the District by encouraging the full participation of disadvantaged businesses in all phases of its procurement activities and affording those disadvantaged businesses a full and fair opportunity to compete for District contracts."[36]

31.　Midtown's program allows bidding companies certified by Houston as a minority-owned business to receive up to a ten-point preference out of a 100-point scale in the bidding process for public contracts.[37]

32.　Beginning in 2025, Midtown removed the ten-point award for minority owned businesses, and instead now considers minority-owned business status as part

---

[36] Midtown Management District's Trial Exhibit 14 at MMD00171 (Midtown Management District's 2004 Administrative Policies and Procedures).

[37] *Joint Admissions of Fact, supra* note 6 at ¶ 16.

of the "organizational qualifications" section of its public contracting scoring matrix.[38]

33. Midtown's policy and procedures manual does not include a policy for how it reviews and scores bids. Additionally, the scoring matrix for landscaping services changed between 2022 and 2025, still with no information provided to prospective Midtown public contract bidders regarding how Midtown reviews and scores bids.[39]

34. Midtown contends that it engages in race-conscious public contracting to comply with Texas Local Government Code §375.222 and similar requirements from the City of Houston, and notes a compelling interest to remedy prior discrimination in the award of public contracts.[40]

35. However, Midtown concedes that its program may disadvantage non-minority-owned companies, even if those companies have never themselves been guilty

---

[38] Midtown Management District's Trial Exhibit 38 at 5 (Midtown Management District's August 2025 Landscape Maintenance Instructions on Bid Compliance) [hereinafter *Midtown Management District's August 2025 Landscape Maintenance Instructions on Bid Compliance*]; Hearing Transcript Day 2, Document No. 150 at 47:4–48:15; 76:1–5; 77:6–25.

[39] Plaintiffs' Trial Exhibit 5 at 4 (Marlon Marshall Deposition Ex. 3, Invitation to Bid); *Midtown Management District's August 2025 Landscape Maintenance Instructions on Bid Compliance, supra* note 38 at 5.

[40] *Joint Admissions of Fact, supra* note 6 at ¶ 76.

of discrimination.[41] Midtown further concedes that it has zero evidence of racial discrimination in its public contracting program.[42]

36.    Midtown's program is not based on a disparity study of the area within Midtown's boundaries. Midtown has not adopted any study, report, or research that identifies specific instances of discrimination in public contracting in the last five years.[43] Additionally, Midtown has not adopted the aforementioned 2024 MGT Study conducted by Houston.[44]

37.    Midtown has not identified any prime contract award based on intentional discrimination against minority-owned business bidders in the last 5 years.[45]

38.    Midtown can identify no specific constitutional or statutory violations related to its public contracting or procurement process awards.[46]

---

[41] *Joint Admissions of Fact, supra* note 6 at ¶ 17.

[42] *Joint Admissions of Fact, supra* note 6 at ¶ 18.

[43] *Joint Admissions of Fact, supra* note 6 at ¶ 14.

[44] *Joint Admissions of Fact, supra* note 6 at ¶¶ 12, 14–15.

[45] *Joint Admissions of Fact, supra* note 6 at ¶ 21.

[46] *Joint Admissions of Fact, supra* note 6 at ¶ 23.

## C.    THE PLAINTIFFS

39.    Plaintiffs Landscape and Metropolitan are small, family-owned landscaping businesses that share the same owner, Gerald Thompson, and approximately fifty employees, ninety-five percent of which are racial minorities.[47]

40.    The companies have operated in the Houston area since 2006, with approximately ninety percent of each company's annual revenue coming from winning local government landscaping contracts.[48]

41.    Neither Plaintiff Landscape nor Plaintiff Metropolitan qualify, or are certified, as a minority owned business enterprise when bidding on contracts with Houston or Midtown.[49]

### i.    PLAINTIFFS' INTERACTIONS WITH HOUSTON

42.    Landscape has successfully bid on—and been awarded—various government contracts that set minority-owned business participation goals. In May 2021, Landscape was awarded a five-year, $1,300,000.00 contract by Houston that remains ongoing.[50]

---

[47] *Joint Admissions of Fact, supra* note 6 at ¶¶ 24, 34.

[48] *Joint Admissions of Fact, supra* note 6 at ¶ ¶ 25–26.

[49] *Joint Admissions of Fact, supra* note 6 at ¶ ¶ 27–28.

[50] *Hearing Transcript Day 1*, Document No. 149 at 67:3–9; *Hearing Transcript Day 2*, Document No. 150 at 123:14–19.

43. Landscape's current contract with Houston includes an eleven percent minority-owned business participation goal.[51]

44. However, Houston's revised ordinance passed in May 2025 now imposes a nineteen percent minority-owned business goal.[52] Landscape's owner, Gerald Thompson, testified that learning about this increase from eleven percent to nineteen percent would be "very expensive and very costly" for small businesses like Landscape and Metropolitan.[53]

45. With nearly all of Landscape and Metropolitan's revenue coming from contracts with Houston-area local governments, Mr. Thompson testified that the growth of Houston's program and its spread to other municipalities "could threaten the livelihood of his business."[54]

46. Mr. Thompson's fears quickly became a harsh reality. On May 8, 2025—one day after the revised ordinance passed—Landscape received an email from the Houston Office of Business Opportunity's Contract Compliance Division regarding Landscape's progress in meeting the minority-owned business subcontracting goal for their ongoing city contract. The email threatened

---

[51] *Joint Admissions of Fact, supra* note 6 at ¶ 28.

[52] *Hearing Transcript Day 1*, Document No. 149 at 40:21–24.

[53] *Hearing Transcript Day 1*, Document No. 149 at 40:21–24, 82:13, 88:10.

[54] *Hearing Transcript Day 1*, Document No. 149 at 50:5–11.

Landscape with enforcement actions, including up to a five-year suspension under Houston Code, Art. V § 15-85 if it does not fulfill the City's subcontracting goal or demonstrate acceptable good faith efforts.[55]

### ii. PLAINTIFFS' INTERACTIONS WITH MIDTOWN

47. On December 31, 2025, Metropolitan completed a multi-year landscaping contract to maintain Midtown's Baldwin and Glover Parks.[56]

48. In addition to the Baldwin and Glover Parks contract, Metropolitan also held Midtown's Field Maintenance Service Project contract off-and-on over the last fifteen years.[57]

49. In 2022, Metropolitan's bid for the Field Maintenance Service Project contract was unsuccessful due to Midtown's policy of awarding ten points to minority-owned business bidders, but not to non-minority-owned business bidders like Metropolitan.[58]

---

[55] *May 8, 2025, Houston Office of Business Opportunity's Compliance Email Sent to Landscape, supra* note 32.

[56] *Hearing Transcript Day 1*, Document No. 149 at 28:13–14; *Hearing Transcript Day 2*, Document No. 150 at 27:5–10.

[57] *Joint Admissions of Fact, supra* note 6 at ¶ 30; *Hearing Transcript Day 1*, Document No. 149 at 31:16–19.

[58] *Hearing Transcript Day 1*, Document No. 149 at 31:12–32:6; 34:6–12.

50. The parties agree that if Metropolitan had been awarded the additional ten points minority-owned businesses may be awarded, Metropolitan would have had the highest score and secured the $350,000.00 contract.[59] Midtown concedes that Metropolitan outscored the winning bidder in every category, except the category that precluded Metropolitan from receiving ten additional points due to the race of its owners.[60]

## III. CONCLUSIONS OF LAW

### A. GENERAL STATEMENTS OF LAW

51. The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

52. Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

53. Venue is proper pursuant to 28 U.S.C. § 1391(b), on the ground that all or a substantial part of the acts giving rise to Plaintiffs' claims have occurred or will occur in the Southern District of Texas.

---

[59] *Joint Admissions of Fact, supra* note 6 at ¶ 33.

[60] *Id.*; *Hearing Transcript Day 1*, Document No. 149 at 34:6–12.

## B.     PRELIMINARY ISSUE OF MOOTNESS

54.    A claim is rendered moot when a "case or controversy" no longer exists between the parties. *See, e.g., Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 345 (5th Cir. 2017). "[A] case will become moot where 'there are no longer adverse parties with sufficient legal interests to maintain the litigation' or 'when the parties lack a legally cognizable interest in the outcome' of the litigation." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (quoting *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotations omitted).

55.    Here, Houston contends that Landscape's claim is moot because Landscape did not amend its pleading after Houston enacted a new ordinance in 2025. Houston further contends that Landscape's 2023 pleading seeks prospective relief only as to Houston's now defunct program, relief which Houston claims is now impossible for any court to provide.

56.    Houston further argues that Houston's Office of Business Opportunity Director, Ms. Cylenthia Hoyrd, testified that Houston's new ordinance enacted in 2025 makes fundamental changes to Houston's program, allowing vendors to meet

20

contract participation goals through race-neutral alternatives, such as subcontracting with small or veteran-owned businesses.[61] Houston also notes for the Court the testimony of Landscape's owner, Mr. Thompson, who testified that he was not fully aware of the changes in Houston's program.[62] Houston contends that based on the foregoing, Landscape's claims against Houston should be denied as moot and dismissed for lack of jurisdiction.

57.   In reviewing the challenged ordinance, the Court finds that Houston's May 2025 amendment did not narrow the challenged racial classifications or suspend their enforcement.[63] On the contrary, Houston retained every racial category, preserved race-based contract goals, and increased the goal applicable to Plaintiffs' industry, raising the subcontracting percentage requirement from eleven to nineteen percent.[64]

---

[61] *Hearing Transcript Day 2*, Document No. 150 at 107:9–20.

[62] During the Court's four-day bench trial, Houston elicited testimony from Landscape's owner, Mr. Thompson, suggesting he was unfamiliar with the details of the revised statute Houston enacted. *See Hearing Transcript Day 1*, Document No. 149 at 40:21–24, 65:6–11, 82:23–24. That testimony is inherently irrelevant—particularly where, as here, the relevant facts are conceded. *See Anne Harding, et. al., v. County of Dallas, Texas, et. al.*, 948 F.3d 302, 307 (5th Cir. 2020) ("[s]tanding is not a pop quiz administered by able defense attorneys to unsophisticated plaintiffs.").

[63] *City of Houston's Revised MWSBE Ordinance, supra* note 22 at 6.

[64] *Id.*

21

58.    Houston does not dispute that it continues to operate a race-conscious program post ordinance revision.[65]

59.    Houston also continues to enforce the revised ordinance against Plaintiffs, evidenced by Houston emailing Landscape threatening that failure to comply with a contract's subcontracting goal was grounds for up to a five-year suspension from City of Houston contracting.[66]

60.    Additionally, testimony at the Court's four-day bench trial revealed that Houston has not ceased the challenged conduct and continues to operate a race-conscious public contracting program under Houston's amended ordinance.[67]

61.    The Supreme Court of the United States has condemned the practice of a municipality replacing one race-conscious ordinance with a similar ordinance at a late stage of litigation, finding that the Northeast Florida Chapter of General Contractors maintained standing after the City of Jacksonville, Florida repealed an ordinance and replaced it with another ordinance that continued the same conduct. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 660-61 (1993) ("*Northeastern Florida*")

---

[65] *Hearing Transcript Day 1*, Document No. 149 at 206:8–10.

[66] *May 8, 2025, Houston Office of Business Opportunity's Compliance Email Sent to Landscape, supra* note 32.

[67] *Hearing Transcript Day 1*, Document No. 149 at 206:8–10.

22

("[t]here is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so.").

62.   In *Northeastern Florida*, the Supreme Court made clear that "[t]he gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment . . . it disadvantages them in the same fundamental way." *Id.* at 662.

63.   Like the City of Jacksonville in *Northeastern Florida*, Houston replaced its existing ordinance with another that continues to disadvantage Plaintiffs in the same fundamental way.[68]

64.   Considering the Supreme Court's uniform rejection of mootness under materially identical circumstances, the Court finds that Plaintiffs' claims for relief against Houston are not moot.

## C.   PRELIMINARY ISSUE OF STANDING

65.   To establish Article III standing, Plaintiffs must demonstrate (1) an "injury in fact" (2) that is "fairly traceable" to each defendant and (3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

---

[68] *Hearing Transcript Day 2*, Document No. 150 at 139:1–140:6.

66. When analyzed in the context of government contracting, a party must show "it is able and ready" to engage in government contracting "and that a discriminatory policy prevents [it] from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

67. In a forward-looking equal protection challenge to a race-based program like the one operated by Houston, a party "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.*

68. Furthermore, a court must ensure that it restricts its standing analysis to the specific contracts for which a contractor is actually eligible to apply within the at-issue program. *See W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 212 (5th Cir. 1999). A plaintiff cannot simply challenge a program "relating to every contract let by [a] City" but rather, only those it is eligible to procure in the first place. *Id.*

69. Here, Landscape maintains that it has standing because it must compete on unequal footing with minority-owned businesses in bidding for Houston contracts. Plaintiffs' owner, Mr. Thompson, testified that Plaintiffs are able and ready to bid on Houston contracts, and recently completed a multi-year

landscaping contract for Houston.[69] Mr. Thompson further testified that Plaintiffs would continue to bid on Houston contracts if they can do so on an equal footing with other bidders.[70]

70. The Court finds that Plaintiffs have established an injury-in-fact through evidence that they are treated in a racially discriminatory way when bidding for Houston contracts. In coming to this conclusion, the Court finds the following evidence particularly persuasive.

71. The record in this matter is clear that Houston's ordinance creates an imbalance between minority-owned and non-minority-owned businesses. For non-minority-owned businesses like Plaintiffs, Houston's ordinance requires that the entirety of Plaintiffs' contract-goal of nineteen percent **must** be subcontracted to a minority-owned business.[71] Conversely, Houston allows minority-owned businesses to self-perform contracting requirements with their own workers.[72]

---

[69] *Hearing Transcript Day 1*, Document No. 149 at 36:8–14.

[70] *Hearing Transcript Day 1*, Document No. 149 at 50:16–52:1; Plaintiffs' Trial Exhibit 13 (*Plaintiffs' Alief Neighborhood Center Proposal*); Plaintiffs' Trial Exhibit 14 (*Plaintiffs' Hermann Park Proposal*).

[71] *Hearing Transcript Day 2*, Document No. 150 at 133:9–13.

[72] *Hearing Transcript Day 2*, Document No. 150 at 133:6–8.

72. Houston's program imposes direct economic harm. The evidence offered at trial shows that Plaintiffs must subcontract the entirety of the nineteen percent minority-owned business subcontracting goal required by Houston, while minority-owned businesses may self-perform half with their own employees.[73] That differential requirement alters bid pricing, reduces margins, and compels Plaintiffs to divert a fixed portion of contract value solely because of race. Considering Plaintiffs' increased financial burdens due to Houston's revised ordinance, the Court finds that Plaintiffs are experiencing a concrete, present economic injury—not a speculative future harm. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 84 (2026) (Barrett, J., concurring) ("[p]ocketbook harm is a traditional Article III injury.").

73. The threat of harm to Plaintiffs is not theoretical; Houston enforced its revised ordinance against Landscape just one day after it was passed, threatening Landscape with suspension for up to five years for failure to satisfy a contract's minority-owned business goal.[74]

74. Houston argues that Landscape's theory of standing is untenable because under Houston's program both minority-owned businesses and non-minority-owned

---

[73] *Hearing Transcript Day 2*, Document No. 150 at 133:6–13.

[74] *May 8, 2025, Houston Office of Business Opportunity's Compliance Email Sent to Landscape, supra* note 32.

businesses need do no more than demonstrate "Good Faith Efforts" to meet contract goals. On balance though, Houston's Good Faith Efforts Policy does not level the playing field for non-minority-owned businesses. As Houston Office of Business Opportunity Director Cylenthia Hoyrd testified, whether a firm made sufficient good faith efforts to waive a contract's minority-owned business goal is within the complete discretion of the office's staff.[75]

75. The Court also notes Midtown's sole argument attacking Plaintiffs' standing in this case, noting that "Landscape has never bid and never intends to bid on Midtown projects, so it does not have standing to challenge Midtown's policies."[76]

76. Having considered the Supreme Court's clear guidance that a party "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so" in order to establish standing, the Court finds Midtown's argument against Landscape unpersuasive, as Landscape has provided sufficient evidence to show it is able and ready to bid on Midtown contracts. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

---

[75] *Hearing Transcript Day 2*, Document No. 150 at 133:16–22; 137:4–138:2.

[76] *Defendant Midtown Management District's Preliminary Proposed Findings of Fact and Conclusions of Law*, Document No. 143 at 17.

77. Accordingly, and based on the foregoing, the Court finds that Plaintiffs possess the requisite Article III standing with respect to their claims against Houston and Midtown. The Court now turns to consider the merits of this case, whether a permanent injunction should be issued to enjoin Houston and Midtown from operating their race-conscious public contracting programs.

## D.   PERMANENT INJUNCTION

78. The elements of a permanent injunction are nearly identical to those of a preliminary injunction, except that a "plaintiff must show actual success on the merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). Thus, to establish it is entitled to a permanent injunction, a plaintiff must demonstrate: (1) an actual success on the merits; (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (3) that greater injury will result from denying the [injunction] than from its being granted; and (4) that an injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.3d 991, 993 (5th Cir. 1985); *Amoco Prod.*, 480 U.S. at 546 n.12.

## E.   ACTUAL SUCCES ON THE MERITS

79. Race-based classifications are presumptively unconstitutional and can only be overcome if the government satisfies the "daunting two-step examination" of strict scrutiny. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991).

28

First, the burden is on Defendants to demonstrate that their programs' racial classifications are used to "further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Second, Defendants must show that the use of race is narrowly tailored to achieve that interest. *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013).

80. Courts have long recognized that "combating racial discrimination is a compelling government interest." *W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999). To invoke a compelling interest in remedying racial discrimination, the City must provide a "strong basis in evidence" that such remedial action is necessary. *Id.*

81. The Supreme Court made clear in its landmark decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* ("*Harvard*") that there are only two compelling interests that permit the government to treat individuals differently based on race: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," **or** (2) "avoiding imminent and serious risks to human safety in prisons." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023).

82. Furthermore, courts must undertake a "searching judicial inquiry into the justification" of a race-based program to ensure that government entities are

29

"pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

83. Here, Houston argues that the Court should apply the Supreme Court's framework in *Croson* and decline to apply the Supreme Court's framework offered in its recent *Harvard* decision because the specific factual posture of this case "does not involve the educational benefits of diversity in the classroom."[77] In sum, Houston asks this Court not to extend the *Harvard* framework to apply in instances of race-conscious public contracting.

84. On balance though, the Court is aware of the United States Supreme Court's very recent opinion in *Louisiana v. Callais, et al.*, 146 S.Ct 1131, 1131 (Apr. 29, 2026) ("*Callais*"). Therein, the Supreme Court extended its holding in *Harvard* beyond the context of higher education admissions. *Id.* (applying the *Harvard* framework in the context of evaluating instances of racial gerrymandering under the Voting Rights Act). While the Supreme Court in *Harvard* never limited its holding to higher education admissions, *Harvard's* application to a Voting Rights Act case further emphasizes *Harvard's* applicability in other contexts such as public contracting. Additionally, the Supreme Court in *Callais* affirms that for any effort to remediate past

---

[77] *City of Houston's Response to Plaintiffs' Motion for Summary Judgment*, Document No. 45 at 15.

discrimination to qualify as a compelling state interest, the discrimination must first be "identified discrimination." *Callais*, 146 S.Ct at 1152–153 (quoting *Croson*, 488 U.S. at 499). The Supreme Court is clear and unequivocal that the government "must identify the specific instances of past discrimination that it aims to remediate," and that the government has "no compelling interest in generally remediating 'past discrimination in a particular industry or region' or "the effects of societal discrimination.'" *Id.* (quoting *Shaw v. Hunt*, 517 U.S. 899, 910 (1996)).

85.    Having considered the record in this case and applicable law, the Court finds no binding or persuasive authority precluding the Court from applying the Supreme Court's framework established in *Harvard* in the present instance. Accordingly, the Court now turns to apply the *Harvard* framework to Houston and Midtown's race-conscious public contracting programs.

### i.    HOUSTON'S MINORITY, WOMEN, AND SMALL BUSINESS ENTERPRISE PROGRAM

86.    Under the Supreme Court's framework in *Harvard*, further amplified by the Supreme Court in *Callias*, Houston holds the burden to show that its race-conscious public contracting program is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Harvard*, 600 U.S. at 207.

31

87. Here, Houston admits that it cannot identify any racial discrimination in its public contracting program, let alone identify any specific Constitutional or statutory violations related to its public contracting program.[78] Within the last six years, Houston has not sanctioned or investigated any city employee for racial discrimination, identified any prime contractor that has discriminated against a minority-owned business subcontractor, or gathered any contemporary evidence of disparities or discrimination within the greater Houston area.[79] Houston cannot have an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" if it has no proof of instances of past discrimination.

88. The 2024 MGT Study—despite being written after the Supreme Court's *Harvard* decision—neither searched for nor found any specific, identified instances of past discrimination that violate the Constitution or a statute and is therefore inadequate to prove past intentional discrimination towards any racial or ethnic group granted a preference under Houston's ordinance.[80]

89. Whether analyzed under *Harvard* or under the Fifth Circuit's longstanding remedial-equal-protection cases, Houston is required to identify concrete,

---

[78] *Joint Admissions of Fact, supra* note 6 at ¶¶ 6–8.

[79] *Joint Admissions of Fact, supra* note 6 at ¶¶ 6–8.

[80] *Hearing Transcript Day 3*, Document No. 151 at 56:10–21.

32

particularized discrimination and demonstrate that its use of race is necessary to remedy that discrimination. Houston has not done so.

90. Because Houston has failed to comply with the Supreme Court's framework in *Harvard* by failing to identify any specific instances of past discrimination that violated the Constitution or a statute, and because Houston has not proven that the racial classifications in its public contracting programs satisfy the demanding requirements of strict scrutiny generally, the Court finds that Plaintiffs have shown actual success on the merits with respect to Plaintiffs' Equal Protection claim against Houston's Minority, Women, and Small Business Enterprise Program.[81] The Court now turns to consider whether Plaintiffs have shown actual success on the merits with respect to their action against Midtown.

## ii.   MIDTOWN'S MINORITY, WOMAN, AND DISADVANTGED BUSINESS ENTERPRISE POLICY

91. Midtown admits that it has identified no specific constitutional or statutory violations related to its public contracting or procurement process or awards in

---

[81] Considering the Court's finding that Houston's race-conscious public contracting program is unconstitutional based on Houston's failure to meet its burden under the Supreme Court's *Harvard* framework, the Court declines to consider Plaintiffs' remaining arguments pertaining to constitutionality.

the last six years.[82] A review of the record in this case reveals that Midtown cannot identify any specific, past constitutional or statutory violation that its program is intended to remedy. Additionally, in the last six years, Midtown has not disciplined, terminated, or otherwise sanctioned any employee or official for discrimination in public contracting, nor has it debarred or sanctioned a contractor for discriminating against a minority-owned business subcontractor.[83]

92.    As required by the framework set out in *Harvard*, without a specific constitutional or statutory violation to remedy, Midtown has no compelling interest in operating a race-based public contracting program. Because Midtown has failed to comply with the Supreme Court's framework in *Harvard* by failing to identify any specific instances of past discrimination that violated the Constitution or a statute, and Midtown has not proven that the racial classifications in its public contracting programs satisfy the demanding requirements of strict scrutiny generally, the Court finds that Plaintiffs have

---

[82] *Joint Admissions of Fact, supra* note 6 at ¶ 22.

[83] *Joint Admissions of Fact, supra* note 6 at ¶¶ 19, 21.

shown actual success on the merits with respect to Midtown's Minority, Woman, and Disadvantaged Business Enterprise Policy.[84]

### F.   SUBSTANTIAL THREAT OF INJURY

93.   The law is clear that the loss of a constitutional right is sufficient to show a threat of injury or irreparable harm. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 657 (1993) ("[t]he "injury in fact" element of standing in such an equal protection case is the denial of equal treatment resulting from the imposition of the barrier—here, the inability to compete on an equal footing in the bidding process—not the ultimate inability to obtain the benefit."); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 at 161 (2d ed. 1995) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

94.   Based on the foregoing, the Court finds that both Houston and Midtown's race-based public contracting programs impermissibly infringe on the Equal Protection Clause of the Fourteenth Amendment.

---

[84] Considering the Court's finding that Midtown's race-conscious public contracting program is unconstitutional based on Midtown's failure to meet its burden under the Supreme Court's *Harvard* framework, the Court declines to consider Plaintiffs' remaining arguments pertaining to constitutionality.

95.   Accordingly, the effects of Houston and Midtown's race-based public contracting programs will cause an irreparable injury which favors enjoining both programs.

## G.   BALANCE OF HARMS

96.   Determining if the balance of the hardship favors the party seeking the injunction requires a court to consider "the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

97.   Here, the Court finds that the infringement of the Plaintiffs' Fourteenth Amendment rights outweighs any hardship on Houston or Midtown.

98.   Accordingly, the Plaintiffs have shown that the balance of harms weighs in their favor.

## H.   PUBLIC INTEREST

99.   The public interest favors a permanent injunction because there is no public interest in permitting the government to continue enforcing an unconstitutional race-based policy. The Fifth Circuit has repeatedly recognized that there is a strong public interest in requiring governmental actors to comply with constitutional and statutory limitations on their authority. *See Wages and White Lon Investments, LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("there is

generally no public interest in the perpetuation of unlawful agency action.")
(quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir.
2016)).

100. Accordingly, the Court finds the Plaintiffs have met all requirements to receive injunctive relief.

## I.   ATTORNEYS' FEES

101. Plaintiffs also move the Court to issue an award of attorneys' fees and costs in this action pursuant to Federal Rule of Civil Procedure 54(d) and 42 U.S.C. § 1988.

102. 42 U.S.C. ¶ 1988(b) establishes that "[i]n any action or proceeding to enforce a provision of sections 1981 [or] 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." Such an award "may include expert fees as part of the attorney's fee." 42 U.S.C. ¶ 1988(c). "The party seeking reimbursement of attorneys' fees ... has the burden of establishing the number of attorney hours expended, and can meet that burden only by presenting evidence that is adequate for the court to determine what hours should be included in the reimbursement." *Bode v. U.S.*, 919 F.2d 1044, 1047 (5th Cir. 1990). "The documentation supporting a factual finding regarding the amount of attorney's fees must be sufficient for the court to verify that the applicant has met its

37

burden of establishing an entitlement to a specific award." *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1044 (5th Cir. 2010).

103.   Here, the Court has reviewed the record in this case and finds no documentation or evidence offered by Plaintiffs establishing the number of attorney hours expended as is required under binding authority in this Circuit. Accordingly, considering the discretionary nature of attorneys' fees in this case, and the Plaintiffs' failure to offer the Court any documentation to assist the Court in evaluating Plaintiffs' request, the Court determines that the pending request for attorneys' fees should be denied.

## IV. CONCLUSION

Based on the foregoing, the Court hereby

**DECLARES** the racial aspect of Defendant City of Houston, Texas's Minority, Women, and Small Business Enterprise Program **UNCONSTITUTIONAL**. The Court concludes that the portion of City of Houston's Minority, Women, and Small Business Enterprise Ordinance that discriminates on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. The Court further

**ORDERS** that Defendant City of Houston, Texas is **PERMANENTLY ENJOINED** from administering the racial aspect of its Minority, Women, and Small Business Enterprise Program. The Court further

38

**DECLARES** the racial aspect of Defendant Midtown Management District's Minority, Woman, and Disadvantaged Business Enterprise Policy **UNCONSTITUTIONAL**. The Court concludes that the portion of Defendant Midtown Management District's Minority, Woman, and Disadvantaged Business Enterprise Policy that discriminates on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. The Court further

**ORDERS** that Defendant Midtown Management District is **PERMANENTLY ENJOINED** from administering the racial aspect of its Minority, Woman, and Disadvantaged Business Enterprise Policy. The Court further

**ORDERS** that Plaintiffs' request for attorneys' fees is **DENIED.**

SIGNED at Houston, Texas, on this 28th day of July, 2026.

DAVID HITTNER
United States District Judge

39