UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC., and METROPOLITAN LANDSCAPE MANAGEMENT, INC.,<br>*Plaintiffs*,<br>v.<br>CITY OF HOUSTON, TEXAS, and MIDTOWN MANAGEMENT DISTRICT,<br>*Defendants*. | Civil Action No. 4:23-cv-03516 |

**DEFENDANT THE CITY OF HOUSTON'S MOTION TO ALTER OR AMEND THE JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 59(e), Defendant, the City of Houston ("Houston"), files this Motion to Alter or Amend this Court's Judgment and Opinion, containing Findings of Fact and Conclusions of Law and Order of Permanent Injunction, both dated July 28, 2026. In support of its Motion, Houston states as follows:

## TABLE OF CONTENTS

**Contents**


TABLE OF CONTENTS .......... 2

SUMMARY OF ARGUMENT .......... 5

MOTION TO ALTER OR AMEND THE JUDGMENT .......... 7

I. RULE 59(E) STANDARDS .......... 7

II. The Supreme Court's Decisions in *Shaw* and *Croson* and Their Fifth Circuit Progeny Still Govern Here and Expressly Reject Any Alleged Requirement That Cities Incriminate Themselves Regarding Past Discrimination to Support Race-Conscious Programs .......... 8

A. The Supreme Court, in *Harvard* and *Callais*, Relied Upon, Rather than Effectively Overruled, its Prior Contracting Discrimination Decision in *Croson* and Did Not Announce a New, More Restrictive Standard of Proof of Compelling Interest .......... 9

B. *Croson,* as Implemented by the Fifth Circuit in *Dean* and *Cannatella,* Specifically Rejects the Need for Cities to Self-Incriminate to Support Programs Like the Racial Component of Houston's MWSBE Program .......... 12

1. Neither *Shaw, Croson,* Their Fifth Circuit Progeny, nor Decisions in Virtually All Other Circuits Mandate the Self-Incrimination this Court Required .......... 13

2. Instead, the Supreme Court, Fifth Circuit, and Other Circuits Permit Cities to Utilize the Specific Statistical Evidence Houston Provided to Show a Compelling Interest .......... 17

3. This Court Thus Misapplied *Harvard* and *Callais,* Which Rely Upon *Croson* and *Shaw* .......... 21

III. As Set Forth in Houston's Motion for Summary Judgment, Houston's MGT Study Demonstrates Its Compelling Interest in the Racial Component of its MWSBE Program ............ 22

A. Houston's MGT Study Meets the *Croson/Shaw/Scott/Dean/Cannatella* Test to Show Houston's Compelling Interest in the Racial Component of its MWSBE Program ............ 23

B. The MGT Study Also Shows That Houston Has Been a Passive Participant in Racial Discrimination in Public Contracting In Houston ............ 28

IV. Although This Court Did Not Reach This Issue, Houston's MWSBE Program is Narrowly Tailored and Has A Definite End Point ............ 29

V. Although this Court Did Not Reach this Issue, Plaintiffs Did Not Even Try Meaningfully to Rebut Houston's Evidence of a Compelling Interest ............ 36

CONCLUSION AND PRAYER FOR RELIEF ............ 39

CERTIFICATE OF CONFERENCE ............ 41

CERTIFICATE OF SERVICE ............ 41

APPENDIX - *True and correct copies of the following documents were attached to Houston's Motion for Summary Judgment and are included here only where relevant for the Court's convenience so that it may have a self-contained document.*

**Declaration of Cylenthia Hoyrd**

Exh. A Houston, Tex., *Code of Ordinances*, art. V, §§ 15-81, *et seq*. (establishing the MWSBE Program)

Exh. B Office of Business Opportunity, Policies and Procedures for the Implementation of Chapter 15, Articles II (Anti-Discrimination Provisions in City Contracts), V, VI and XI (Feb. 2, 2022)

Exh. C Houston's "Good Faith Efforts" Policy

Exh. D Executive Summary of Houston's MGT Study

Exh. E Houston's 2006 Disparity Study

Exh. F Houston's 2012 Disparity Study

**Declaration of Andres Bernal**

Exh. A Bernal CV

Exh. B Houston's MGT Consulting Disparity Study

## SUMMARY OF ARGUMENT

In applying to Houston's contracting what it believed was the Supreme Court's standard of proof of a compelling interest from *Students for Fair Admission, Inc. v. President and Fellow of Harvard College, et al. ("Harvard")*, 600 U.S. 181 (2023), and *Louisiana v. Callais*, 146 S. Ct. 1131 (2026) ("Callais"), and, in the process, disregarding Houston's 2024 MGT Consulting disparity study ("MGT Study") as insufficient under that standard, this Court effectively required Houston to admit to committing specific past discriminatory acts in contracting and thus confessing constitutional and/or statutory violations to support its need for the racial component of its Minority Women Small Business Enterprise ("MWSBE") program. *Opin*. at *12 ("[H]ouston holds the burden to show that its race-conscious public contracting program is 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute") (citing *Harvard*, 600 U.S. at 207). This Court, therefore, concluded that "Houston cannot have an interest in 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute' *if it has no proof of instances of past discrimination*." *Opin*. at *12 (emphasis supplied). It is undisputed that Houston identified no specific instances of past discrimination.

This Court applied what it believed was the *Harvard/Callais* standard here because it felt unconstrained to do so. "Having considered the record in this case

and applicable law*, the Court finds no binding or persuasive authority precluding the Court from applying the Supreme Court's framework established in Harvard in the present instance*." *Id*. (emphasis supplied). This Court, however, was mistaken: there is clear, controlling authority, including from the Supreme Court and Fifth Circuit, that this Court overlooked or mistakenly discounted that would bar *Harvard/Callais's* ostensible mandate that Houston show specific instances of its past discrimination to support the racial component of its program. Instead, under controlling Supreme Court and well-established Fifth Circuit authority interpreting it, authority mirrored in virtually every other circuit, Houston is *not* required effectively to incriminate itself to support the racial component of its program. Instead, as an *equally probative* alternative, it may provide the specific statistical evidence of existing discrimination in its contracting that Houston provided through its MGT Study and that this Court summarily rejected.

Had this Court applied controlling standards of proof, it would have held that the MGT Study meets those standards and that Houston's MWSBE Program is constitutional. Houston, therefore, respectfully requests that this Court 1) withdraw its July 28, 2026, judgment and opinion; 2) evaluate Houston's MGT Study under the proper standards; and 3) enter a take-noting judgment for Houston, and issue a new opinion holding the racial component of Houston's MWSBE Program constitutional.

## MOTION TO ALTER OR AMEND THE JUDGMENT

### I. RULE 59(E) STANDARDS

Federal circuit courts have identified four grounds for granting a Rule 59(e) motion, two of which apply here: a court may alter or amend a judgment to correct a clear error of law or fact *or* to prevent manifest injustice, which requires clear and certain prejudice to the moving party that is fundamentally unfair in light of governing law. Houston meets both of those standards.

First, as demonstrated below, this Court made a clear error of law. It both read *Harvard* and *Callais* as too restrictive, improperly discarded governing Supreme Court case authority, on which the *Harvard* opinion repeatedly relied, and overlooked binding Fifth Circuit authority that allows Houston to submit *and prevail* with the proof of compelling interest it offered.

Second, it would be fundamentally unfair and clearly and certainly prejudicial to Houston to refuse to consider a study that long-standing governing law expressly permits it successfully to submit to support its MWSBE program. Moreover, because this is a case of first impression and one that may be relied upon by cities, not just in Southern District of Texas, but potentially around the country, it would be manifestly unjust for this Court to announce an incorrect, overly-restrictive standard or hold Houston alone to it.

## II. The Supreme Court's Decisions in *Shaw* and *Croson* and Their Fifth Circuit Progeny Still Govern Here and Expressly Reject Any Alleged Requirement That Cities Incriminate Themselves Regarding Past Discrimination to Support Race-Conscious Programs

Because Houston's MWSBE program utilizes a racial classification that would likely otherwise be prohibited by the Fourteenth Amendment, that program is subject to strict judicial scrutiny. Strict scrutiny is a demanding standard, but it is not an impossible one. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). Houston's MWSBE program can withstand strict scrutiny if it is justified by a compelling governmental interest and if it is narrowly tailored to meet that interest. *See id.* If Houston makes that showing, the burden "shifts back to the Plaintiff[s] to prove unconstitutionality." *Kossman Contracting, Co. v. City of Houston*, No. CV H-14-1203, 2016 WL 11473826, at *17 (S.D. Tex. Feb. 17, 2016) (adopting the Seventh Circuit process, citing *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000)). It may do so by introducing credible, particularized evidence to rebut Houston's initial showing of a compelling interest. *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 241-42 (4th Cir. 2010). In this regard, a plaintiff may "offer a neutral explanation for the [City's] evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable." *Id.* at 242. But "mere speculation that [Houston's] evidence is insufficient or methodologically flawed does not suffice

to rebut [Houston's] showing." *Id.*

The central issue here then is how Houston can successfully make the required showing of a compelling interest. Unfortunately, this Court mistakenly imposed a too-restrictive standard of proof here and, as a result, rejected long-accepted evidence of Houston's compelling interest.

### A. The Supreme Court, in *Harvard* and *Callais*, Relied Upon, Rather than Effectively Overruled, its Prior Contracting Discrimination Decision in *Croson* and Did Not Announce a New, More Restrictive Standard of Proof of Compelling Interest

By Harvard's own admission, its challenged, race-conscious, student admission policies and practices did not involve any effort by the school to remedy past discrimination. Instead, they were aspirational: "Harvard identifies the following educational benefits that it is pursuing: (1) 'training future leaders in the public and private sectors'; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *Harvard*, 600 U.S. at 214. The Supreme Court, however, found that these goals were not "'sufficiently measurable to permit judicial [review] under the rubric of strict scrutiny.'" *Id*. at 214 (citing *Fisher v. University of Tex. at Austin*, 579 U.S. 365, 381 (2016)). In addition, all defendants conceded that their respective admissions program effectively had no end point. *Id*. at 225.

Relying repeatedly on *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989) ("*Croson*"), the *Harvard* Court held that merely attempting to remedy "past *societal* discrimination" was insufficient to pass strict scrutiny. *Harvard,* 600 U.S. at 227 (emphasis supplied). After criticizing the dissenters for failing to cite *Croson*, *id*., the Court concluded that both programs [Harvard's and UNC's] violated the Equal Protection Clause because they "[l]ack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id*. at 230.

At no point in the *Harvard* decision did the Court require that an organization or governmental entity admit to specific acts of past discrimination as the *only* means to justify an affirmative-action program. Instead, in referencing "remediating specific, identified instances of past discrimination that violated the Constitution or statute," *id.* at 207, the Supreme Court cited its own decision in *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("*Shaw*"), which describes in detail the kind of proof that may be offered to meet the demands of strict scrutiny when the goal is to ameliorate the effects of past or current discrimination:

> A State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions. *Croson*, 488 U.S., at 498–506. For that interest to

> rise to the level of a compelling state interest, it must satisfy two conditions. First, the discrimination must be 'identified discrimination.' *Id.*, at 499, 500, 505, 507, 509. 'While the States and their subdivisions may take remedial action when they possess evidence' of past or present discrimination, 'they must identify that discrimination, public or private, *with some specificity* before they may use race-conscious relief.' *Id.*, at 504. *A generalized assertion of past discrimination in a particular industry or region is not adequate* because it 'provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.' *Id.* at 498 (opinion of O'Connor, J.). Accordingly, *an effort to alleviate the effects of societal discrimination is not a compelling interest*. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274–275, 276, 288 (1986). Second, the institution that makes the racial distinction must have had a '*strong basis in evidence*' to conclude that remedial action was necessary, "before it embarks on an affirmative-action program," 476 U.S. at 277 (plurality opinion).

*Id*. (emphasis supplied). As demonstrated below, this is also the standard reaffirmed in *Croson*.

Nothing in *Callais* changes this standard for cases not brought under the Voting Rights Act. Indeed, the *Callais* Court cites *Harvard*, then quotes *Croson* and *Shaw* for the same standard. *See Callais*, 146 S. Ct. at 1152-53. Nevertheless, the Supreme Court found that Louisiana's newly-drawn congressional maps were not unconstitutional under an "updated *Gingles* framework," a proof standard specifically applicable to congressional maps. The only portion of that standard that is arguably relevant here is its requirement that the proof focus on "current conditions" and not merely long-past discrimination. *Id*. at 1162.

This Court was, therefore, mistaken in assuming that *Harvard* and *Callais* somehow announced a new, more restrictive standard for race-conscious programs to survive strict scrutiny and that this Court was, therefore, free to ignore *Shaw* and *Croson* and their progeny in applying it. *Opin*. at *11. Instead, the Supreme Court simply made clear that vague, unmeasurable goals and remedying generalized societal discrimination were not compelling interests that would survive strict scrutiny.

More important here, the Supreme Court by no means overruled *Croson*, *Shaw,* or the cases across the circuits that interpret them to allow the proof Houston provided here. Had it been the Supreme Court's goal to announce a new, more restrictive standard, it surely would have said so and expressly overruled *Croson*, *Shaw,* and the dozens of circuit opinions applying them. Instead, the Supreme Court repeatedly cited and applied *Croson* and *Shaw* with approval in *Harvard* and *Callais*. This Court was required to do the same.

### B. *Croson,* as Implemented by the Fifth Circuit in *Dean* and *Cannatella,* Specifically Rejects the Need for Cities to Self-Incriminate to Support Programs Like the Racial Component of Houston's MWSBE Program

The Supreme Court's decision in *Croson,* as implemented by the Fifth Circuit in in *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("*Dean*"), and *Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*

("*Cannatella*"), 100 F.3d 1159, 1167–68 (5th Cir. 1996), specifically reject the notion that Houston must admit acts of past discrimination to support the racial component of its MWSBE program. Because this Court was bound by such authority and imposed a requirement *Croson* and its progeny have specifically rejected, it erred in failing to utilize Houston's MGT Study to find the race-conscious component of Houston's MWSBE program constitutional.

### 1. Neither *Shaw, Croson,* Their Fifth Circuit Progeny, nor Decisions in Virtually All Other Circuits Mandate the Self-Incrimination this Court Required

*Croson* involved the same kind of program at issue in this case. Richmond adopted a Minority Business Utilization Plan requiring prime contractors to subcontract at least 30% of the dollar amount of each city construction contract to one or more minority business enterprises ("MBEs"). In evaluating that program, the Supreme Court noted that "[t]he *Wygant* plurality indicated that the Equal Protection Clause required 'some showing of prior discrimination by the governmental unit involved.'" *Croson*, 488 U.S. at 492 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986)). The Supreme Court found, however, that "there was no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors. *Id*. at 480. That fact, however, did not end the Court's inquiry.

Instead, the Supreme Court held that a city like Richmond, "[c]an use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment." It explained that "[i]f the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system." *Id*. at 492.

The Court held that Richmond had not met that standard because only study it offered had shown only that there was past discrimination in the "construction industry" generally. *Id*. at 498. The Court held that such as showing "[p]rovides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id*. "Reliance on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond is similarly misplaced." *Id*. at 501. Finally, the Supreme Court found that Richmond's program had "[n]o logical stopping point." *Id*. The Court concluded that such evidence did not provide Richmond with the "strong basis in evidence" for its conclusion that remedial action was necessary. *Id*. at 500. Although it clearly required greater specificity than Richmond had provided to uphold its program, the Supreme Court stopped well short of requiring Richmond to confess to specific instances of past

discrimination to support its program, as this Court has required.

In *Wygant*, Justice O'Connor explained the reason for not requiring a contemporaneous or antecedent finding of past discrimination as a constitutional prerequisite to a public employer's voluntary agreement to utilize an affirmative action plan.

> [t]he imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. This result would clearly be at odds with [the Supreme] Court's and Congress' consistent emphasis on 'the value of voluntary efforts to further the objectives of the law.' The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance.

476 U.S. at 290 (O'Connor, J., concurring).

In applying *Croson* and *Wygant* in *Cannatella*, 100 F.3d at 1167–68, the Fifth Circuit clearly stated that: "[*C*]*roson* does not require a city to incriminate itself by proving its own participation in past discrimination…" Instead, "[J]ustice O'Connor … require[d] a showing of at least passive involvement in past discrimination." *Id*. (citing *Croson*, 488 U.S. at 492). Similarly, in *Dean*, 438 F.3d at 455, the Fifth Circuit reaffirmed its decision in *Cannatella*, explaining:

> what we meant in *Police Ass'n* was that *the government need not incriminate itself with a formal finding of discrimination prior to using a race-conscious remedy*, but if the remedy is later challenged, a court

> must determine there was *a strong evidentiary basis* for its enactment. This approach is consistent with *pre-Croson* Supreme Court precedent. Thus, to the extent our prior decisions were unclear, we now clarify that *when a governmental unit employs a race-conscious remedy, it need not have already made a formal finding of past discrimination*. Nevertheless, if the remedy is later challenged, the reviewing court must ensure there was strong evidence of past discrimination warranting the remedy.

*Id*. (emphasis supplied). As demonstrated below, this is the standard Houston applied and met here.

Virtually every other circuit has a similar rule.[1] In *Howard v. McLucas,* 871 F.2d 1000, 1007 (11th Cir. 1989), for example, the Eleventh Circuit specifically

---

[1] *Midwest Fence Corp. v. United States Dep't of Transp.*, 840 F.3d 932, 945 (7th Cir. 2016), *cert. denied*, 582 U.S. 930 (2017) ("[t]o justify its program, USDOT does not need definitive proof of discrimination"); *H.B. Rowe Co.*, 615 F.3d at 241 (government entities are not required to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence"); *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver*, 321 F.3d 950 (10th Cir. 2003) ("[T]he Fourteenth Amendment does not require a court to make an ultimate judicial finding of discrimination before a municipality may take affirmative steps to eradicate discrimination"); *Aiken v. City of Memphis,* 37 F.3d 1155, 1162–63 (6th Cir. 1994) ("No formal finding of past discrimination by the government unit involved is necessary …."); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1565–66 (11th Cir. 1994) ("Although *Croson* requires that a public employer show strong evidence of discrimination when defending an affirmative action plan, the Supreme Court has never required that, before implementing affirmative action, the employer must have already proved that it has discriminated. On the contrary, formal findings of discrimination need neither precede nor accompany the adoption of affirmative action") (citing *Wygant,* 476 U.S. at 286 (O'Connor, J., concurring) (rejecting any formal findings requirement)) (emphasis supplied); *id.* at 305 (Marshall, J., dissenting, joined by Brennan and Blackmun, JJ.) (stating that "[t]he Court is correct to recognize, as it does at least implicitly today, that formal findings of past discrimination are not a necessary predicate to the adoption of affirmative-action policies"); *id.* at 313 (Stevens, J., dissenting) (arguing that a showing of past discrimination is not necessary to finding a compelling interest in racial classifications with purely prospective effect)); *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1539 (11th Cir. 1994) (explaining that the government "was not required to make *formal findings* about its own past discrimination—it merely had to have a strong basis in evidence") (emphasis in original); *Contractors Ass'n v. City of Philadelphia,* 6 F.3d 990, 1004 (3d Cir. 1993) (noting that federal courts have admitted evidence that supports

rejected the intervening white employees' argument "that a showing of past discrimination must precede the implementation of the promotional relief and that this showing may be made only through the employer's own admittance of such discrimination or through a judicial finding of past discrimination."

### 2. Instead, the Supreme Court, Fifth Circuit, and Other Circuits Permit Cities to Utilize the Specific Statistical Evidence Houston Provided to Show a Compelling Interest

In *W.H. Scott Const. Co., Inc. v. City of Jackson, Miss.*, 199 F.3d 206, 218 (5th Cir. 1999), the Fifth Circuit identified the kind of evidence required to meet *Croson's* "compelling interest" standard. It first quoted *Croson* for the notion that: "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's

affirmative action, even when that evidence was developed after the affirmative action plan); *Brunet v. City of Columbus*, 1 F.3d 390, 406 (6th Cir. 1993) ("The Brunet plaintiffs are correct that a strong basis in evidence to support a public employer's affirmative action plan does not require a formal finding of past discrimination. Thus, less evidence is necessary to justify an affirmative action plan than is necessary to prevail on an individual or class action claim of intentional discrimination"); *Donaghy v. City of Omaha*, 933 F.2d 1448, 1459 (8th Cir. 1991) (formal findings of past discrimination need not precede a public employer's adoption of a remedial affirmative action plan); *see also Eng'g Contractors Ass'n of S. Florida Inc. v. Metro. Dade Cnty.,* 122 F.3d 895, 911 (11th Cir. 1997) ("With respect to the BBE program, most of the statistical evidence presented by the County is "post-enactment" evidence, *i.e.* evidence based on data related to years *following* the County's initial enactment of the BBE program in 1982. As we and a number of other circuits have held, the use of that kind of evidence is permissible"); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir. 1992) ("The law is plain that the constitutional sufficiency of a state's proffered reasons necessitating an affirmative action plan should be assessed on whatever evidence is presented, whether prior to or subsequent to the program's enactment").

prime contractors, an inference of discriminatory exclusion could arise." *Id*. at 218 (quoting *Croson*, 488 U.S. at 509). It added: "'Moreover, evidence of a pattern of individual discriminatory acts can, *if supported by appropriate statistical proof,* lend support to a local government's determination that broader remedial relief is justified.'" *Id*. (quoting *Croson*, 488 U.S. at 509) (emphasis in original). The *Scott* court then explained:

> Given *Croson's* emphasis on statistical evidence, other courts considering equal protection challenges to minority-participation programs have looked to disparity indices, or to computations of disparity percentages, in determining whether *Croson's* evidentiary burden is satisfied. *Disparity studies are probative evidence of discrimination because they ensure that the 'relevant statistical pool' of qualified minority contractors is being considered*.

*Scott*, 199 F.3d at 218 (quoting *Croson,* 488 U.S. at 501) (citing *Concrete Works*, 36 F.3d at 1526–27; *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 426 (D.C. Cir. 1992); *Assoc. Gen'l Contractors of California*, 950 F.2d at 1414; *Cone Corp. v. Hillsborough County, Fla*., 908 F.2d 908, 916 (11th Cir.1990)) (emphasis supplied).

The Fifth Circuit in *Dean*, 438 F.3d at 454, reaffirmed the probative value of *Croson's* statistical evidence when it noted that "[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facies proof of a pattern or practice of discrimination.'" *Id*. (quoting *Croson*, 488 U.S. at 501).

In *Aiken*, 37 F.3d at 1163, the Sixth Circuit attempted to flesh out exactly what kind of "strong" evidence of past discrimination would survive strict scrutiny, absent self-incrimination, specifically, whether the race-based promotions at issue were supported by a compelling interest. Citing *Croson*, it explained:

> It is settled that '*[a]ppropriate* statistical evidence setting forth a prima facie case of discrimination is sufficient to provide a strong basis in evidence to support a public employer['s] affirmative action plan.' As we explained in *United Black Firefighters,* 'appropriate' statistical evidence involves an examination of the racial composition of the qualified labor pool:
>
> The method generally used is to compare the minority percentage in the relevant statistical pool to the minority percentages in the group of persons selected for the positions at issue. The relevant statistical pool is comprised of all persons qualified for the position at issue. Roughly the same percentage of minorities observed in the relevant statistical pool should also be observed in the group of persons selected for the position at issue. Where a gross disparity exists between the expected percentage of minorities selected and the actual percentage of minorities selected, *then prima facie proof exists to demonstrate intentional discrimination in the selection of minorities to those particular positions. Such prima facie proof presents a strong basis in evidence to support a finding of a compelling governmental interest*.

*Id*. (citing *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1011 (6th Cir. 1992) (citations omitted)) (emphasis supplied).

Similarly, in *Concrete Works*, 321 F.3d at 958, the Tenth Circuit held that "Denver may rely on empirical evidence that demonstrates 'a significant statistical disparity between the number of qualified minority contractors ... and

the number of such contractors actually engaged by the locality or the locality's prime contractors.'" *Id.* (quoting *Croson*, 488 U.S. at 509 (plurality opinion)).

Courts in *this* judicial district have embraced similar requirements. In *Kossman Contracting,* 2016 WL 11473826, at *16, this Court held that:

> To justify remedial action based on passive participation, 'a governmental entity must establish a factual predicate, tying its set-aside percentage to identified injuries in the particular local industry." *W.H. Scott Constr. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999) (citing *Croson*, 488 U.S. at 499). '[A] *significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors' would support a finding that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities and would justify remedial action*. *Id.* at 218 (emphasis omitted) (quoting *Croson*, 488 U.S. at 509).

*Id*. (emphasis added). The Court explained, just as the *Scott* court had that:

> Given *Croson's* emphasis on statistical evidence, other courts considering equal protection challenges to minority-participation programs have looked to disparity indices, or to computations of disparity percentages, in determining whether *Croson's* evidentiary burden is satisfied. *Disparity studies are probative evidence of discrimination because they ensure that the 'relevant statistical pool' of qualified minority contractors is being considered*.

*Id*. (citations omitted) (quoting *Croson*, 488 U.S. at 501); *see Scott*, 199 F.3d at 218) (which includes the same quote from *Croson*).

In sum, rather than the one-size-fits-all self-incrimination rule this Court imposed, the Supreme Court, Fifth Circuit, and most other circuit courts have made plain that "the sufficiency of a municipality's findings of discrimination in

a local industry must be evaluated on a case-by-case basis. We note only that an emphasis on disparity studies is particularly relevant to the case at hand because the City contests the district court's treatment of its own study," as Houston does here. *Scott,* 199 F.3d 206, 218, n.11 (5th Cir. 1999).

### 3. This Court Thus Misapplied *Harvard* and *Callais,* Which Rely Upon *Croson* and *Shaw*

Citing *Harvard*, this Court required that Houston "identify concrete particularized discrimination and demonstrate that its use in race is necessary to remedy that discrimination" to support its MWSBE program but held that "Houston has not done so." *Opin*. at *13. The Court based its ruling on Houston's admission that it "[h]as not identified any specific constitutional or statutory violations related to its public contracting or procurement or awards in the last five years." *Id*. at *2. This Court explained: "The 2024 MGT Study—despite being written after the Supreme Court's *Harvard* decision—neither searched for nor found any specific, identified instances of past discrimination that violate the Constitution or a statute and is therefore inadequate to prove past intentional discrimination towards any racial or ethnic group granted a preference under Houston's ordinance." *Id.* at *12. This Court, therefore, viewed Houston's MGT Study as insufficient to demonstrate Houston's compelling interest in the program under what it assumed was the *Harvard*/*Callais* standard.

> Because Houston has failed to comply with the Supreme Court's framework in *Harvard* by failing to identify any specific instances of past discrimination that violated the Constitution or a statute, and because Houston has not proven that the racial classifications in its public contracting programs satisfy the demanding requirements of strict scrutiny generally, the Court finds that Plaintiffs have shown actual success on the merits…

*Id*. In so holding, this Court abrogated both the Supreme Court's governing decisions in *Shaw*, *Croson,* and the Fifth Circuit's governing decisions in *Cannatella* and *Dean*.

## III. As Set Forth in Houston's Motion for Summary Judgment,[2] Houston's MGT Study Demonstrates Its Compelling Interest in the Racial Component of its MWSBE Program

As demonstrated above, to show its compelling interest in remedying racial discrimination, Houston had to provide a "strong basis in evidence" that such remedial action is necessary. *Scott*, 199 F.3d at 217. Houston could carry this burden by providing "statistical evidence," including "disparity indices" and "computations of disparity percentages." *Scott*, 199 F.3d at 217. A study that reveals a "significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors [supports] an inference of discriminatory exclusion" sufficient

[2] These materials were included, in substantially the same form, in Houston's Motion for Summary Judgment, filed Nov. 30, 2024. They are attached here for the Court's convenience so that it will have a self-contained document.

to demonstrate a compelling interest. *Id.* at 218 (citing *Croson,* 488 U.S. at 509); *see also Dean*, 438 F.3d at 454 ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination'") (quoting *Croson*, 488 U.S. at 501).

### A. Houston's MGT Study Meets the *Croson/Shaw/Scott/Dean/ Cannatella* Test to Show Houston's Compelling Interest in the Racial Component of its MWSBE Program

In 2024, as required by its Code of Ordinances, Houston commissioned a rigorous study by MGT Consulting that provides both statistical and anecdotal evidence of racial discrimination in public contracting in Houston. *See* Hoyrd Decl. ¶¶ 9, 18; Hoyrd Decl., Exh. D (Executive Summary of MGT Study), at 5-6; Bernal Decl. ¶¶ 5-9. Specifically, the MGT Study demonstrates a substantial and statistically significant underutilization of available minority-owned businesses in public contracting in Houston and that Houston has been a passive participant in that discrimination. Hoyrd Decl., Exh. D (Executive Summary of MGT Study), at 5-6; Bernal Decl. ¶¶ 5-9; Exh. B (MGT Study), at 82-88. The MGT Study thus provides a strong basis in the evidence for Houston's conclusion that remedial action is necessary to combat racial discrimination in its contracting. Such evidence, therefore, is more than sufficient, under *Croson*, *Shaw*, *Scott*, *Dean*, and *Cannatella*, to support Houston's compelling interest in

administering the racial component of its MWSBE program. By contrast, Plaintiffs did not provide any expert testimony or other credible or particularized evidence to rebut Houston's showing.

Consequently, had it utilized the correct, applicable standards of proof here, this Court would have concluded that Houston has a compelling interest in administering its MWSBE program.

First, the MGT Study shows substantial and statistically significant underutilization of minority-owned businesses *specifically in city contracting*. Statistical analysis reveals that while MBEs represented 25.75% of available contractors, their utilization across all procurement categories was disproportionately lower at 22.24%, which is considered a statistically significant underutilization of minority firms. Bernal Decl. ¶¶5-9, Exh. B (MGT Study), at 82. For example, Black American-owned firms constituted 7.70 % of available, qualified firms but they received only 5.55 % of all contract spending, resulting in a disparity index of 72.05—well below the threshold of 80 at which point discrimination is understood to be shown. Bernal Decl., Exh. B (MGT Study), at 82.

The MGT Study's disparity indices consistently reflect substantial and statistically significant underutilization of available minority firms, which confirms the persistence of racial discrimination in Houston city contracting.

Bernal Decl. ¶¶ 5–9. In professional services contracts, for example, Black American-owned firms experienced particularly severe underutilization, with a disparity index of 52.04 (14.55 % availability; 7.57 % utilization). Bernal Decl., Exh. B (MGT Study), at 84. Native American firms had an even more severe underutilization rate, resulting in a disparity index of just 6.71 (2.65% availability; 0.18% utilization). *Id*.

The "other services" category—the category in which Landscape competes for contracts—revealed similar patterns: Black American firms had a disparity index of 72 (9.30 % availability; 6.76 % utilization), and Asian-American firms registered a 67.64 disparity index (5.61 % availability; 3.80 % utilization). *Id*. at 85. MBEs in the "other services" category represented 33.71% of available firms but only 23.02% of utilized businesses, resulting in an overall disparity index of 68.30, reflecting a substantial and statistically significant underutilization for all minority firms in this procurement category. *Id*.

In sum, the statistical significance of measured disparities indicates that the likelihood of these patterns occurring by chance is negligible. Consequently, such analyses support a strong inference that the measured disparities are the result of discrimination. *Id*. at 88; Bernal Decl. ¶¶ 5–9.

The MGT Study also discusses anecdotal evidence of specific incidents of discrimination to supplement the statistical analyses. Bernal Decl. ¶ 7, Exh. B

(MGT Study), at 129–142. Courts may consider anecdotal evidence in conjunction with statistical evidence to show discrimination. *See, e.g.*, *H. B. Rowe*, 615 F.3d at 249; *Concrete Works*, 321 F.3d at 989; *Midwest Fence v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705 (N.D. Ill. 2015), *aff'd,* 840 F.3d 932, 945 (7th Cir. 2016), *cert. denied*, 582 U.S. 930 (2017).

Houston's MGT Study also collected anecdotal evidence that underscored the challenges and discriminatory practices faced by minority-owned businesses in city contracting. Bernal Decl. ¶ 7, Exh. B (MGT Study), at 129–142. Business owners reported encountering barriers that hindered their ability to compete for city contracts, including perceptions of favoritism in contract awards, a lack of transparency in procurement processes, and challenges accessing informal business networks. Bernal Decl., Exh. B (MGT Study), at 136–142. Participants in interviews and focus groups highlighted specific examples of discriminatory treatment, such as being excluded from bidding opportunities due to restrictive requirements or preferences for established, non-minority firms. *Id*. at 135–36. MBEs also described difficulties securing financing and bonding, which disproportionately affected their ability to participate in large-scale projects. *Id*. at 136. These challenges were compounded by a lack of mentorship and support, as well as insufficient outreach from Houston city agencies to minority-owned firms. *Id*.

The MGT Study reached conclusions similar to those in prior studies, including Houston's 2006 and 2012 studies, regarding significant disparities faced by MBEs. Bernal Decl. ¶ 9; Hoyrd Decl., Exh. E (2006 Study), at 7-1–7-31, 8-2–8-8; Hoyrd Decl., Exh. F (2012 Study), at 9. In all studies, MBEs were underutilized in Houston city contracting compared to their availability in the relevant marketplace. Bernal Decl. ¶ 9. In the 2006 Study, for example, for prime construction contracts under $500,000, African-American, Hispanic-American, and Asian-American businesses were notably underrepresented relative to their availability in that market. Hoyrd. Decl., Exh. E (2006 Study), at 7-4–7-5. African-American businesses constituted 16.06% of available firms but received just 6.95% of contract dollars, and Asian-American businesses, representing 3.96% of firms, received none of the contracts—both of which are statistically significant disparities. *Id.*

Similarly, in goods and other services contracts under $500,000, MBEs, including Hispanic Americans and Asian Americans, faced statistically significant underutilization. *Id.* at 7-13–7-14. While Hispanic-American businesses made up 8.65% of available firms, they received only 2.91% of city contracts. *Id.* Asian American businesses experienced an even more pronounced gap, with 4.65% availability but only 0.45% utilization. *Id.* at 7-15.

Houston's 2012 Study focused exclusively on construction contracts but also revealed comparable disparities. Bernal Decl. ¶ 9; Hoyrd Decl., Exh. F (2012 Study), at 9, 13. Like the 2024 MGT Study, the 2006 and 2012 studies underscore the substantial barriers to participation in Houston city contracting that remain for MBEs. Bernal Decl. ¶ 9.2.

### B. The MGT Study Also Shows That Houston Has Been a Passive Participant in Racial Discrimination in Public Contracting In Houston

The MGT Study also shows that Houston has been a passive participant in racial discrimination in public contracting in Houston. By showing the persistence of substantial and statistically significant underutilization of minority firms in Houston city contracting, the MGT Study carries Houston's burden of demonstrating that there is racial discrimination in Houston contracting and that Houston is at least a passive participant in that discrimination.

Under governing authority, a rigorous study with statistical and anecdotal evidence, like the one conducted by MGT here, satisfies Houston's requirement to show empirical evidence of specific, intentional episodes of government-linked discrimination, as distinguished from general social disparities. The 2006 and 2012 studies are similarly rigorous and provide the needed empirical evidence in support of Houston's compelling interest. Indeed, in prior cases in

which it was held that a state or local government lacked a compelling interest in a remedial contracting program, the government either did not conduct a study, *see e.g.*, *Croson*, 488 U.S. at 505; *Scott*, 199 F.3d at 218-19, or its study was compromised by an improper gauge of minority contractor availability, *see, e.g.*, *Assoc. Gen'l Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000) ("[T]he data does not distinguish minority construction contractors from minority businesses generally . . . ."). But when a city conducts a rigorous study that reveals the sharp disparities evident in the MGT Study, as well as in the 2006 and 2012 studies, courts ordinarily find a compelling interest. *See, e.g., Concrete Works,* 321 F.3d at 979-80; *H.B. Rowe*, 615 F.3d at 254-55; *Kossman*, 2016 WL 11473826, at *22.

Accordingly, this Court should conclude that Houston has carried its burden of showing a strong basis in evidence for its conclusion that the racial component of its MWSBE program is needed to remedy Houston's participation in racial discrimination in city contracting.

## IV. ALTHOUGH THIS COURT DID NOT REACH THIS ISSUE, HOUSTON'S MWSBE PROGRAM IS NARROWLY TAILORED AND HAS A DEFINITE END POINT

Although this Court never reached the issue because of its decision on Houston's compelling interest, strict scrutiny analysis also requires that Houston

show that its program to remediate race discrimination is narrowly tailored to address that harm. It can clearly do so.

To determine whether a race-based measure is narrowly tailored to achieve its purpose, courts use the factors articulated by the Supreme Court in *United States v. Paradise,* 480 U.S. 149, 171 (1987): (1) the efficacy of alternative (race-neutral) remedies; (2) the flexibility and duration of the program, including the availability of waiver provisions, (3) the relationship of the numerical goals to the relevant labor market; (4) the impact of the program on the rights of third parties. Courts may also assess whether a program is overinclusive or underinclusive. *Croson*, 488 U.S. at 506. As shown below, Houston's MWSBE program is narrowly tailored to its compelling interest in remedying Houston's active and/or passive participation in racial discrimination in public contracting in Houston.

In their prior briefing, Plaintiffs have implied that the U.S. Supreme Court's recent decision in *Harvard* has somehow modified the factors used to determine whether a race-based measure is narrowly tailored. It did not. Instead, the factors the *Harvard* Court applied overlap closely with the *Paradise* factors, strongly suggesting that the Court did not intend to change this legal framework. The Supreme Court surely would have stated it clearly if it had intended to overturn this time-tested framework and announce a new standard.

Instead, the Court's opinion in *Harvard* held only that the affirmative action programs invalidated ran afoul of existing Equal Protection precedents.

Yet, even if *Harvard* could be viewed as modifying or expanding the narrow tailoring component of the strict scrutiny analysis, Houston's MWSBE program would still survive such scrutiny. *Harvard* focused on whether the challenged program (1) was over- or under- inclusive, (2) utilized stereotypes, or otherwise operated "as a negative," and (3) had a logical endpoint. 600 U.S. at 212, 216, 228. Houston's MWSBE program easily meets both the *Harvard* and *Paradise* factors.

**Faced with persistent racial disparities in its contracting, Houston uses race-neutral remedies to combat discrimination.** Although Houston also utilizes a myriad of race-neutral measures to combat discrimination in its public contracting, it still faces persistent racial discrimination in its contracting. For example, Houston has a "Hire Houston First" program designed to help local small businesses win city contracts regardless of race. *See* Hoyrd Decl., Exh. B MWSBE Policies and Procedures), at 17-20; *see* Houston, Tex., *Code of Ordinances*, Ch. 15, art. XI, §§ 15-175, *et. seq*. (July 1, 2013) (establishing the program).

Moreover, based on a recommendation from the MGT Study, Houston has expanded the ability of small business enterprises ("SBEs") to substitute for

MBEs across all procurement categories, as well as to create a new certification for veteran-owned businesses. *See* Hoyrd Decl., at ¶¶ 20-21; Trial Tr. 103:6-10 (Dec. 2, 2025); Doc. No. 102-1 at 68-72, 75-78. Houston's ability and that of its prime contractors to substitute small businesses or veteran-owned businesses for minority-owned businesses in meeting contract goals is a critical race-neutral measure that will now be available for virtually all Houston city contracts. *See id*.

**Houston's program is also narrowly tailored because it is flexible** and responsive to the various circumstances of each contract and to situations that arise that may make it difficult to meet MBE participation goals. Houston's program allows for waiver or adjustment of goals when circumstances indicate that such action is appropriate. Hoyrd Decl. ¶¶ 11–13, 16–17. Houston also has a "good faith efforts" policy under which a prime contractor can explain that it tried to meet contract goals but was unable to do so due to circumstances beyond its control. *Id*. at ¶¶ 11–14, 16–17; Hoyrd Decl., Exh. C (Good Faith Efforts Policy), at 1–5; *see Croson*, 488 U.S. at 478–79 (challenged program was inflexible where city did not permit waiver of set-aside except in exceptional circumstances).

**Houston's MWSBE programs goals are tailored to remedy identified discrimination and are set for each contract based on the availability of MBEs**

**for each code involved for each portion of the contract**. Unlike *Croson*, where the goal of the challenged program was inflexible and chosen arbitrarily, Houston's MWSBE program's participation goals are tailored to statistical evidence of underutilization of MBEs by procurement category. Hoyrd Decl. ¶ 8; Bernal Decl. ¶ 9. Specifically, Houston tailors its MWSBE participation goals on a contract-by-contract basis, considering the divisibility of the work elements involved in the particular contract and the availability of MBEs for each portion of the contract by North American Industry Classification System[3] ("NAICS") code. Hoyrd Decl. ¶ 10.

**Other parties—including Plaintiffs—are not negatively affected by Houston's MWSBE program, which does not stereotype minority groups**. Because Houston's MWSBE program is focused on remedying discrimination in public contracting, it does not utilize stereotypes. Instead, it promotes participation by minority-owned firms belonging to groups where the evidence proves underutilization. Hoyrd Decl. ¶ 8; Bernal Decl. ¶¶ 7, 9. Consequently, third parties are not harmed by the program. As discussed above, Plaintiffs have not and cannot show any harm from the program because they need to show

---

[3] According to the General Services Administration website, NAICS is the standard the U.S. federal government uses to classify businesses by industry. Each code has six digits, and every federal solicitation is tagged with one. Businesses can hold more than one NAICS code. *See* https://www.gsascheduleservices.com/blog/naics-codes-construction-contractors/.

only good faith efforts to meet contract goals and, in any event, they have never been penalized for failing to make such a showing.

Moreover, the program does not create an uneven playing field for non-minority firms because all firms are required to show good faith efforts for at least half of the stated contract goal. Hoyrd Decl. ¶¶ 13–17.

Finally, now that Houston's small business and veteran-owned business programs are fully implemented, all contractors will have a race-neutral method of fulfilling contract goals. Hoyrd Decl. ¶¶ 20–21. Prime contractors will be able to satisfy participation goals for any contract in any procurement category by hiring small businesses, veteran-owned businesses, and disabled owned businesses. Trial Tr. 103:6-10 (Dec. 2, 2025; Doc. No. 102-1 at 75-78. Accordingly, Houston's program does not negatively affect non-minority firms.

**Houston's MWSBE program is limited in duration and scope and has a logical end point**. The express terms of the ordinance creating Houston's MWSBE Program provides for periodic review every five years. Hoyrd Decl., Exh. A (Houston, Tex., *Code of Ordinances*, art. V, §§ 15-81, *et seq.*), at § 15-81(b). Specifically, article V, section 15 of Houston's Code of Ordinances, provides a definitive, statistically-based end point for its MWSBE program. It provides:

> (b) *This article is intended to be remedial in nature and to continue only until its purposes and objectives are achieved. At least every five years* the city shall make its best efforts to initiate a review of its minority and

> women business enterprise program, the results of which shall be provided to city council, who shall determine, upon its receipt of recommendations and the consideration of other relevant information from the OBO director, *whether there is strong statistical and anecdotal evidence of discrimination against minority and women business enterprises in city contracting warranting the continuation of a race and gender conscious minority and women business enterprise program*.

Exh. A (emphasis supplied). Periodic review ensures that the race-conscious elements of Houston's program do not last any longer than necessary to rectify the disparities identified. Houston's commissioning of the MGT Study and its anticipated adoption of race-neutral programs to promote small businesses and veterans-owned businesses in response to the MGT Study's findings is strong [and unrebutted] evidence of Houston's commitment to end its MWSBE program once its remedial goals have been met. Hoyrd Decl. ¶¶ 8, 9, 18–21; Hoyrd Decl., Exh. D (MGT Study Executive Summary), at 9–10.

Houston's program is also limited in scope, both geographically and economically, focusing on data from the local Houston metropolitan market and applying only locally. Unlike the situation in *Croson*, where the Court noted that firms from all over the country would be favored over local firms, Houston's program benefits local businesses because, to be certified as an MBE in Houston, the firm must be located in the Houston area. *See* Hoyrd Decl., Exh. A, at § 15-82; *accord Croson*, 488 U.S. at 481. Unlike the plan which did not pass muster in

*Croson*, Houston's MWSBE program is narrow in geographic, temporal, and economic scope.

**Houston's MWSBE Program is neither over- nor under- inclusive.** Houston's MWSBE program is neither over- nor under-inclusive because it only promotes participation by minority-owned firms for which Houston has evidence of underutilization. Bernal Decl. ¶ 7. The MGT Study and all prior studies Houston has commissioned employ the same census-data-based definitions of minority groups that are used in Houston's ordinance and associated policies and procedures, drawn from the U.S. Small Business Administration and typically used to evaluate racial disparities in contracting with a market area. Bernal Decl. ¶ 7, 9; Trial Tr. 130:6-9 (Dec. 2, 2025). The MGT Study, along with past studies, all document substantial and statistically significant underutilization of minority-owned firms with respect to each of the minority groups addressed by Houston's program. Bernal Decl. ¶ 7, 9. Like the minority contracting program in Denver upheld in *Concrete Works*, 321 F.3d at 970, Houston has provided evidence of discrimination for each of the racial minority groups addressed by the program.

## V. ALTHOUGH THIS COURT DID NOT REACH THIS ISSUE, PLAINTIFFS DID NOT EVEN TRY MEANINGFULLY TO REBUT HOUSTON'S EVIDENCE OF A COMPELLING INTEREST

As discussed above, once Houston made the required showing of compelling interest, Plaintiffs were required to rebut Houston's evidence with credible and particularized evidence of their own. *See, e.g.*, *Concrete Works*, 321 F.3d at 959 (quoting *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1175 (10th Cir.2000), *cert. dism'd as improvidently granted*, 122 S. Ct. 511 (2001)). They did not even try to do so.

Rebuttal evidence can consist of a neutral explanation for the statistical disparities. *Id*. Because Houston produced a rigorous disparity study, however, Plaintiffs were required to rebut that study by "(1) showing that the statistics are flawed; (2) demonstrating that the disparities shown by the statistics are not significant or actionable; or (3) presenting contrasting statistical data." *Id.*; *Eng'g Contractors Ass'n of S. Fla.*, 122 F.3d at 916 (same); *Contractors Ass'n of E. Pa., Inc. v. City of Phila.*, 6 F.3d 990, 1007 (3d Cir.1993) (same). As the Supreme Court has repeatedly reminded, however, "the ultimate burden remains with the [plaintiff] to demonstrate the unconstitutionality of an affirmative-action program." *Wygant*, 476 U.S. at 277–78 (plurality opinion).

Plaintiffs, however, failed to introduce either an expert report identifying substantive problems with Houston's study or their own competing study. Given their lack of any credible evidence, Plaintiffs fall far short of the efforts of even unsuccessful litigants in other cases challenging local government minority

contracting programs. *See, e.g.*, *Kossman,* 2016 WL 11473826, at *18-19 (explaining why plaintiffs' evidence did not discredit Houston's 2012 disparity study); *see also W. Tennessee Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 302 F. Supp. 2d 860, 864–65 (W.D. Tenn. 2004) ("Plaintiffs have produced arguments, and a supporting expert report, detailing missing data, incorrect calculations, and improper methodology in the disparity study"). Indeed, given their failure even to designate an expert within the discovery period, Plaintiffs here were prohibited by the Federal Rules of Civil Procedure from offering anything more than "general criticism" of Houston's MGT disparity study, which courts have said is "of little persuasive value." *Midwest Fence,* 84 F. Supp. 3d at 727; *see also Geyer Signal, Inc. v. Minn. Dep't of Transp.*, No. 11-321 (JRT/LIB), 2014 WL 1309092, at *15 (D. Minn. Mar. 31, 2014) ("[D]espite their apparent disagreement with the evidence presented by the [government] . . . Plaintiffs have failed to present affirmative evidence that no remedial action was necessary.").

Given Plaintiffs' failure to provide any credible and particularized evidence that could rebut Houston's MGT Study, this Court should have found that Houston has carried its burden to show a compelling interest in continued administration of the racial component of its MWSBE program.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Houston respectfully requests that this Court 1) withdraw and vacate its July 28, 2026, judgment and opinion, containing findings of fact, conclusions of law, and an order of permanent injunction; 2) evaluate Houston's MGT Study under the proper, governing standards set forth here; 3) enter a take-nothing judgment for Houston and an opinion, including Houston's requested findings of fact and conclusions of law, holding that the racial component of Houston's MWSBE program, the only part of that program challenged, is constitutional; and 4) order such further relief as to which Houston may be justly entitled. A proposed order is attached.

Respectfully submitted,

ARTURO G. MICHEL
City Attorney

By *[/s/Collyn A. Peddie]*
Collyn A. Peddie
City Solicitor General
State Bar No. 15707300
SD Tex. No. 843
collyn.peddie@houstontx.gov
Brian A. Amis
State Bar No. 24040424
SD Tex. No.37342
brian.amis@houstontx.gov
City Of Houston Legal Department
900 Bagby, 4th Floor
Houston, Texas 77002
Telephone: 832.393.6463
Facsimile: 832.393.6259

Ben Stephens
State Bar No. 2409842
SD Tex. No. 2898153
ben.stephens@huschblackwell.com
Sandy Hellums-Gomez
State Bar No. 24036750
SD Tex. No. 561314
sandy.gomez@huschblackwell.com
HUSCH BLACKWELL LLP
600 Travis Street, Suite 2350
Houston, Texas 77002
Telephone: 713.647.6800

*Attorneys for Defendant, the City of Houston*

## CERTIFICATE OF CONFERENCE

I certify that counsel for movant has conferred by email with counsel for Plaintiffs regarding the City's Motion to Alter or Amend this Court's Judgment and Opinion, both dated July 28, 2026, and counsel for Plaintiffs has confirmed their opposition to this motion and the relief sought therein.

*/s/Collyn A. Peddie*
Collyn A. Peddie

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2026, a true and correct copy of the foregoing has been served on counsel below via the CM/ECF Filing system.

Erin E. Wilcox, *Attorney-in-Charge*
ewilcox@pacificlegal.org
Joshua P. Thompson, *Of Counsel**
jthompson@pacificlegal.org
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

Laura D'Agostino, *Of Counsel**
ldagostino@pacificlegal.org
Dean McGee, *Of Counsel**
dmcgee@pacificlegal.org
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201

*Counsel for Plaintiffs*

Brett J. Sileo
bsileo@hhstxlaw.com
Britton B. Harris
bharris@hhstxlaw.com
Harris Hilburn P.L.L.C.
1111 Rosalie
Houston, Texas 77004

*Counsel for Midtown Management District*

*/s/Collyn A. Peddie*
Collyn A. Peddie